Nos. 25-6970, 25-6980

# United States Court of Appeals
# for the Ninth Circuit

HELEN ROE, A MINOR, BY AND THROUGH HER PARENT AND NEXT FRIEND MEGAN ROE, ET AL.,

*Plaintiffs-Appellees,*

—v.—

DEBORAH JOHNSTON, IN HER OFFICIAL CAPACITY,

*Defendant-Appellant,*

—v.—

WARREN PETERSON, PRESIDENT OF THE ARIZONA STATE SENATE; STEVE MONTENEGRO, SPEAKER OF THE ARIZONA HOUSE OF REPRESENTATIVES,

*Intervenors-Defendants-Appellants.*

On Appeal from the United States District Court
for the District of Arizona, Case No. 4:20-CV-00484 (Soto, J.)

## ANSWERING BRIEF FOR PLAINTIFFS-APPELLEES

KYLE C. WONG
COOLEY LLP
3 Embarcadero Center, 20th Floor
San Francisco, CA 94111
(415) 693-6000
kwong@cooley.com

PATRICK J. HAYDEN
COOLEY LLP
55 Hudson Yards
New York, NY 10001
(212) 479-6000
phayden@cooley.com

RACHEL H. BERG
KELLY JO POPKIN
NATIONAL CENTER FOR LGBTQ RIGHTS
1401 21st Street, No. 11548
Sacramento, CA 95811
(415) 343-7679
rberg@nclrights.org
kpopkin@nclrights.org

MARY O'GRADY
PAYSLIE BOWMAN
OSBORN MALEDON, P.A.
2929 North Central Avenue, 21st Floor
Phoenix, AZ 85012
(602) 640-9000

*Counsel for Plaintiffs-Appellees*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Plaintiffs-Appellees certify that no Plaintiff-Appellee has a parent corporation and that no publicly held company owns 10% or greater ownership in any Plaintiff-Appellee.

Date:  March 13, 2026

*/s/ Rachel H. Berg*
Rachel H. Berg

i

# TABLE OF CONTENTS

INTRODUCTION .......................................................................................1

CONSTITUTIONAL AND STATUTORY AUTHORITIES ......................5

STATEMENT OF THE CASE ................................................................6

I. GENDER IDENTITY AND GENDER DYSPHORIA .....................6

II. THE IMPORTANCE OF ACCURATE IDENTITY DOCUMENTS FOR TRANSGENDER PEOPLE .......................................................8

III. ARIZONA VITAL STATISTICS RECORDS LAWS .....................10

    A. Corrections (A.R.S. § 36-323(C)) ...............................................11

    B. Amendments (A.R.S. § 36-337(A)(3)) .....................................12

    C. Court Orders (A.R.S. § 36-337(A)(4)) .....................................14

IV. NAMED PLAINTIFFS .....................................................................16

V. PROCEDURAL HISTORY ................................................................18

    A. The Complaint and Motion to Dismiss .................................18

    B. Summary Judgment ...............................................................19

    C. The Permanent Injunction ...................................................22

    D. The Motion to Intervene and this Appeal ............................23

SUMMARY OF THE ARGUMENT ........................................................24

STANDARD OF REVIEW .....................................................................26

ARGUMENT ...........................................................................................27

I. THE SURGICAL REQUIREMENT VIOLATES EQUAL PROTECTION. ..................................................................................27

    A. The Surgical Requirement Discriminates on the Basis of Transgender Status. ...............................................................27

        1. The Surgical Requirement Is Not "Facially Neutral." 28

# TABLE OF CONTENTS
(continued)

2.      A Discriminatory Purpose Is Not Required. ................ 32

3.      *Skrmetti* Does Not Apply. ........................................... 32

B.      The Surgical Requirement Fails Heightened Scrutiny. ........ 35

1.      The Asserted Interests in Preserving Accurate Records Does Not Justify the Surgical Requirement. ............... 36

2.      The Surgical Requirement Is Not Substantially Related to an Interest in Preventing Fraud. ............................ 40

3.      Intervenors' Newly Asserted Interests in Stability, Reliability, and Costs Related to Records Are Unpersuasive. ............................................................. 40

4.      The Government Speech Doctrine Does Not Apply. ... 43

C.      The Surgical Requirement Fails Rational Basis Review. .... 45

II.      THE SURGICAL REQUIREMENT VIOLATES DUE PROCESS. ................................................................................................ 46

A.      The Surgical Requirement Violates the Right to Privacy. ... 46

1.      Due Process Protects Plaintiffs' Right to Informational Privacy. ................................................................................ 46

2.      The Surgical Requirement Violates Plaintiffs' Right to Informational Privacy. ................................................... 51

B.      The Surgical Requirement Violates the Right to Individual Liberty and Autonomy. ....................................................... 55

C.      The Surgical Requirement Violates the Right to Choose Whether to Undergo a Particular Medical Treatment. ........ 58

D.      The Surgical Requirement Cannot Withstand Strict Scrutiny, and the Remaining Due Process Arguments Lack Merit. ................................................................................... 60

III.      SECTION (A)(4)'S COURT-ORDER PROCESS DOES NOT RENDER SECTION (A)(3) CONSTITUTIONAL. ......................... 63

iii

# TABLE OF CONTENTS
(continued)

IV.   THE PERMANENT INJUNCTION IS PROPER. .......................... 69

    A.   The Permanent Injunction Is Consistent with Legislative Intent. ................................................................................... 70

    B.   The District Court Did Not "Rewrite" Section (A)(3). .......... 72

    C.   The Permanent Injunction Does Not Violate Arizona's Unintelligibility Doctrine ...................................................... 74

V.   *PULLMAN* ABSTENTION DOES NOT APPLY. .......................... 74

CONCLUSION ........................................................................................ 77

iv

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*44 Liquormart, Inc. v. Rhode Island,*
  517 U.S. 484 (1996) ................................................................ 55

*ACLU of Arizona v. Arizona Dep't of Child Safety,*
  493 P.3d 885 (2021) ................................................................ 64

*Allegheny Cnty. v. Frank Mashuda Co.,*
  360 U.S. 185 (1959) ................................................................ 75

*Arroyo Gonzalez v. Rossello Nevares,*
  305 F. Supp. 3d 327 (D.P.R. 2018) .................................... 47, 56

*Ayotte v. Planned Parenthood of N. New England,*
  546 U.S. 320 (2006) ................................................................ 71

*Benson v. Terhune,*
  304 F.3d 874 (9th Cir. 2002) .................................................. 58

*Christian Legal Soc'y Chapter of the Univ. of California,*
  *Hastings Coll. Of the Law v. Martinez,*
  561 U.S. 661 (2010) ................................................................ 29

*City & Cnty. of San Francisco v. EPA,*
  604 U.S. 334 (2025) ................................................................ 64

*City of Cleburne, Tex. v. Cleburne Living Ctr.,*
  473 U.S. 432 (1985) ................................................................ 45

*Coleman v. Quaker Oats Co.,*
  232 F.3d 1271 (9th Cir. 2000) ................................................ 38

*Columbia Gas & Elec. Corp. v. American Fuel & Power Co.,*
  322 U.S. 379 (1944) ................................................................ 41

*Confederated Salish v. Simonich,*
  29 F.3d 1398 (9th Cir. 1994) .................................................. 75

v

# TABLE OF AUTHORITIES
## (continued)

*Coons v. Lew*,
762 F.3d 891 (9th Cir. 2014).................................................................58

*Corbitt v. Sec'y of the Alabama Law Enf't Agency*,
115 F.4th 1335 (11th Cir. 2024) .......................................................... 42

*Cruzan by Cruzan v. Dir., Missouri Dep't of Health*,
497 U.S. 261 (1990) .............................................................................58

*Doe v. City of New York*,
15 F.3d 264 (2d Cir. 1994) ...................................................................62

*Doe v. Lockwood*,
89 F.3d 833 (6th Cir. 1996).................................................................62

*eBay Inc. v. MercExchange, LLC*,
547 U.S. 388 (2006).............................................................................70

*Geduldig v. Aiello*,
417 U.S. 484 (1974).............................................................................35

*Gore v. Lee*,
107 F.4th 548 (6th Cir. 2024) ................................................. 38, 39, 54

*Hawaii Housing Authority v. Midkiff*,
467 U.S. 229 (1984).............................................................................76

*Hundley v. Aranas*,
No. 21-15757, 2023 WL 166421 (9th Cir. Jan. 12, 2023) ..................35

*Indiana Bureau of Motor Vehicles v. Simmons*,
233 N.E. 3d 1016 (Ind. App. 2024) .....................................................42

*Inscoe v. Ishee*,
915 S.E.2d 448 (N.C. Ct. App. 2025)...................................................30

*Jacques v. Macomber*,
No. 2:23-cv-0345, 2024 WL 4264009 (E.D. Cal. Sep. 23,
2024) ....................................................................................................47

# TABLE OF AUTHORITIES
(continued)

*Karnoski v. Trump,*
  926 F.3d 1180 (9th Cir. 2019)........................................................... 35

*L. F. v. Lake Wash. Sch. Dist. #414,*
  947 F.3d 621 (9th Cir. 2020) ............................................................ 26

*Latta v. Otter,*
  771 F.3d 456 (9th Cir. 2014) ............................................. 29, 32, 48, 49

*Loving v. Commonwealth of Virginia,*
  388 U.S. 1 (1967) ............................................................................. 50

*Lyng v. Castillo,*
  477 U.S. 635 (1986) ...................................................................... 42, 43

*Matthews v. Pennsylvania Life Ins.,*
  606 F. App'x 460 (10th Cir. 2015) ................................................... 31

*McLaughlin &. Swanson,*
  476 P.3d 336 (Ariz. Ct. App. 2020) .................................................. 68

*In re Michaela Lee R.,*
  756 A.2d 214 (Conn. 2000) ............................................................... 54

*Nat'l Fed'n of Indep. Bus. v. Sebelius,*
  567 U.S. 519 (2012) .......................................................................... 71

*Norman-Bloodsaw v. Lawrence Berkeley Lab'y,*
  135 F.3d 1260 (9th Cir. 1998) ....................................................... 46, 49

*Nyquist v. Mauclet,*
  432 U.S. 1 (1977) ............................................................................. 64

*Obergefell v. Hodges,*
  576 U.S. 644 (2015) .................................................. 43, 48, 50, 56, 57

*Ostergren v. Cuccinelli,*
  615 F.3d 263 (4th Cir. 2010) ........................................................... 54

# TABLE OF AUTHORITIES
(continued)

*P.B. v. Koch,*
  96 F.3d 1298 (9th Cir. 1996)................................................... 48

*Pac. Shores Props., LLC v. City of Newport Beach,*
  730 F.3d 1142 (9th Cir. 2013)............................................... 29

*Patel v. City of Los Angeles,*
  594 F. App'x 415 (9th Cir. 2015) ........................................ 75

*Pavan v. Smith,*
  582 U.S. 563 (2017) ................................................... 39, 44

*Pearl Inv. Co. v. City and Cnty. of San Francisco,*
  774 F.2d 1460 (9th Cir. 1985)............................................... 75

*People for the Ethical Treatment of Animals, Inc. v. Gittens,*
  414 F.3d 23 (D.C. Cir. 2005) ............................................. 45

*Perry v. Sindermann,*
  408 U.S. 593 (1972)........................................................ 55

*Pers. Adm'r of Mass. v. Feeney,*
  442 U.S. 256 (1979)........................................................ 28

*Phillips v. Martin Marietta Corp.,*
  400 U.S. 542 (1971) ....................................................... 34

*Pleasant Grove City, Utah v. Summum,*
  555 U.S. 460 (2009) ....................................................... 44

*Powell v. Schriver,*
  175 F.3d 107 (2d Cir. 1999) ............................................. 47

*Railroad Commission of Texas v. Pullman,*
  312 U.S. 496 (1941)....................................... 5, 26, 74, 75, 76

*Rakas v. Illinois,*
  439 U.S. 128 (1978)........................................................ 50

# TABLE OF AUTHORITIES
(continued)

*Ray v. McCloud,*
  507 F. Supp. 3d. 925 (S.D. Ohio 2020) ................................................. 62

*Riley v. St. Louis Cnty. of Mo.,*
  153 F.3d 627 (8th Cir. 1998) ................................................................. 62

*Roberts v. U.S. Jaycees,*
  468 U.S. 609 (1984) .............................................................................. 57

*Rochin v. People of California,*
  342 U.S. 165 (1952) .............................................................................. 50

*Russell v. Gregoire,*
  124 F.3d 1079 (9th Cir. 1997) .............................................................. 62

*San Antonio Indep. School Dist. v. Rodriguez,*
  411 U.S. 1 (1973) ............................................................................ 31, 55

*San Francisco Cnty. Democratic Cent. Comm. v. Eu,*
  826 F.2d 814 (9th Cir. 1987) ................................................................ 76

*Shurtleff v. City of Boston,*
  596 U.S. 243 (2022) .............................................................................. 44

*Smelt v. Cnty. of Orange,*
  447 F.3d 673 (9th Cir. 2006) ................................................................ 26

*Stavrianoudakis v. United States Fish & Wildlife Serv.,*
  108 F.4th 1128 (9th Cir. 2024) ....................................................... 59, 63

*Thorne v. City of El Segundo,*
  726 F.2d 459 (9th Cir. 1983) ................................................................ 51

*Tipsword v. Tipsword,*
  2013 WL 1320444 (Ariz. Ct. App. Apr. 2, 2013) ................................ 73

*Transgender L. Ctr. v. USCIS,*
  775 F. Supp. 3d 131 (D.D.C. 2025) ...................................................... 30

ix

# TABLE OF AUTHORITIES
(continued)

*Trump v. Orr,*
   146 S. Ct. 44 (2025)................................................................49

*Tucson Woman's Clinic v. Eden,*
   379 F.3d 531 (9th Cir. 2004).................................................51

*Turner v. Safley,*
   482 U.S. 78 (1987)................................................................50

*United States v. Skrmetti,*
   605 U.S. 495 (2025).......................................28, 32, 33, 34, 35

*United States v. Virginia,*
   518 U.S. 515 (1996)....................................................3, 36, 41

*United States v. Washington,*
   853 F.3d 946 (9th Cir. 2017).................................................26

*W. Va. State Bd. of Educ. v. Barnette,*
   319 U.S. 624 (1943)..............................................................50

*Ward v. Rock Against Racism,*
   491 U.S. 781 (1989)..............................................................68

*Wash. State Grange v. Wash. State Republican Party,*
   552 U.S. 442 (2008)..............................................................61

*Washington v. Glucksberg,*
   521 U.S. 702 (1997).......................................56, 57, 58, 60

*Whalen v. Roe,*
   429 U.S. 589 (1977)..............................................................47

*Wood v. Milyard,*
   566 U.S. 463 (2012)..............................................................41

*Zzyym v. Pompeo,*
   958 F.3d 1014 (10th Cir. 2020)..............................................30

# TABLE OF AUTHORITIES
(continued)

## Statutes and Regulations

Arizona Revised Statutes (A.R.S.)
§ 32-3230(A) ................................................................................ 8
§ 36-301 ............................................................................... 27, 34
§ 36-301(6) ........................................................................... 11, 65
§ 36-323(C) ......................................................... 10, 11, 27, 34, 65
§ 36-337(A)(3) ........................................ 1, 10, 12, 22, 27, 65, 70, 72
§ 36-337(A)(4) ............................................................ 11, 14, 25, 68

Ariz. Admin. Code
§ R9-19-207 ........................................................... 11, 27, 35, 65
§ R9-19-208(O) ............................................... 1, 12, 13, 22, 27, 70

## Other Authorities

Federal Rule of Civil Procedure
Rule 65(d) ................................................................................ 74

## INTRODUCTION

Birth certificates are critical identity documents. Having identity documents that correctly reflect one's identity is essential to an individual's ability to participate in our society. For example, lacking documentation that accurately reflects an individual's identity can jeopardize access to employment, education, housing, health care, banking, travel, and government services. For transgender people in particular, inaccurate birth certificates can also impede their clinical treatment and disclose to others that they are transgender, thereby exposing them to discrimination, harassment, and even violence.

Arizona law provides two different paths for individuals to change the sex listed on their birth certificates. If a non-transgender person has any need to change the sex listed on their birth certificate, the process is straightforward: they request a "correction," with a physician's letter attesting to their sex. But for transgender people, things work differently: they must request an amendment with a physician's written statement that they have "undergone a sex change operation." A.R.S. § 36-337(A)(3); *see* Ariz. Admin. Code § R9-19-208(O) (the "Surgical Requirement"). For transgender people, then, changing the sex listed on

their birth certificates through the private administrative process requires surgery.

Plaintiffs in this case are transgender individuals born in Arizona who seek to change the sex listed on their birth certificates but have not "undergone a sex change operation." Plaintiffs, like many transgender people, do not (and in some cases cannot) undergo surgery for any number of reasons—because surgery is medically inappropriate, too costly, or, for minors, illegal.

As the district court determined at summary judgment, the Surgical Requirement violates Plaintiffs' equal protection and due process rights. The law discriminates against transgender individuals—whereas non-transgender people may change the sex marker listed on their birth certificate (in the rare event they need to) through a "correction" and a doctor's letter attesting to their sex, transgender individuals must do more—they must provide evidence that they have "undergone a sex change operation." While ADHS and Intervenors call that distinction neutral, they provide no persuasive basis to question that the term "sex change operation" refers exclusively to transgender people—and for that reason, the Surgical Requirement applies only to

transgender people.

Classifications on the basis of transgender status are subject to heightened scrutiny, and neither ADHS nor Intervenors provides any "exceedingly persuasive justification" for that discrimination. *United States v. Virginia*, 518 U.S. 515, 531 (1996) (*VMI*). ADHS has claimed that Section (A)(3) serves two interests: preserving accurate historical records and preventing fraud. Neither justification holds up. As to the first, a birth certificate that does not reflect a transgender person's correct sex is *not* an accurate record at all, and in any event, ADHS already maintains the original birth certificate reflecting individual's birth sex. And as to the second, there is zero evidence to suggest any fraud or even risk of fraud related to the sex markers on birth certificates.

The district court's finding of a due process violation was also correct. The Surgical Requirement forces transgender individuals to disclose highly intimate and personal information about their identities—risking their physical safety in the process—and undergo medical treatment they do not want and, in some cases, cannot legally receive. The justifications offered by ADHS and Intervenors do not satisfy strict scrutiny.

3

To sidestep these constitutional problems, ADHS points to a *different* section of A.R.S. § 36-337—Section (A)(4), which permits amendment to birth certificates if an individual petitions a court to order ADHS to make a change. But Section (A)(4) is no cure: for years, ADHS claimed that Section (A)(4) did *not* permit courts to order the amendment of a transgender person's sex marker—proof of surgery was still required. And even if ADHS now takes a different position, Section (A)(4) remains a more costly, less confidential, and less reliable means of changing information in a birth certificate.

The district court's remedy was also proper. The district court properly entered a permanent injunction enjoining one word in the statute—"operation"—in two locations. That approach preserves as much of the statute as possible and comports with the legislature's intent at the time Section (A)(3) was enacted.

This Court should affirm.

## STATEMENT OF JURISDICTION

Plaintiffs agree with ADHS's and Intervenors' statement of jurisdiction.

## ISSUES PRESENTED

1.   Does the Surgical Requirement violate the Equal Protection

4

Clause because it discriminates on the basis of transgender status and cannot survive any level of review?

2. Does the Surgical Requirement violate the Due Process Clause because it infringes on Plaintiffs' right to privacy, right to individual liberty and autonomy, and right to refuse to undergo a particular medical treatment and cannot survive any level of review?

3. Does the mere possibility of obtaining a court order directing ADHS to amend a birth certificate pursuant to Section (A)(4) cure Section (A)(3)'s constitutional defects?

4. Did the district court act within its discretion in entering a permanent injunction that enjoined the enforcement of just one word—"operation"—in two locations in Section (A)(3) and implementing regulation?

5. Did the district court act within its discretion in declining to abstain from resolving the constitutional questions this case presents pursuant to the *Pullman* doctrine, where no state-law case could resolve Plaintiffs' constitutional claims?

## **CONSTITUTIONAL AND STATUTORY AUTHORITIES**

All applicable statutory authorities and constitutional provisions

are contained in ADHS's and Intervenors' Addendums.

## STATEMENT OF THE CASE

### I.     Gender Identity and Gender Dysphoria

When a child is born, a health care provider identifies the child's sex based on the child's observable anatomy.  2-DirectorER-96 ¶ 1.  In medical terminology, this provider-identified sex is often referred to as the person's "assigned sex."  2-DirectorER-96-97 ¶ 2.  "Gender identity" is the medical term for a person's internal, innate, and deeply held sense of their own gender.  2-DirectorER-97 ¶ 3.  There is a medical consensus that a person's gender identity has a significant biological foundation and is not subject to voluntary change.  2-DirectorER-97 ¶ 4.  Gender identity, like sexual orientation, is thus immutable.  2-DirectorER-97 ¶ 5.  For most people, gender identity matches their sex assigned at birth.  2-DirectorER-97 ¶ 6.

For a transgender person, however, that initial designation of sex at birth does not match the person's gender identity.  2-DirectorER-98 ¶ 7.  The discordance between one's gender identity and birth-assigned sex can cause what is known as gender dysphoria—a serious medical condition that, if left untreated, can cause severe health consequences,

6

including anxiety, depression, eating disorders, substance abuse, self-harm, and suicide. 2-DirectorER-98 ¶¶ 8-9. But when individuals with gender dysphoria receive appropriate medical care and support, they can and do thrive. 2-DirectorER-98 ¶ 10.

Major associations of medical and mental health providers in the United States, including the American Medical Association, the American Academy of Pediatrics, the American Psychiatric Association, and the American Psychological Association have adopted or endorsed standards of care for treating gender dysphoria. 2-DirectorER-98-99 ¶ 11. The goal of treatment is to allow transgender people to live consistently with their gender identities in all aspects of their lives. 2-DirectorER-99 ¶ 12.

The process of undergoing treatment for gender dysphoria is now commonly referred to as transition. 2-DirectorER-99 ¶ 13. The transition process typically includes one or more of the following three components: (i) social transition, including adopting a new name, pronouns, appearance, and clothing, and correcting identity documents; (ii) medical transition, including puberty-suppressing medication and hormone-replacement therapy; and, only for adults, (iii) surgeries to alter

7

the appearance and functioning of primary and secondary-sex characteristics.[1] 2-DirectorER-99 ¶ 14. Transition is highly individualized for each person. 2-DirectorER-99 ¶ 15. For a variety of reasons, not every transgender person undergoes surgical transition. *See, e.g.,* 1-SER-11 ¶ 30 ("Once a diagnosis of gender dysphoria is established, individualized treatment should be initiated."); 1-SER-18 ¶ 54 ("some medical complications [] preclude surgical treatment."); 1-SER-55 ¶ 35 (similar).

## II. The Importance of Accurate Identity Documents for Transgender People

Birth certificates are government-issued documents that people need to prove their identities in a wide variety of important situations, whether registering for school, securing employment, or obtaining other identity documents, such as driver's licenses and passports. 2-DirectorER-100 ¶ 17. But transgender people who cannot change the sex marker on their identity documents to accurately reflect their gender

---

[1] In Arizona, people younger than 18 years of age are not legally permitted to receive surgical treatment for gender dysphoria. *See* A.R.S. § 32-3230(A) ("A physician may not provide irreversible gender reassignment surgery to any individual who is under eighteen years of age.").

identity face a number of negative practical, social, and psychological consequences. 2-DirectorER-100-01 ¶ 18.

Transgender people may not, for instance, use their birth certificates to prove their identities. Indeed, a birth certificate containing a sex marker that visibly conflicts with a person's gender identity—as reflected by their physical appearance—may arouse suspicion as to whether they are the person identified by the document. 2-DirectorER-101 ¶ 19. In addition, birth certificates that reflect an incongruency between a person's gender identity and assigned sex risk disclosing a person's transgender status—highly personal information the person may not wish to disclose for fear of discrimination, harassment, or violence. 2-DirectorER-101-02 ¶ 20.

Those fears are well-founded: according to the 2015 U.S. Transgender Survey, nearly one in three transgender respondents "who . . . show[ed] an [identity document] with a name or gender that did not match their perceived gender were verbally harassed, denied benefits or service, or assaulted." 2-SER-279; 2-DirectorER-102-03 ¶ 22. On top of that, transgender people suffer from interference in the treatment of gender dysphoria—thereby exacerbating gender dysphoria and

9

distress—when they cannot safely and privately change the sex listed on their birth certificate. 2-DirectorER-103 ¶ 23.

In sum, denying birth certificates to transgender people that accurately reflect who they are stigmatizes transgender people, invades their privacy, releases their confidential medical information, and places them at risk for grave psychological and physical harm. 2-DirectorER-103-04 ¶ 24.

## III. Arizona Vital Statistics Records Laws

As the Director of the Arizona Department of Health Services (ADHS), Defendant Deborah Johnston is responsible for issuing and changing Arizona birth certificates. 2-DirectorER-104 ¶ 25. Under her direction, ADHS registers a birth certificate for every person born in the state that reflects, among other things, their sex. 2-DirectorER-104-05 ¶ 26.

Through a number of statutes and regulations, Arizona law provides three ways for individuals to change information on their birth certificates: (1) applying to ADHS for a "correction," A.R.S. § 36-323(C); (2) applying to ADHS for an "amendment," *id.* § 36-337(A)(3); or (3) petitioning a court for an order, then—if the court grants the petition—

10

applying to ADHS for an "amendment," *id.* § 36-337(A)(4). *See generally* 2-DirectorER-105-06 ¶ 27.

### A.    Corrections (A.R.S. § 36-323(C))

While the vast majority of non-transgender individuals born in Arizona will never need to change the sex markers on their birth certificates, Arizona law permits them to apply for a "correction" to their sex marker if it reflects a "typographical error." *See* A.R.S. § 36-323(C) (permitting "corrections" to birth certificates); *id.* § 36-301(6) (defining "correction" to mean correction of a "typographical error"); 2-ER-106-07 ¶ 29. To seek a "correction," individuals follow a private administrative process, which involves submitting a confidential request to ADHS. *See* Ariz. Admin. Code § R9-19-207 (implementing the correction process); 2-DirectorER-106 ¶ 30.

If a request to correct the sex listed on a birth certificate is made after 90 days of birth, the applicant must provide a medical record or a physician's letter that simply attests to their sex. Ariz. Admin. Code § R9-19-207(E)(4).[2] If ADHS grants the requested "correction," it seals

---

[2] If such a request is made within 90 days of birth, ADHS does not require the applicant to provide an evidentiary document attesting to their correct sex. Ariz. Admin. Code § R9-19-207(E)(4).

the record. 2-DirectorER-108 ¶ 33. Transgender individuals born in Arizona are not permitted to "correct" the sex listed on their birth certificates through this process. 2-DirectorER-108 ¶ 34; *see* 3-DirectorER-250 (ADHS representative testifying that ADHS would reject an application for such a correction).

### B.  Amendments (A.R.S. § 36-337(A)(3))

Transgender individuals born in Arizona seeking to change the sex listed on their birth certificate follow a different process, which governs applications for "amendments" to sex markers under Section (A)(3). A.R.S. § 36-337(A)(3). Under Section (A)(3) and its implementing regulation, Ariz. Admin. Code § R9-19-208(O), the state registrar must amend the sex listed in the birth certificate of an individual who "has undergone a sex change operation," provided the individual or their representative has submitted both (i) a "written request for an amended birth certificate, and (ii) a "written statement by a physician that verifies the sex change operation." A.R.S. § 36-337(A)(3).[3]

---

[3] Section (A)(3) also permits the amendment of birth certificates for an individual who has "a chromosomal count that establishes the sex of the person as different than in the registered birth certificate." A.R.S. § 36-337(A)(3). This provision of Section (A)(3) has not been challenged in this case, and it is not subject to the district court's injunction.

Under Section (A)(3)'s implementing regulation, transgender individuals born in Arizona who have had a surgical operation may submit a confidential application directly to ADHS and a letter from a physician attesting that they have undergone a "sex change operation." Ariz. Admin. Code § R9-19-208(O)(2)(a). If ADHS determines the application is complete, it must grant the "amendment," and the original birth certificate is then sealed and maintained. 2-DirectorER-110-11 ¶¶ 37-38; *see* 3-DirectorER-196-97 (testifying that ADHS always retains original birth certificate and never deletes or destroys it). Transgender individuals born in Arizona who have not had surgery, including those younger than 18 years of age, may not apply for an amendment using this private administrative process. 2-DirectorER-111 ¶ 39.

Neither Arizona law nor ADHS policy define the term "sex change operation." 2-DirectorER-111 ¶ 40. Rather, when determining whether to grant an amendment requested by a transgender individual born in Arizona, ADHS assesses whether the physician's letter contains language that "matches" Section (A)(3) or otherwise "indicate[s] a sex change operation." 2-DirectorER-112 ¶ 41. To make that assessment, ADHS may seek advice from its "administrative counsel," but it does not

13

consult with medical professionals or medical organizations. 2-DirectorER-112 ¶ 42.

### C. Court Orders (A.R.S. § 36-337(A)(4))

Finally, individuals born in Arizona may petition a court for changes to their birth certificate under A.R.S. § 36-337(A)(4). 2-DirectorER-113 ¶ 44. Section (A)(4)'s court-order process is not specifically designed for transgender people seeking to correct their birth certificates; instead, it is a general provision that authorizes Arizona courts to order ADHS to change any information on a birth certificate. 2-DirectorER-113 ¶ 45.

To comply with Section (A)(4), transgender individuals seeking to change the sex listed on their birth certificate must prepare a court petition, pay a fee, file it with the court, and are often required to appear in person in open court, thereby publicly disclosing their transgender status. If they wish their case to be confidential, they must prepare and file a separate motion to seal the documents—which a court is not obligated to grant. 2-DirectorER-113-14 ¶ 46. For transgender people, invasions of privacy of this nature exacerbate gender dysphoria. 2-DirectorER-114 ¶ 47. These burdens are compounded for transgender

14

individuals who were born in Arizona but now live in other states, as they may be legally or practically unable to file a petition in Arizona state court. 2-DirectorER-115-16 ¶ 49.

Unlike the "correction" and "amendment" process under Section (A)(3), the court-order process of Section (A)(4) provides no specific standards for when or why a court should grant a petition, including for transgender individuals. 2-DirectorER-116 ¶ 50. Indeed, despite its contrary statements in this appeal, ADHS has previously taken the public position that Arizona courts lack the authority under Section (A)(4) to issue orders amending the sex listed on an Arizona birth certificate unless the individual has undergone surgery, just as Section (A)(3) requires. 2-DirectorER-116-17 ¶ 51; 2-DirectorER-92 ¶ 2.

In light of ADHS's representations, Arizona courts considering a transgender person's request to change their birth marker pursuant to Section (A)(4) have imposed exactly the same surgery requirement as in Section (A)(3)—thus refusing to issue orders that would amend the sex listed on an Arizona birth certificate unless the individual has undergone surgery. 2-DirectorER-116-17 ¶ 51. Even if a court grants an individual's petition to amend the sex listed in a birth certificate, the individual must

15

file the court order with an application to ADHS to obtain an amended birth certificate. 2-DirectorER-117 ¶ 52.

## IV. Named Plaintiffs

Plaintiffs Helen Roe, James Poe, and Carl Voe (together, the "Named Plaintiffs") are transgender people, all younger than age eighteen, who were born in Arizona. 2-DirectorER-117 ¶ 53. Each has been diagnosed with gender dysphoria, and each has undergone appropriate, necessary steps to better align their body, appearance, and lived experience with their gender identity. 2-DirectorER-117-18 ¶¶ 54-55. Due to their age, they are not permitted under Arizona law to undergo surgery to treat their gender dysphoria. 2-DirectorER-118 ¶ 56. And they may never need surgery to alleviate their gender dysphoria. 2-DirectorER-118 ¶ 57.

Every time Named Plaintiffs have attempted to use inaccurate birth certificates, however, they risked disclosing private medical information and intensely personal aspects of their identities. They were thus faced with an impossible choice: risk disclosure to participate in normal childhood activities—including attending school and participating in extracurricular activities—or forgo participation

16

altogether. 2-DirectorER-118-19 ¶ 58. Either way, these individuals would suffer harm to their health, development, and well-being, which would limit their interest and ability to engage in those everyday activities. 2-DirectorER-118-19 ¶ 58.

To avoid these harms, Plaintiffs Helen Roe and James Poe, through their parents, petitioned for a court order under Section (A)(4). The Arizona state courts, however, denied both Helen's and James's petitions because—just as ADHS had publicly advocated—they found that the Surgical Requirement of Section (A)(3) would also apply under Section (A)(4). 2-DirectorER-119-20 ¶ 60. For example, when James's mother sought a court order directing the amendment of his birth certificate, the court refused, handing her a copy of Section (A)(3) and informing her that ADHS would not "honor" the order. 4-SER-819-20 at 83:19-84:6 (similar); 4-SER-830 at 94:14-25 (similar); 4-SER-971-73 at 103:6-105:14 (similar). Plaintiff Carl Voe's mother did not file a petition because she understood it would be denied without proof of a "sex change operation." 2-DirectorER-120 ¶ 61. As a result, each of the three Named Plaintiffs wished to apply for an amended birth certificate through the private administrative process ADHS provides, but each was prevented from

17

doing so.  2-DirectorER-120-21 ¶ 62.

Named Plaintiffs represent a class of all transgender individuals born in Arizona, now and in the future, who seek to change the sex listed on their birth certificates but have not undergone a "sex change operation."  1-DirectorER-25-26.

## V.  Procedural History

### A.  The Complaint and Motion to Dismiss

On November 4, 2020, Plaintiffs filed their initial complaint in this action, 5-DirectorER-717-38, which they amended on January 8, 2021, 4-DirectorER-677-710.  In their Amended Complaint, Plaintiffs claimed that the Surgical Requirement violates the Equal Protection Clause and the Due Process Clause right to privacy, right to individual liberty and autonomy, and the right to choose whether to undergo a particular medical treatment.  4-DirectorER-705-08.

ADHS moved to dismiss, and the district court denied the motion on August 5, 2021.  1-DirectorER-33-49.  The district court also granted Plaintiffs' motion for class certification, which certified the class described above.  1-DirectorER-25–32.  The parties proceeded to discovery, which proved extensive—consisting of numerous depositions

18

and the submission of expert reports in support of Plaintiffs' position, even though ADHS never responded with expert evidence of its own. *Compare* Dist. Ct. Dkt. 232 (Plaintiffs' motion), *with* Dist. Ct. Dkt. 233 (ADHS's motion). Although the parties may have disagreed about the interpretation or characterization of the evidence, 2-DirectorER-94; 2-DirectorER-95-124, the parties agreed that there were no material facts in dispute and cross-moved for summary judgment, 2-DirectorER-63; 2-DirectorER-75.

## B. Summary Judgment

On August 20, 2024, the district court granted Plaintiffs' motion for summary judgment on all claims and denied ADHS's cross-motion for summary judgment. 1-DirectorER-24.

*First,* the district court found that the Surgical Requirement violated the Equal Protection Clause. 1-DirectorER-18-20. It determined that, under "any logical reading," the Surgical Requirement discriminates against transgender individuals on its face—after all, "who else is going to voluntarily seek out a 'sex change operation'?" 1-DirectorER-20. The district court then determined that the Surgical Requirement did not survive rational basis review, let alone heightened

19

scrutiny, as discussed in further detail below. 1-DirectorER-24 n.10.

*Second,* the district court found that the Surgical Requirement violated due process. 1-DirectorER-21-22. The district court explained that Plaintiffs have a due process right to privacy, individual liberty and autonomy, and whether to undergo a particular medical treatment. 1-DirectorER-21. The district court found the Surgical Requirement infringed on those rights and was therefore subject to strict scrutiny. 1-DirectorER-21-22.

*Third,* in applying heightened scrutiny to Plaintiffs' equal protection claim and strict scrutiny to Plaintiffs' due process claims, the district court examined ADHS's asserted government interests in (1) preserving accurate records; and (2) preventing fraud. 1-DirectorER-23. The district court found that neither of these purported justifications survived rational basis review, let alone heightened or strict scrutiny. 1-DirectorER-24. As to the asserted interest in preserving records, the district court explained that this interest could not justify the requirement of a sex change operation to amend a birth certificate—after all, "ADHS still nonetheless maintains the original birth certificate," even if a birth certificate is amended. 1-DirectorER-23. As to the

asserted interest in accuracy, the district court found that requiring surgery would not ensure the accuracy of identification documents—if anything, it would do the opposite, as the birth certificates of transgender individuals would be "misleading and likely unhelpful in accurately verifying identity" if the individual follows medical recommendations and adopts their gender identity without surgery. *Id.* Finally, as to the supposed fraud-prevention rationale, the district court found that there had been "no showing of how changing a gender marker without a sex change operation would lead to more fraud." *Id.*

*Fourth*, the district court rejected ADHS's claim that Section (A)(4) cured any possible constitutional infirmity. 1-DirectorER-19. As the district court explained, the undisputed evidence confirmed that Section (A)(4) provided no alternative to the Surgical Requirement in Section (A)(3): Arizona courts had "imported the surgery requirement for amending the sex marker on an Arizona birth certificate, and if transgender individuals choose not to, or are unable to undergo surgery, they are barred from amending their birth certificate through a court order." *Id.* The district court also found that even with a court order, Section (A)(4) forces transgender individuals to prepare and file legal

21

documents, pay a fee, and ultimately, risk publicly outing themselves. 1-DirectorER-14.

Accordingly, the district court granted Plaintiffs' motion for summary judgment on all four claims and declared the Surgery Requirement unconstitutional. 1-DirectorER-24.

## C. The Permanent Injunction

Following further briefing on the remedy for this constitutional violation, the district court entered a permanent injunction on September 30, 2025. 1-DirectorER-4-11. After weighing the four factors relevant to a request for a permanent injunction, the district court provided narrow relief: it enjoined the enforcement of the word "operation" in Section (A)(3) and its implementing regulation, Ariz. Admin. Code § R9-19-208(O). *Id.* Thus, under this injunction, an applicant may avail themselves of Section (A)(3)'s administrative process by submitting a physician's written statement that they have "undergone a sex change," without further stating that they have received an "operation." 1-DirectorER-11; *see* A.R.S. § 36-337(A)(3); Ariz. Admin. Code § R9-19-208(O). Through this injunction, the statute and regulations otherwise remain intact.

22

In fashioning that relief, the district court carefully considered and sought to protect the legislature's purpose in enacting the statute. In particular, the district court explained that ADHS had already "conceded that the legislature intended to provide an avenue for transgender persons to access the private administrative process to amend the sex marker on their birth certificate," rather than to nullify the entirety of Section (A)(3) and leave transgender people with no access to any administrative process to change their sex markers. 1-DirectorER-9-10. In light of these representations and in recognition of legislative intent at the time the statute was enacted, the district court found that enjoining enforcement of the word "operation" in two locations in the statute and implementing regulations served as the proper remedy for the constitutional violations. *Id.*

## D. The Motion to Intervene and this Appeal

After the permanent injunction was entered, Arizona Senate President Warren Petersen and Speaker of the Arizona House of Representatives Steve Montenegro moved to intervene for purposes of appeal, which the district court granted. 2-DirectorER-54-56.

ADHS also appealed, 5-DirectorER-746-47. On December 2, 2025,

23

ADHS moved for a stay pending appeal and administrative stay pending consideration of its stay request, *see* Dkt. 4, and a motions panel referred the motion to the merits panel, *see* Dkt. 14. The Court subsequently consolidated the two appeals. *See* Dkt. 20.

## SUMMARY OF THE ARGUMENT

The district court correctly found that the Surgical Requirement facially violates both the Equal Protection and Due Process Clauses. The district court then entered a properly tailored permanent injunction, which enjoined enforcement of one word in the statute—"operation"—in two locations. This Court should affirm.

*First*, the Surgical Requirement violates the Equal Protection Clause. The Surgical Requirement discriminates against transgender individuals by establishing a unique and more burdensome process— requiring evidence of a "sex change operation"—for transgender individuals who seek to change the sex listed on their birth certificates. It is therefore subject to heightened scrutiny, but ADHS and Intervenors have provided no adequate justification for that discrimination: their references to interests in preserving accurate historical records or preventing fraud (or even newly asserted interests in costs or the stability

24

and reliability of records) have no support in the record.

*Second*, the Surgical Requirement infringes on Plaintiffs' due process right to privacy, individual liberty and autonomy, and whether to receive a particular medical treatment. It is therefore subject to strict scrutiny but comes nowhere near satisfying that standard—ADHS and Intervenors defend these due process violations on essentially the same grounds as they do for equal protection, and none suffice.

*Third*, contrary to ADHS's arguments, the availability of a court-order process to amend a birth certificate pursuant to A.R.S. § 36-337(A)(4) does not cure the Surgical Requirement's constitutional defects. ADHS long represented, and Arizona courts accepted, that a transgender person may not obtain a court order to amend their sex marker under Section (A)(4) without satisfying the criteria of Section (A)(3)—namely, surgery. ADHS now takes a different position in this litigation, but the court-order process remains more costly, less reliable, and less confidential than the administrative process available to non-transgender people.

*Fourth*, the scope of the district court's permanent injunction is proper. Consistent with the legislature's intent, the district court struck

25

just one word—"operation"—from the statute and regulation, which cures the constitutional violations but preserves as much of the law as possible.

*Finally*, *Pullman* abstention does not apply here because there can be no litigation in state court that could address the constitutional claims raised in this litigation.

For all these reasons, this Court should affirm.

## STANDARD OF REVIEW

This Court reviews a district court's grant of summary judgment *de novo*. *L. F. v. Lake Wash. Sch. Dist. #414*, 947 F.3d 621, 625 (9th Cir. 2020). In reviewing an order granting a permanent injunction, this Court reviews "factual findings for clear error, legal conclusions *de novo*, and the scope of the injunction for abuse of discretion." *United States v. Washington*, 853 F.3d 946, 962 (9th Cir. 2017). Decisions regarding *Pullman* abstention are reviewed under a "modified abuse of discretion standard." *Smelt v. Cnty. of Orange*, 447 F.3d 673, 678 (9th Cir. 2006) (quoting *Almodovar v. Reiner,* 832 F.2d 1138, 1140 (9th Cir. 1987)). The Court reviews *de novo* whether the requirements for *Pullman* abstention have been met, then reviews the district court's ultimate decision

26

whether to abstain for abuse of discretion.  *See id.*

## ARGUMENT

## I. THE SURGICAL REQUIREMENT VIOLATES EQUAL PROTECTION.

### A. The Surgical Requirement Discriminates on the Basis of Transgender Status.

When it comes to changing the sex listed on an individual's birth certificate, Arizona law treats transgender and non-transgender people differently.  Non-transgender people may simply request a "correction" through a private administrative process, with a physician's letter attesting to their sex.  A.R.S. §§ 36-323(C), 36-301; Ariz. Admin. Code § R9-19-207; *see* 2-DirectorER-106-08 ¶¶ 29-33.  That process is not available to transgender people, who must instead submit a physician's written statement that they have "undergone a sex change operation." A.R.S. §§ 36-337(A)(3); Ariz. Admin. Code § R9-19-208(O); *see* 2-DirectorER-108 ¶ 34; 3-DirectorER-250.

This scheme is fundamentally discriminatory.  And by its terms, Section (A)(3) singles out transgender individuals—they are only ones who undergo "sex change operations." A.R.S. § 36-337(A)(3).  The district court was correct to recognize the clearly discriminatory line Section (A)(3) draws against transgender people—after all, "who else is going to

27

voluntarily seek out a 'sex change operation'?" 1-DirectorER-20.

ADHS and Intervenors' attempts to resist this straightforward conclusion are unpersuasive.[4]

### 1. The Surgical Requirement Is Not "Facially Neutral."

ADHS and Intervenors primarily contend that Section (A)(3) and its implementing regulation are "neutral" as to transgender status because they do not use the word "transgender." Def. Br. 33-35; *see also* Int. Br. 15 (making similar arguments). This argument is foreclosed by Supreme Court precedent, which recently reaffirmed that "a State may not circumvent the Equal Protection Clause by writing in abstract terms." *United States v. Skrmetti*, 605 U.S. 495, 514 (2025); *see also Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 274-75 (1979) (noting that a classification that "could not be plausibly explained on a neutral ground" discriminates on the basis of a protected characteristic).

Consistent with these principles, this Court's precedents have long

---

[4] While not the focus of the district court's order, the Surgical Requirement also discriminates on the basis of sex, as discrimination on the basis of transgender status also necessarily constitutes sex-based discrimination.

recognized that a law draws a facial classification when it "discriminates against individuals on the basis of criteria that are *almost exclusively* indicators of membership in the disfavored group"—even if the fit, like "between age and gray hair"—may be imperfect. *Pac. Shores Props., LLC v. City of Newport Beach*, 730 F.3d 1142, 1160 n.23 (9th Cir. 2013) (emphasis added, citation omitted). That is why, for instance, this Court has held that laws prohibiting marriages between individuals other than a man and a woman facially "discriminate on the basis of sexual orientation," rejecting arguments that the laws classified only on the basis of "procreative capacity" and that "differential treatment by sexual orientation is an incidental effect." *Latta v. Otter*, 771 F.3d 456, 464 n.2, 467-68 (9th Cir. 2014); *see also, e.g.*, *Christian Legal Soc'y Ch. of the Univ. of Cal., Hastings Coll. of the Law v. Martinez*, 561 U.S. 661, 689 (2010) (similar). These precedents fully apply here: even if the relevant statute and regulation do not use the term "transgender," "sex change operation[s]" are performed almost exclusively on transgender people. On its face, the Surgical Requirement discriminates on the basis of transgender status.

ADHS and Intervenors respond that Section (A)(3) is not limited to

29

transgender people, largely because it may also implicate intersex people. *See* Def. Br. 29, 34, 37. But for intersex people, the statutory phrase "sex change operation" is fundamentally inapt: by definition, intersex people have biological characteristics that do not fit standard binary definitions of male or female—there is no fixed "sex" to "change." While intersex people may undergo procedures to address ambiguous or atypical sex characteristics, these procedures are not "sex change operations" in any sense. *See, e.g., Zzyym v. Pompeo*, 958 F.3d 1014, 1018 (10th Cir. 2020) (explaining that the State Department "defines an 'intersex' individual as someone 'born with reproductive or sexual anatomy and/or chromosomal pattern that does not fit typical definitions of male or female'" (citations omitted)); *Transgender L. Ctr. v. USCIS*, 775 F. Supp. 3d 131, 147 (D.D.C. 2025) ("'Transgender' refers to individuals who identify with a gender that is different than their birth sex, and 'intersex' refers to individuals born with reproductive or sexual anatomy that does not fit into a male or female sex classification." (citing *Intersex*, Cleveland Clinic (July 19, 2022)); *Inscoe v. Ishee*, 915 S.E.2d 448, 461 (N.C. Ct. App. 2025) ("Put more simply, an intersex person is physiologically neither clearly male nor clearly female.").

30

The claim Section (A)(3) applies to intersex people also lacks support in the record. *Contra* Def. Br. 29, 35, 37; Int. Br. 14-15. ADHS points to a statement from its own 30(b)(6) witness, *see* 3-DirectorER-299 at 125:6-23, but that witness is not a medical professional, and ADHS provided no expert evidence that intersex people may undergo sex change operations. *But see Matthews v. Pa. Life Ins.*, 606 F. App'x 460, 464 (10th Cir. 2015) (finding plaintiff "not qualified to give a medical opinion" as a "lay witness"). Intervenors cite no evidence at all—they simply reference A.R.S. § 36-337 as a whole, not the Surgical Requirement in particular, *see* 4-DirectorER-619 (citing A.R.S. § 36-337).[5] And the record is silent on whether any intersex person has ever even sought to use Section (A)(3).[6]

---

[5] Intervenors cite to a single article not included in the record, *see* Int. Br. 15 n.5, but this article—despite discussing a number of surgical interventions available for intersex children—does not use the term "sex change operation," nor can such an article be considered expert evidence in this litigation.

[6] ADHS's attempt to re-frame Subsection (A)(3)'s private administrative process as an "affirmative benefit" akin to the "school finance system" at issue in *San Antonio Independent School District v. Rodriguez,* 411 U.S. 1 (1973), is also unpersuasive. Def. Br. 35-36. *Rodriguez* did not involve a suspect classification, which explains why it was subject to rationale basis review.

31

### 2. A Discriminatory Purpose Is Not Required.

ADHS also argues that, based on its mistaken premise that Section (A)(3) is "facially neutral," Plaintiffs must demonstrate a "discriminatory purpose." Def. Br. 33. ADHS is wrong on both counts: as discussed *supra* pp. 27-31, Section (A)(3) facially discriminates against transgender people. Given the discrimination explicit in the statutory text itself, a showing of subjective animus or hostility toward transgender people is not required—"[w]hether facial discrimination exists 'does not depend on why' a policy discriminates, 'but rather on the explicit terms of the discrimination.'" *Latta*, 771 F.3d at 467-68 (9th Cir. 2014) (quoting *Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., UAW v. Johnson Controls, Inc.*, 499 U.S. 187, 199 (1991)).

### 3. *Skrmetti* Does Not Apply.

Finally, ADHS and Intervenors try to analogize this case to *United States v. Skrmetti*, 605 U.S. 495 (2025), claiming that Section (A)(3) classifies only on the basis of "medical use," "medical treatment," or "medical procedure." Def. Br. 18, 36, 38; Int. Br. 12-16. In *Skrmetti*, the Supreme Court held that a Tennessee statute prohibiting healthcare providers from providing puberty blockers or hormone treatment to minors for certain diagnoses classified on the basis of on age and medical

32

use—not their status as transgender individuals. 605 U.S. at 511, 517-19. Central to that holding was the fact that the statute applied equally to transgender and non-transgender individuals: for both groups, the Court explained, treatment was prohibited for some diagnoses and not for others. *Id.* at 518-19.

But the Surgical Requirement is fundamentally different. Whereas the group of people who "might seek puberty blockers or hormones" for various medical conditions included "both transgender and nontransgender individuals" in *Skrmetti,* 605 U.S. at 519, the group of people would seek a "sex change operation" under Section (A)(3) includes *only* transgender people. While ADHS and Intervenors suggest that the group seeking a "sex change operation" includes non-transgender individuals too, *see* Int. Br. 14, those arguments are unsupported and unavailing. *Supra* pp. 29-31.

Seeking to build a parallel to *Skrmetti,* Intervenors then claim their second group—those who do *not* undergo a "sex change operation"—includes both transgender and non-transgender individuals. Int. Br. 15. In other words, not all transgender people have "undergone a sex change operation." But when a law facially discriminates on a suspect basis, like

33

transgender status, it is subject to heightened scrutiny—even if the law applies only to a subset of the targeted group. *See, e.g.*, *Phillips v. Martin Marietta Corp.*, 400 U.S. 542, 543-44 (1971) (per curiam) (holding that a workplace policy that applied only to women with children discriminated based on sex, even though it did not burden all women).

*Skrmetti* itself recognized precisely this point. Responding to the dissent, the Court *rejected* the claim that, under its analysis, "a law depriving all individuals who 'have ever, or may someday, menstruate' of access to health insurance would be sex neutral merely because not all women menstruate.'" 605 U.S. at 519 n.3 (quoting *id.* at 600 (Sotomayor, J., dissenting)). *Skrmetti* held that such a law would instead "regulate[] a class of *persons* identified on the basis of a specified characteristic." *Id.* That is exactly what the Surgical Requirement does, and *Skrmetti* thus confirms that it discriminates against "*persons*" on the basis of transgender status. *Id.*

Ultimately, Arizona law provides a different, far easier path to non-transgender people who wish to change the sex listed on their birth certificate: they obtain a "correction" with physician's letter attesting to their sex—no surgery required. A.R.S. §§ 36-323(C), 36-301; Ariz.

Admin. Code § R9-19-207; *see* 2-DirectorER-106-08 ¶¶ 29-33. That process is not available to transgender people, who must instead provide evidence of a "sex change operation," 2-DirectorER-108 ¶ 34; 3-DirectorER-250, and nothing about *Skrmetti* suggests that this scheme is a neutral one.[7]

* * *

Accordingly, the Surgical Requirement discriminates on the basis of transgender status.

### B. The Surgical Requirement Fails Heightened Scrutiny.

Under Ninth Circuit precedent, heightened scrutiny applies to classifications based on transgender status. *See Karnoski v. Trump*, 926 F.3d 1180, 1200-01 (9th Cir. 2019) (per curiam) (holding that policy barring transgender individuals from military service is subject to heightened scrutiny); *see also Hundley v. Aranas*, 2023 WL 166421, at *1 (9th Cir. Jan. 12, 2023) (unpublished) ("Discrimination against an individual based on a person's gender identity demands heightened

---

[7] Intervenors also try to sidestep the Surgical Requirement's facial discrimination by comparing the law to a state insurance program that excluded coverage for pregnancy. *See generally Geduldig v. Aiello*, 417 U.S. 484 (1974). But the state program at issue in *Geduldig* did not involve a facial classification, as does the law at issue here.

35

scrutiny."). To satisfy heightened scrutiny, a party "must establish an 'exceedingly persuasive justification.'" *VMI*, 518 U.S. at 531. Accordingly, it must demonstrate that the statute serves "important governmental objectives" and that "the discriminatory means employed" are "substantially related to the achievement of those objectives." *Id.* at 533 (citation omitted). "The justification must be genuine, not hypothesized or invented post hoc in response to litigation." *Id.*

On the summary judgment record, ADHS (and Intervenors) cannot satisfy this "demanding" burden to justify the Surgical Requirement under heightened scrutiny. *VMI*, 518 U.S. at 533. Nothing in the record suggests that requiring transgender people to undergo a "sex change operation" to change the sex marker on their birth certificates is substantially related to any important government interest. The justifications ADHS and Intervenors offer here are "hypothesized or invented *post hoc* in response to litigation" and insufficient to satisfy heightened review. *Id.*

### 1. The Asserted Interests in Preserving Accurate Records Does Not Justify the Surgical Requirement.

ADHS seeks to defend Section (A)(3) by asserting an interest in the

36

"accurate gathering and preservation of [] records," which ADHS claims is "necessary for Arizona's gathering of vital health statistics and for sharing that information with the federal government." Def. Br. 38-39, 41. But despite asserting a generalized interest in the preservation of accurate records, neither ADHS nor Intervenors explains how the *specific* provision at issue—the statute's use of "sex change operation" as a prerequisite to amending a birth certificate—serves that interest at all. Nowhere do they argue that records are more accurate, or better preserved, if a transgender individual has undergone a "sex change operation," as Section (A)(3) requires. If anything, the opposite is true: since many transgender individuals do not undergo a "sex change operation," the surgical requirement means that birth certificates will provide inaccurate vital records. *See* 1-DirectorER-23. Thus, ADHS's appeal to an interest in maintaining accurate records is self-contradictory and provides no basis to justify Section (A)(3).

Nor does Section (A)(3) do anything to preserve *historical* records that Arizona seeks to maintain. *See* Def. Br. 38-39.[8] ADHS undisputedly

---

[8] Below, ADHS asserted no interest in the preservation of historical records, and it has therefore forfeited any argument about this interest.

37

maintains the original birth certificates. 3-DirectorER-196-97. There is simply no risk that these original records would not be "preserved" if transgender individuals were permitted to change the sex markers on their birth certificates without undergoing a sex change operation. And the statute already allows transgender individuals to amend their birth certificate in certain circumstances.

ADHS invokes *Gore v. Lee*, 107 F.4th 548 (6th Cir. 2024), *see* Def. Br. 39, but that case provides no grounds to sustain Section (A)(3). *Gore* considered a Tennessee statute that prohibited any changes to birth certificate sex markers absent proof of an "error" in recording information at birth. 107 F.4th at 554. Applying rational basis review, *Gore* held that the statute was reasonably related to an interest in ensuring accurate recording of "a historical fact," which is "unchangeable by an individual's transition to a different gender identity." *Id.* at 551; *see also id.* at 561 (noting interest in "consistency and historical accuracy" in "record[ing] a

---

*See Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1292 (9th Cir. 2000) (affirming refusal to consider theory raised for first time on summary judgment). Indeed, ADHS's Rule 30(b)(6) witness testified at deposition that ADHS was *not* advancing any justification apart from ensuring the "truthfulness, completeness, and correctness" of birth certificates. *See* 3-DirectorER-367-68.

fact [at] birth").

This case is different. ADHS and Intervenors here agree that birth certificates in Arizona are more than just recordings of a historical fact—they are critical identity documents. That is why Arizona, unlike Tennessee, *already* allows transgender people to change the birth markers on their birth certificates. And the interests in historical records *Gore* emphasizes are inapplicable here—no one disputes that Arizona law already requires the preservation of the original birth certificate, which accurately "record[s] a fact [at] birth." *Id.* at 561.

Accordingly, any interest in the preservation of accurate records falls well short of satisfying heightened scrutiny.[9]

---

[9] ADHS also cites Justice Gorsuch's dissent in *Pavan v. Smith*, 582 U.S. 563 (2017) (per curiam), which is not relevant here. *Pavan* invalidated an Arkansas law requiring a mother's male spouse to appear on child's birth certificate—while allowing the omission of a female spouse—when the mother conceived the child through artificial insemination. *Id.* at 564. In dissent, Justice Gorsuch stated that maintaining a biologically based sex regime in birth records was a legitimate state interest. *Id.* at 568 (Gorsuch, J., dissenting). That interest does not apply here because Section (A)(3) already allows amendments to sex markers on birth certificates, and ADHS retains the original birth record. 3-DirectorER-197.

39

### 2. The Surgical Requirement Is Not Substantially Related to an Interest in Preventing Fraud.

ADHS and Intervenors also seek to defend Section (A)(3) on the ground that it serves an interest in the "prevention of fraud." Def. Br. 39; Int. Br. 18-19.[10] But as the district court correctly found, that made-for-litigation rationale has no support in the record: it is undisputed that there has never been any fraud—or even investigations into potential fraud— related to sex markers on birth certificates. 1-DirectorER-23-24; *see* 2-DirectorER-93 ¶ 6; 3-SER-725 at 52:4-6. Any interest in preventing fraud in general provides no basis to defend Section (A)(3).

### 3. Intervenors' Newly Asserted Interests in Stability, Reliability, and Costs Related to Records Are Unpersuasive.

Intervenors spend much of their brief asserting a new argument—not asserted by ADHS—that the Surgical Requirement serves the government's purported interests in promoting the "stability of its vital records" and "reliable identification," while supposedly avoiding "confusion, costs, and administrative burdens." Int. Br. 17-23; *see also id.* at 26-27 (arguing that injunction would require "maintaining two

---

[10] ADHS's fraud theory was never raised before the parties' motions for summary judgment.

concurrent versions of an individual's birth certificate"). Intervenors cannot insert such justifications into this case, which were never raised in the five years of proceedings in the district court, including during years of discovery and testimony from state officials about the interests Section (A)(3) supposedly serves. *See Columbia Gas & Elec. Corp. v. Am. Fuel & Power Co.*, 322 U.S. 379, 383 (1944) ("As an intervenor the United States was limited to the field of litigation open to the original parties."); *Wood v. Milyard*, 566 U.S. 463, 473 (2012) ("[A]ppellate courts ordinarily abstain from entertaining issues that have not been raised and preserved in the court of first instance.").

In any event, Intervenors provide no support for their speculation. For example, Intervenors cite no evidence for their speculation, *see* Int. Br. 23, that undergoing a "sex change operation" reduces the likelihood that a transgender person decides to "detransition" later in life—a proposition that has no basis in the record of this case. Any supposed interest in promoting "stability" or minimizing "costs" is not one that has ever been claimed in defending this law, and it is precisely the sort of "hypothesized or invented *post hoc*" rationale courts must reject under heightened scrutiny. *VMI*, 518 U.S. at 533.

41

In fact, Intervenors illustrate the defects in this theory by invoking the Eleventh Circuit's decision *Corbitt v. Secretary of the Alabama Law Enforcement Agency,* 115 F.4th 1335 (11th Cir. 2024). S*ee* Int. Br. 19-20. There, the Eleventh Circuit applied rational basis review in considering an Alabama law that established uniform documentation requirements for all individuals seeking to amend sex designations on driver's licenses, regardless of whether they were transgender. *See Corbitt*, 115 F.4th at 1348-49. The Eleventh Circuit upheld the driver's license law because the policy was "model[ed] after a preexisting statute" related to the amendments of birth certificates, such that the law would facilitate Alabama's interest in promoting uniform treatment of sex across government documents. *Id.* at 1349. But as noted, that rationale has no bearing on this case: Arizona already allows an individual's sex to appear differently across its government records—transgender people may amend the sex marker on their drivers' licenses without proof of a "sex change operation." 2-DirectorER-137 ¶ 65. Accordingly, no "consistency" or "stability" rationale could similarly apply. 2-DirectorER-122-23 ¶ 65.[11]

---

[11] Intervenors also cite *Indiana Bureau of Motor Vehicles v. Simmons*, 233 N.E. 3d 1016 (Ind. App. 2024) and *Lyng v. Castillo,* 477 U.S. 635

### 4. The Government Speech Doctrine Does Not Apply.

Finally, Intervenors also invoke the government speech doctrine—another argument that was never made in district court and has therefore been forfeited. Int. Br. 22. Even if that argument could be considered at this stage, it lacks merit for the simple reason that a birth certificate is not solely government speech.[12] Rather, as Intervenors themselves recognize, a birth certificate is a government *benefit*. *See Obergefell v. Hodges*, 576 U.S. 644, 670 (2015) (noting "birth and death certificates" in the "list of governmental rights, benefits, and

---

(1986), *see* Int. Br. 20, but neither case applies here. Applying rational basis review, *Simmons* considered an Indiana agency's refusal to create a new "non-binary" designation on state driver's licenses and identification cards. That is not relevant: this case involves transgender individuals (who thus identify as male or female) and the *same* gender markers that have long existed on Arizona birth certificates. *Lyng* is even further afield: it did not involve a suspect classification, and no administrability concerns have been raised in this case—much less any analogous to the distribution of benefits under the Federal Food Stamp Program. *See* 477 U.S. at 640.

[12] Even if the government speech doctrine applies here, this doctrine undermines both Defendant and Intervenors' due process argument, discussed below, that the state is not infringing on Plaintiffs' due process right to privacy because the government is not disclosing Plaintiffs' transgender status. Intervenors cannot have it both ways: they cannot argue that an Arizona birth certificate constitutes government speech and that the Surgical Requirement does not infringe on Plaintiffs' due process right to privacy.

responsibilities" that states had withheld from same-sex couples); *Pavan v. Smith*, 582 U.S. 563, 564 (2017) (per curiam) (holding that Arkansas's refusal to "issue birth certificates including the female spouses of women who give birth" constituted "differential treatment infring[ing] *Obergefell*'s commitment to provide same-sex couples 'the constellation of benefits that the States have linked to marriage'"). Birth certificates are identification documents used to exercise a wide range of rights under federal and Arizona law, and the government speech doctrine provides no basis to defend the Surgical Requirement.

Moreover, the government speech "doctrine is based on the notion that [the] . . . government's communicative agenda—do[es] not normally 'restrict the activities of . . . persons acting as private individuals.'" *Shurtleff v. City of Boston*, 596 U.S. 243, 269 (2022) (Alito, J. concurring) (quoting *Rust v. Sullivan*, 500 U.S. 173, 198-99 (1991)). Thus, the doctrine does not limit equal protection rights in this case. *See, e.g.*, *Pleasant Grove City v. Summum*, 555 U.S. 460, 468 (2009) (noting that the government speech doctrine "does not mean that there are no restraints on government speech"); *id.* at 482 (Stevens, J., concurring) ("[G]overnment speakers are bound by the Constitution's other

44

proscriptions, including those supplied by the . . . Equal Protection Clause[]"); *People for the Ethical Treatment of Animals, Inc. v. Gittens*, 414 F.3d 23, 28 (D.C. Cir. 2005) (same).

***

Accordingly, the Surgical Requirement is not substantially related to any government interest asserted in this case, and it cannot survive heightened scrutiny.

### C. The Surgical Requirement Fails Rational Basis Review.

Even if Ninth Circuit precedent did not require this Court to apply heightened scrutiny, as the district court found, the Surgical Requirement does not satisfy even rational basis review. As discussed, each rationale that ADHS and Intervenors have put forth is insufficient. *Supra* § I.B. Their purported interests in preserving accurate records, preventing fraud, promoting the stability and reliability of identification, and reducing costs related to records are far too attenuated from the discrimination Section (A)(3) imposes. *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 446 (1985) ("The State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational.").

45

## II. THE SURGICAL REQUIREMENT VIOLATES DUE PROCESS.

The district court was also correct to find that the Surgical Requirement violates Plaintiffs' due process rights, including the right to informational privacy, the right to individual liberty and autonomy, and the right to choose whether to undergo a particular medical treatment. 1-DirectorER-21-23. The Surgical Requirement's restrictions on these rights cannot withstand any level of review, let alone strict scrutiny. 1-DirectorER-24 n.10. ADHS and Intervenors' arguments to the contrary are unpersuasive. *See* Def. Br. 41-51; Int. Br. 28-38.

### A. The Surgical Requirement Violates the Right to Privacy.

#### 1. Due Process Protects Plaintiffs' Right to Informational Privacy.[13]

This Court has long held that "[t]he constitutionally protected privacy interest in avoiding disclosure of personal matters clearly encompasses medical information and its confidentiality." *Norman-Bloodsaw v. Lawrence Berkeley Lab'y*, 135 F.3d 1260, 1269 (9th Cir. 1998). That is because the right to privacy protects both the "right of an

---

[13] Intervenors' arguments regarding informational privacy were not raised in district court proceedings.

individual not to have his private affairs made public by the government," as well as the right to be free "from governmental compulsion." *Whalen v. Roe*, 429 U.S. 589, 599-600 n.24 (1977).

For decades, courts have recognized that this interest also encompasses disclosure of one's transgender status. *See, e.g.*, *Powell v. Schriver*, 175 F.3d 107, 111 (2d Cir. 1999) (finding that "[t]he excruciatingly private and intimate nature" of gender identity, "for persons who wish to preserve privacy in the matter, is really beyond debate"); *Arroyo Gonzalez v. Rossello Nevares*, 305 F. Supp. 3d 327, 333 (D.P.R. 2018) (forced disclosure of transgender status violates constitutional right to informational privacy); *Jacques v. Macomber*, No. 2:23-cv-0345, 2024 WL 4264009 (E.D. Cal. Sep. 23, 2024) (R. & R.) (disclosure of transgender status by custody officials sufficient to allege violation of right to privacy), *adopted*, 2024 WL 4755376 (E.D. Cal. Nov. 8, 2024).

The right to privacy in information about one's transgender status is particularly compelling where, as here, disclosure of such personal information would expose an individual to physical harm. 1-DirectorER-15 n.5 (discussing study finding that "nearly one-third of transgender

47

respondents who had an identity document that did not match their gender presentation were harassed, discriminated against, or assaulted"); *see, e.g.*, *P.B. v. Koch*, 96 F.3d 1298, 1302 (9th Cir. 1996) (noting that the "right to ultimate bodily security" is the "most fundamental aspect of personal privacy" (citation omitted)).

Intervenors—but not ADHS, *see* Def. Br. 41—seek to deny that Plaintiffs hold any right to privacy in this deeply personal information, Int. Br. 29, 31-33, but their arguments are without merit. Intervenors argue that Plaintiffs are asserting a narrow "right to a birth certificate conforming to one's gender identity." Int. Br. at 31-32. But Intervenors' cramped framing of the right at it issue is inconsistent with this Court's precedents, which have long emphasized that due process rights must be drawn from the broader principles set forth in prior precedent. In considering challenges to bans on same-sex marriage, for instance, this Court recognized the right as the long-recognized "right to marry," rather than the "new, narrow fundamental right" to same-sex marriage. *Latta,* 771 F.3d at 477; *see Obergefell,* 576 U.S. at 671. After all, the right at issue cannot be "defined in terms of those who sought the ability to exercise it"—instead, the question is "whether there existed a sufficiently

48

compelling justification for depriving plaintiffs of the right they, as people, possessed." *Latta*, 771 F.3d at 477-78. That forecloses Intervenors' argument: though they happen to be transgender, Plaintiffs simply assert their right to privacy, which this Court has recognized for decades. *See, e.g. Norman-Bloodsaw,* 135 F.3d at 1269.

Building off their erroneously narrow view of the informational privacy right this case involves, Intervenors further argue that Plaintiffs' right is not deeply rooted in this country's history and tradition—noting that birth certificates were not habitually used prior to 1900. Int. Br. 32-33.[14] But Intervenors' claim about history and tradition is contrary to decades of Supreme Court precedent, which holds that the identification of fundamental rights is "guided by many of the same considerations relevant to analysis of other constitutional provisions that set forth broad

---

[14] In discussing Plaintiffs' due process claims, Intervenors invoke *Trump v. Orr*, 146 S. Ct. 44 (2025), *see* Int. Br. 32, which stayed a district court's injunction against enforcement of a federal policy requiring new passports to display an individual's biological sex at birth. 146 S. Ct. at 46. In a brief ruling, *Orr* determined that the policy likely did not violate equal protection because, in this context, a passport "is merely attesting to a historical fact without subjecting anyone to differential treatment." *Id.* That has no bearing on the due process analysis in this case, and its reasoning does not apply to Plaintiffs' equal protection claims either—as discussed *supra* pp. 37-39, a "historical facts" justification does not apply.

principles rather than specific requirements," and rejects the idea that "[h]istory and tradition . . . set [the] outer boundaries" of the due process inquiry. *Obergefell*, 576 U.S. at 663-64; *see also, e.g.*, *Rochin v. People of California*, 342 U.S. 165, 170, 172 (1952) (explaining that "the concept of due process of law is not final and fixed," and the evaluation of such claims must be "duly mindful of reconciling the needs both of continuity and of change").

Thus, while Intervenors may urge otherwise, due process has long protected liberties that may not have been formally recognized in the more distant past. *See, e.g.*, *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 637-42 (1943) (right to freedom of speech and religious worship); *Loving v. Virginia*, 388 U.S. 1, 12 (1967) (right to interracial marriage); *Turner v. Safley*, 482 U.S. 78, 94-99 (1987) (prisoners' right to marry).

Intervenors' approach to due process is misguided, and in any event, the right at issue here is nothing new. Rather, this case involves a basic application of the right to privacy—a fundamental right grounded in liberty, with roots in our nation's traditions that predate the Constitution itself. *See Rakas v. Illinois*, 439 U.S. 128, 143 n.12 (1978)

50

(describing the right to privacy as presented in W. Blackstone, *Commentaries*, Book 2, ch. 1).

### 2. The Surgical Requirement Violates Plaintiffs' Right to Informational Privacy.

By forcing Plaintiffs to present inaccurate birth certificates, which thus requires the involuntary disclosure of their transgender status, the Surgical Requirement violates Plaintiffs' due process rights in informational privacy.

In a variety of circumstances, this Court has recognized that forcing an individual to disclose sensitive information to third parties violates the individual's privacy rights. In *Tucson Woman's Clinic v. Eden*, 379 F.3d 531 (9th Cir. 2004), for example, this Court held that an Arizona regulation requiring licensed abortion providers to submit patients' ultrasound prints and patient identifying information to private contractors violated the patients' right to informational privacy, as the information was "obviously very sensitive" and the "potential for harm" from disclosure was "tremendous." *Id.* at 553, *abrogated on other grounds by Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022); *see also, Thorne v. City of El Segundo,* 726 F.2d 459, 468 (9th Cir. 1983) (holding that a plaintiff's right to privacy was invaded when she was compelled by

her state employer to "disclose information regarding personal sexual matters," including a prior relationship and miscarriage).

Consistent with this precedent, the district court correctly recognized that the Surgical Requirement infringes on Plaintiffs' right to informational privacy. *See* 1-DirectorER-21-22. By foreclosing access to ADHS's private administrative process to change the sex marker on their birth certificates, the Surgical Requirement forces transgender people to disclose their transgender status when they present an inaccurate identity document. Such disclosure inherently reveals Plaintiffs' sensitive and intimate medical and personal information, which, once revealed, puts them at great risk for bodily harm—a reality borne out by the life experiences of the Plaintiffs' in this case. *Supra* pp. 16-17; 2-DirectorER-118 ¶ 58.

Moreover, after one's transgender status is disclosed to a third party through an identity document discordant with one's gender identity, there are no safeguards to prevent that third party from disclosing the information to others. *See* 2-DirectorER-123 ¶ 67. Thus, in addition to revealing intimate information, the Surgical Requirement takes away Plaintiffs' control over the circumstances in which their

52

personal matters are disclosed to others. By forcing the disclosure of such personal information with no meaningful ability to control its dissemination, the Surgical Requirement infringes on Plaintiffs' due process right to informational privacy. *See, e.g.*, *Ostergren v. Cuccinelli*, 615 F.3d 263, 283 (4th Cir. 2010) (recognizing individual's privacy interest in controlling use of personal information, such as social security numbers).

ADHS and Intervenors argue that the Surgical Requirement does not implicate Plaintiffs' right to privacy because the statute does not *explicitly* compel Plaintiffs to reveal their transgender status to third parties or require the Registrar to disclose Plaintiffs' transgender status. Def. Br. 43-45; Int. Br. at 30-31 (claiming that Plaintiffs willingly disclose their identities whenever they "decide[] to share their birth certificates"). These arguments are spurious. As the record establishes, Plaintiffs have not willingly disclosed their transgender identity to others—rather, despite taking precautions, they have no choice but to use government documents in certain circumstances, like enrolling in school. *See, e.g.*, 4-SER-768 at 32:1-11 (birth certificate required to enroll in school); 4-SER-807-08 at 71:8-72:2 (unable to enroll Plaintiff in extracurricular activities

53

that require birth certificate); 4-SER-917 at 49:16-24 (Plaintiff's mother did not disclose plaintiff's transgender status unless absolutely necessary).[15]

In addition, the fact that ADHS allegedly does not release this sensitive information directly to third parties does not change the result: as discussed above, this Court has long found invasions of an individual's right to privacy even when the government did not directly disclose the information to others. ADHS and Intervenors cite no controlling case to the contrary.[16]

ADHS further mischaracterizes the Surgical Requirement as an "affirmative benefit" that Arizona can lawfully deny and argues that due process imposes no "affirmative obligation on the State" to protect against third party disclosure. Def. Br. at 44. As discussed above, Plaintiffs' ability to use the private administrative process to receive an

---

[15] *See also, e.g.*, 4-SER-794 at 58:4-6 (parents consider who is privy to information about Plaintiff's transgender status).

[16] Intervenors' references to *Gore* and *In re Michaela Lee R.*, 756 A.2d 214 (Conn. 2000), *see* Int. Br. 31, miss the mark. Both premise their holding on the fact that disclosing private information on birth certificates is *not* necessary in those states to obtain any important benefit. *See Gore*, 107 F.4th at 563; *Michaela Lee*, 756 A.2d at 233. As discussed and as ADHS and Intervenors concede, that is not true in Arizona.

54

accurate birth certificate is not an "affirmative benefit." *Supra* p. 31 n.6. And in any event, the government cannot attach unconstitutional conditions to a benefit. *See Perry v. Sindermann*, 408 U.S. 593, 597 (1972) (holding that the government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests"); *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 513 (1996) (finding that the conferral of a government benefit cannot be conditioned on the surrender of a constitutional right).[17]

Accordingly, the Surgical Requirement infringes on Plaintiffs' right to informational privacy.

### B. The Surgical Requirement Violates the Right to Individual Liberty and Autonomy.

The district court also properly found that the Surgical Requirement violates Plaintiffs' right to individual liberty and autonomy.

---

[17] In claiming that this case involves an "affirmative benefit," ADHS again points to the "school finance system" at issue in *San Antonio Independent School District v. Rodriguez,* 411 U.S. 1 (1973), but there, the Court observed that the "relative differences in spending levels" were troublesome but not unconstitutional, in part because they did not cause "an absolute denial of educational opportunities to any of its children." 411 U.S. at 37-40. Here, however, Plaintiffs have been entirely foreclosed from changing their sex markers via the state's private administrative process, which is a state-created pathway to correct an essential identity document issued by Arizona to every individual born in the state.

As the district court recognized, the Due Process Clause "promises liberty to all within its reach, a liberty that includes certain specific rights that allow persons, within a lawful realm, to define and express their identity." *Obergefell*, 576 U.S. at 651-52; *see Glucksberg*, 521 U.S. at 719-20. The fundamental liberties due process guarantees encompass "certain personal choices central to individual dignity and autonomy, including intimate choices that define personal identity and beliefs." *Obergefell*, 576 U.S. at 663. These liberties undeniably include a transgender individual's personal decisions to live in a manner consistent with their gender identity. *See Arroyo Gonzalez*, 305 F. Supp. 3d at 333 ("Much like matters relating to marriage, procreation, contraception, family relationships, and child rearing, there are few areas which more closely intimate facts of a personal nature than one's transgender status." (cleaned up)).

As the district court recognized, requiring surgery to apply for a sex marker change infringes on Plaintiffs' right to define who they are and to live autonomously. Transgender people born in Arizona face unjustifiable and unnecessary hurdles to obtain accurate birth certificates, forcing them to endure the constant risk of exposure,

56

rejection, discrimination, and bodily harm. 2-DirectorER-123 ¶ 66; *see also* 2-DirectorER-114 ¶ 47; 2-DirectorER-118 ¶ 58. They are also deprived of the ability to define their own identities, which is "fundamental to our concept of constitutionally ordered liberty." *Washington*, 521 U.S. at 727; *see Roberts v. U.S. Jaycees*, 468 U.S. 609, 619 (1984) (finding "ability independently to define one's identity . . . is central to any concept of liberty"). And because gender identity, like sexual orientation, is undisputedly immutable, *see* 2-DirectorER-97 ¶ 5, Plaintiffs' ability to participate as full members of society depends on their ability to amend the sex listed on their birth certificates to correctly identify who they are, *Obergefell*, 576 U.S. at 658.

Intervenors do not contest this ruling, but ADHS argues that the Surgical Requirement does not burden Plaintiffs' fundamental right to define or express their identities because it only requires the Director to amend a birth certificate under specified circumstances. Def. Br. at 43. This argument fails. As discussed in more detail below, a statute that does not explicitly force individuals to undergo a medical procedure but hinges a public benefit on doing so clearly violates due process. *Infra* pp. 58-60. Accordingly, the Surgical Requirement violates Plaintiffs' due

process rights to individual liberty and autonomy.

**C. The Surgical Requirement Violates the Right to Choose Whether to Undergo a Particular Medical Treatment.**

Finally, the district court correctly recognized that the Surgical Requirement violates the due process right to choose whether to undergo a particular medical treatment. 1-DirectorER-21-22. As ADHS and Intervenors recognize, the Supreme Court has long "recognized fundamental rights to determine one's own medical treatment," and "has recognized a fundamental liberty interest in medical autonomy." *Coons v. Lew*, 762 F.3d 891, 899 (9th Cir. 2014); *see, e.g.*, *Cruzan by Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 278 (1990) (holding that "a competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment"); *Glucksberg*, 521 U.S. at 720, 725 (acknowledging fundamental right to refuse unwanted medical treatment and describing the "long legal tradition protecting the decision to refuse unwanted medical treatment"); *accord Benson v. Terhune*, 304 F.3d 874, 884 (9th Cir. 2002).

The district court recognized that the Surgical Requirement infringes on this right and puts Plaintiffs to an impossible choice. It forces Plaintiffs to choose between undergoing medically inappropriate,

unnecessary, unaffordable, or even illegal surgery, or subjecting themselves to the constant risk of dangerous exposure from having identity documents that disclose their transgender status.

ADHS and Intervenors argue that the district court erred because the Surgical Requirement does not explicitly require transgender individuals to have surgery. Def. Br. 43; Int. Br. 37. That is incorrect. "A plaintiff suffers a 'constitutionally cognizable injury' whenever the government succeeds in pressuring the plaintiff into forfeiting a constitutional right in exchange for a benefit or the government withholds a benefit based on the plaintiff's refusal to surrender a constitutional right." *Stavrianoudakis v. U.S. Fish & Wildlife Serv.*, 108 F.4th 1128, 1137 (9th Cir. 2024) (citing *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 606–07 (2013)). Thus, a statute that does not expressly force individuals to undergo a medical procedure but hinges a public benefit on receiving that procedure clearly violates one's right to choose whether to undergo such a procedure. *See id.*

Indeed, Plaintiffs suffer from constitutional violations twice over. The Surgical Requirement forces Plaintiffs to undergo unwanted or unnecessary surgery in violation of their right to individual liberty and

59

autonomy and the right to choose not to undergo a particular medical treatment to obtain a government benefit available to all other Arizonans. Should they fail to undergo a "sex change operation," Plaintiffs must forfeit their constitutional right to privacy whenever they are required to use this inaccurate document. Either way, their due process rights are violated.

### D. The Surgical Requirement Cannot Withstand Strict Scrutiny, and the Remaining Due Process Arguments Lack Merit.

Because the Surgical Requirement infringes on Plaintiffs' due process rights, strict scrutiny applies. This standard forbids any government restriction on due process unless the action is "narrowly tailored to serve a compelling state interest." *Glucksberg*, 521 U.S. at 721 (citation omitted). But because the Surgical Requirement does not satisfy heightened scrutiny or even rational basis, the Surgical Requirement necessarily fails the highest level of scrutiny. *Supra* §§ I.B-C. ADHS and Intervenors rest on the same meritless justifications they invoke as to equal protection, *see* Def. Br. 51, and their remaining due process arguments fare no better.

To start, ADHS claims Section (A)(3) does not violate due process

60

because it believes the statute could, in theory, be constitutionally applied to "people whose chromosomal count does not match the sex field on their birth certificate." Def. Br. 43. That is irrelevant: Plaintiffs do not challenge the constitutionality of the chromosomal count procedure in Section (A)(3). In addition, ADHS is wrong to suggest that the district court confused Plaintiffs' facial challenge with an as-applied challenge. Def. Br. 46. As discussed above, the district court correctly found that Section (A)(4) does not cure the Surgical Requirement's constitutional deficiencies. 1-DirectorER-19; *infra* pp. 63-69.

Intervenors, for their part, assert that Plaintiffs cannot maintain a right-to-privacy claim because, for some transgender people, "the disclosure would have already happened"—including through hypothetical disclosures of their birth certificate to others, such as school officials. Int. Br. 34. But on facial challenges, courts may not "go beyond the statute's facial requirements and speculat[e] about 'hypothetical' or 'imaginary' cases." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008). And even accepting Intervenors' hypothetical, there is no requirement of absolute secrecy for the right to informational privacy to attach. The right to informational privacy is the interest in

61

avoiding the *unwanted* disclosure of private and sensitive information. Simply put, "Plaintiffs do not lose their informational right to privacy by choosing to share the private information at certain times with certain people." *Ray v. McCloud*, 507 F. Supp. 3d. 925, 934 (S.D. Ohio 2020).

The cases Intervenors cite do not suggest otherwise. *See* Int. Br. 34. The Surgical Requirement does not divulge information that is "already fully available to the public," such as conviction records, *Russell v. Gregoire*, 124 F.3d 1079, 1094 (9th Cir. 1997), or photographs taken at a public gathering, *Riley v. St. Louis Cnty. of Mo.*, 153 F.3d 627, 629, 631 (8th Cir. 1998). Nor are Plaintiffs asserting a privacy claim over sensitive information that they have intentionally revealed to the public "without coercion by the state." *Doe v. Lockwood*, 89 F.3d 833 (6th Cir. 1996) (holding that information willingly shared in open court proceedings is not subject to constitutional protection); *see also Doe v. City of New York*, 15 F.3d 264, 268 (2d Cir. 1994) (recognizing an informational privacy claim where a state agency purposely disclosed sensitive medical information without consent).

Intervenors also assert that the Surgical Requirement withstands constitutional scrutiny in cases where transgender individuals *have*

62

undergone a "sex change operation." Int. Br. 35. That gets things backwards: conditioning a birth certificate amendment on having a "sex change operation" is the constitutional defect itself, and it does not become permissible merely because some individuals (by choice or not) comply with it. *See Stavrianoudakis*, 108 F.4th at 1137 ("A plaintiff suffers a 'constitutionally cognizable injury' whenever the government succeeds in pressuring the plaintiff into forfeiting a constitutional right in exchange for a benefit or the government withholds a benefit based on the plaintiff's refusal to surrender a constitutional right." (citation omitted)).

## III. SECTION (A)(4)'S COURT-ORDER PROCESS DOES NOT RENDER SECTION (A)(3) CONSTITUTIONAL.

The central and false conceit of ADHS's appeal is that the court-order process of Section (A)(4)—a different process contained in a different part of the statute—absolves it of the Surgical Requirement's constitutional defects. Def. Br. 22-32. As the district court recognized, this argument fails for multiple reasons. 1-DirectorER-19.

*First*, ADHS provides no support for argument that excluding a class of persons from a statutorily-created process can be remedied through the existence of a *different* statutory procedure—especially one

63

that is much more burdensome, risks sacrificing the very privacy interests Plaintiffs wish to protect, and is not guaranteed to provide the relief they seek. Therefore, it is of no consequence whether ADHS has processed a sex marker amendment under Section (A)(4) when the individual did not provide evidence of a "sex change operation." *See Nyquist v. Mauclet*, 432 U.S. 1, 9 n.11 (1977) (holding that a statute excluding noncitizens from obtaining a benefit discriminated on the basis of national origin, even if the noncitizens could obtain the benefit through alternative means).

*Second*, contrary to ADHS's suggestions, *see* Def. Br. 21-25, the context of Section (A)(3) only underscores its constitutional deficiencies. A.R.S. § 36-337 contains four subsections, but only one of them—Section (A)(3)—addresses "the sex of the person" on a birth certificate. "[W]here [the legislature] includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that [the legislature] acts intentionally and purposely in the disparate inclusion or exclusion." *City & Cnty. of San Francisco v. EPA*, 604 U.S. 334, 344 (2025) (citation omitted); *accord ACLU of Ariz. v. Ariz. Dep't of Child Safety*, 493 P.3d 885, 890 (2021) ("[W]hen the legislature has

64

specifically included a term in some places within a statute and excluded it in other places, courts will not read that term into the sections from which it was excluded[.]" (citation omitted)). Coupled with ADHS's prior position on the issue, that helps explain why Arizona courts have determined Section (A)(4) does not permit amendments for transgender people—the subject Section (A)(3) addresses—in the absence of a "sex change operation." A.R.S. § 36-337(A)(3); *infra* pp. 66-67.

Moreover, with statutory context in mind, the "corrections" process highlights the differential and inferior treatment of transgender people under Section (A)(3). *See* A.R.S. § 36-323(C) (permitting "corrections" to birth certificates); *id.* § 36-301(6) (defining "correction" to mean correction of a "typographical error"). As noted, under this process, non-transgender individuals seeking to change the sex marker on their birth certificates (due to "typographical error") do so through a simple and confidential administrative process, involving the submission of a confidential request to ADHS or the vital record's office. Ariz. Admin. Code § R9-19-207 (implementing the correction process). Through that process, the individual need only provide a medical record or physician's letter attesting to their sex. *Id.*; *see* 2-DirectorER-106-07 ¶¶ 29-31. But

65

that process is not available for a transgender person who seeks to change a sex marker—instead, they must undergo a "sex change operation" or obtain a court order. 2-DirectorER-106-08 ¶¶ 29-31.

*Third*, while ADHS insists that Arizona courts allow transgender people to obtain orders requiring changes to their sex markers without surgery, Def. Br. 25-28, the historical record tells a very different story. For years, ADHS asserted in Arizona state court that surgery was an essential prerequisite to any request from a transgender individual to change a sex marker, even when an individual petitioned a court for such a change pursuant to Section (A)(4). 2-DirectorER-92 ¶ 2. ADHS argued, for instance, that the court-order process did *not* "creat[e] a broad grant to the courts to amend birth certificates that would circumvent the procedures and standards established by [ADHS] for amendments," and that "[t]he existing statutory scheme for vital records and the attendant rules adopted by [ADHS] require that requests to amend or correct birth certificates ordinarily be initiated by filing a request with [ADHS]." 3-SER-713-14 at 3-4.

Arizona courts have agreed with this position. Courts have explained, for instance, that "[a]bsent specific authority, [courts] lack[]

66

original jurisdiction to amend or correct birth certificates" as the basis for refusing to accept court-orders without a "physician's written statement" as required by Section (A)(3). 2-DirectorER-92 ¶ 1; *see also id.* (collecting other examples). ADHS does not deny that it expressly and repeatedly provided this position to Arizona courts, and that ADHS never publicly disavowed that position to the courts or to transgender individuals.

The experience of Named Plaintiffs in this case illustrates how Arizona courts have refused to amend birth certificates for transgender individuals under Section (A)(4). For Helen Roe and James Poe, courts denied the petitions and simply handed them printed copies of Section (A)(3), which contains the Surgical Requirement, at their respective hearings. 2-DirectorER-93 ¶ 7; *see also* 2-DirectorER-119 ¶ 60. At James's hearing, the Arizona judge even stated that the court would have granted his petition, but knew ADHS would not "honor it" because of Section (A)(3)'s surgical requirement. 2-DirectorER-93. Understandably, Carl Voe's mother did not even try to file a petition for a court order—recognizing the significant risk that the state court would deny it, as Carl had not undergone surgery—an outcome she knew would

67

devastate her son. 2-DirectorER-120 ¶ 61.[18]

In describing the state of play in Arizona state court, ADHS relies heavily on *McLaughlin &. Swanson*, 476 P.3d 336 (Ariz. Ct. App. 2020), which addressed whether same-sex parents may both be listed as mothers or as parents on a child's birth certificate, and suggests the decision shows that "Arizona courts have broad authority to order amendments to birth certificates based on § 36-337(A)(4)." Def. Br. 23-24. But *McLaughlin* is too thin a reed to support ADHS's arguments here: it did not address the Surgical Requirement or changes to sex markers under Section (A)(4), and it does not dispel the confusion Arizona state courts have suffered regarding the lack of standards for such petitions.

*Finally*, even accepting that *some* Arizona courts may, in their discretion, grant an order under Section (A)(4) directing ADHS to amend

---

[18] ADHS argues that when deciding a facial challenge, a court is limited to reviewing the text of the statute itself. Def. Br. at 28. However, the Supreme Court has explicitly stated that administrative interpretation and implementation of a statute or regulation is essential to the analysis. *See Ward v. Rock Against Racism*, 491 U.S. 781, 795-96 (1989) ("In evaluating a facial challenge to a state law, a federal court must . . . consider any limiting construction that a state court or enforcement agency has proffered." (quoting *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 495 n.5 (1982)).

the sex marker of a transgender person who has not received a "sex change operation," *see* Def. Br. 26-27, ADHS ignores that the court process is far more burdensome, intrusive, and uncertain than Section (A)(3). Compared to Section (A)(3)—which allows applicants to submit a confidential request directly to ADHS accompanied by only a physician's letter—petitioning for a court order requires extra filing fees, additional time, numerous court documents that are filed publicly, appearing in open court, and additional motion practice to protect a transgender person's privacy. 2-DirectorER-113-15 ¶¶ 46-48. And this is not just a complaint about "costs and headaches." Def. Br. 47. Rather, the public nature of court filings forces petitioners to disclose their names on the docket, thus disclosing their identities, 2-DirectorER-113 ¶ 46, with no guarantee that a request to seal their records would be granted, 2-DirectorER-92 ¶¶ 3-4; *cf.* Def. Br. 49. That transgender people may have some chance of securing amendments through the court-order process does not justify Section (A)(3)'s discriminatory and restrictive requirements.

## IV. THE PERMANENT INJUNCTION IS PROPER.

Beyond the merits, ADHS and Intervenors take issue with the

69

remedy. They do not question that Plaintiffs satisfied the criteria for a permanent injunction—namely, irreparable injury, inadequate remedies at law, and that the balance of hardships and public interest weigh in favor of injunctive relief. *See eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006). But ADHS and Intervenors challenge the scope of the district court's injunction, which enjoined enforcement of a just single word—"operation"—in two locations in the statue and implementing regulation. Def. Br. 51-56; Int. Br. 38-49; *see* 1-DirectorER-4-11.[19] Their arguments fail to demonstrate any abuse of discretion.

## A. The Permanent Injunction Is Consistent with Legislative Intent.

In fashioning a remedy for a constitutional violation, courts consider "[t]hree interrelated principles": (1) avoiding "nullify[ing] more of a legislature's work than is necessary," (2) refraining from "rewriting state law to conform to it to constitutional requirements," and (3) considering legislative intent—whether "the legislature [would] have

---

[19] With this injunction in place, an applicant may amend their birth certificate with a physician's written statement that the applicant has "undergone a sex change," without further stating that the applicant has received an "operation." 1-DirectorER-11; *see* A.R.S. § 36-337(A)(3); Ariz. Admin. Code § R9-19-208(O).

preferred what is left of its statute to no statute at all." *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 329-30 (2006) (cleaned up). Unless it is "evident" that the Arizona legislature would have preferred to nullify Section (A)(3) in its entirety rather than enjoining the word "operation," this Court "must leave the rest of the [statute] intact." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 587 (2012) (citation omitted).

Contrary to the claims of ADHS and Intervenors, the district court closely hewed to these standards, including by giving effect to the legislature's intent. In particular, as ADHS has conceded, at the time the statute was enacted, the "legislature intended to provide an avenue for transgender persons to access the private administrative process to amend the sex marker on their birth certificate." 1-DirectorER-10. The permanent injunction thus maintains a path for transgender people to amend their sex markers through an administrative process, as the legislature intended. And contrary to Intervenors' suggestion, the injunction also maintains a system that would "limit birth certificate amendments to specific, carefully delineated, and expressly enumerated circumstances." Int. Br. 40. Under the permanent injunction, an

71

individual must still provide a physician's written statement "establish[ing] that the sex of the person as different than in the registered birth certificate," A.R.S. § 36-337(A)(3)—certainly "a narrow class of cases involving objectively verifiable circumstances" that can be (and *must* be) "corroborated by independent medical documentation," Int. Br. 40; *see* 1-DirectorER-11. The permanent injunction fully comports with the legislature's intent.

### B. The District Court Did Not "Rewrite" Section (A)(3).

Despite striking just one word from Section (A)(3) and its implementing regulations, both ADHS and Intervenors accuse the district court of improperly "rewriting" the statute. Def. Br. 51-52, 54; Int. Br. 44-46. That is baseless.

ADHS's alternative would be to leave the text as-is, but somehow construe it as "not requiring any particular surgical procedure." Def. Br. 53. But as discussed *supra* pp. 58-60, that is not what the text of Section (A)(3) says or means, and adopting this approach would be an entire rewrite of the statute, in contrast to the district court's measured approach of enjoining only one word in two locations. The proper approach, as ADHS recognizes, is "to sever the offending provision from

72

the remainder of the statute"—"as little of a statute as possible," which here means just one word.  Def. Br. 53-54.

Intervenors claim that Arizona law does not permit the district court to enjoin the word "operation" because it is "inseparable" from the phrase "sex change"—in other words, the phrase "sex change" *requires* an "operation."  Int. Br. 45.  To Intervenors, "sex change" is simply "an adjective," Int. Br. 46, used exclusively to modify "operation" but incapable of standing on its own.  That is incorrect:  "sex change" is a noun, and using it as such is entirely consistent with the legislature's intent in this case.  *Supra* pp. 70-72.[20]  Indeed, the phrase "sex change" can stand on its own under Arizona law.  *See Tipsword v. Tipsword*, 2013 WL 1320444, at *2 (Ariz. Ct. App. Apr. 2, 2013) (explaining that a "mother's sex change . . . did not provide grounds for changing custody").  The cases Intervenors cite do not involve injunctive relief—instead, they concern the interpretation of federal statutes—and therefore cast no doubt on the district court's injunction here.  Int. Br. 46 (citing *Terry v.*

---

[20] In claiming an improper re-write, Intervenors again appeal to their mistaken view of legislative intent—arguing that the legislature "would not have enacted 'sex change' without 'operation.'"  Int. Br. 46 (cleaned up).  As discussed *supra* pp. 23, 71-72, Intervenors' assertion regarding the legislative intent is not correct.

*United States*, 593 U.S. 486, 494 (2021) and *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979)).

### C. The Permanent Injunction Does Not Violate Arizona's Unintelligibility Doctrine.

Finally, Intervenors assert that the district court's injunction would violate Arizona's intelligibility doctrine, reiterating its view that "sex change" and "operation" cannot be separated without rendering "sex change" "unintelligible." Int. Br. 47-49. But Federal Rule of Civil Procedure 65(d) requires only that an injunction "describe in reasonable detail . . . the act . . . restrained"—a standard the district court's injunction plainly meets. ADHS's own administrative practice confirms this: ADHS already accepts physician letters containing the phrase "sex change operation" or any exact synonym and nothing more. 3-DirectorER-303-06. ADHS cannot credibly claim that removing the word "operation" renders the injunction unintelligible when it has been applying the phrase "sex change" for years.

## V. *PULLMAN* ABSTENTION DOES NOT APPLY.

Finally, ADHS argues that the district court should have abstained under *Railroad Commission of Texas v. Pullman*, 312 U.S. 496 (1941), from resolving questions of state law—mainly, whether Section (A)(3)'s

74

surgical requirement applies in the Section (A)(4) process. Def. Br. 56-60. That argument is unpersuasive.

*Pullman* abstention applies in "extraordinary and narrow" circumstances, *Patel v. City of Los Angeles,* 594 F. App'x 415 (9th Cir. 2015), when "a federal constitutional issue . . . might be mooted or presented in a different posture by a state court determination of pertinent state law," *Allegheny County v. Frank Mashuda Co.*, 360 U.S. 185, 189 (1959). It is "appropriate when (1) the case touches on a sensitive area of social policy upon which the federal courts ought not to enter unless no alternative to its adjudication is open, (2) constitutional adjudication plainly can be avoided if a definite ruling on the state issue would terminate the controversy, and (3) the possible determinative issue of state law is uncertain." *Confederated Salish v. Simonich*, 29 F.3d 1398, 1407 (9th Cir. 1994). *Pullman* abstention is reserved for "exceptional cases where principles of comity and federalism justify postponing the exercise of jurisdiction" so that a state court can render a decision under state law that would make resolution of the federal question unnecessary. *Pearl Inv. Co. v. City & Cnty. of San Francisco*, 774 F.2d 1460, 1462-63 (9th Cir. 1985).

But the *Pullman* doctrine does not fit in this case because there is no litigation in state court that could possibly address the federal constitutional claims raised in this litigation—an essential requirement of the doctrine. As discussed above, any state court case regarding the statutory interpretation of Section (A)(4) could not resolve the constitutional issues before this Court. *See S.F. Cnty. Democratic Cent. Comm. v. Eu*, 826 F.2d 814, 825 (9th Cir. 1987) (holding *Pullman* abstention inapplicable when state-court case does not involve dispute that, if decided, "would moot the constitutional questions raised by plaintiffs"). And any state law administrative case regarding Section (A)(3) also could not resolve the constitutional issues before this Court, as Section (A)(3) is not ambiguous. *See Haw. Hous. Auth. v. Midkiff*, 467 U.S. 229, 237 (1984) ("[W]e have frequently emphasized that abstention is not to be ordered unless the statute is of an uncertain nature, and is obviously susceptible of a limiting construction." (cleaned up)). Accordingly, the *Pullman* doctrine does not apply.[21]

---

[21] The Court should not remand with instructions to certify any question to the Arizona Supreme Court. *See* Def. Br. at 60. As discussed above, there is no state law case that could resolve the central questions here.

76

## CONCLUSION

For the foregoing reasons, the Court should affirm the decisions of the district court.

Dated: March 13, 2026

Respectfully submitted,

/s/ *Rachel H. Berg*

RACHEL H. BERG
KELLY JO POPKIN
NATIONAL CENTER FOR LGBTQ RIGHTS
1401 21st Street, No. 11548
Sacramento, CA 95811
(415) 343-7679
rberg@nclrights.org
kpopkin@nclrights.org

KYLE C. WONG
COOLEY LLP
3 Embarcadero Center
20th Floor
San Francisco, CA 94111
(415) 693-2000
kwong@cooley.com
eborn@cooley.com

PATRICK J. HAYDEN
COOLEY LLP
55 Hudson Yards
New York, NY 10001
(212) 479-6000
phayden@cooley.com

MARY O'GRADY
PAYSLIE BOWMAN

77

78

> OSBORN MALEDON, P.A.
> 2929 North Central Avenue
> 21st Floor
> Phoenix, AZ 85012
> (602) 640-9000
> mogrady@omlaw.com
> pbowman@omlaw.com



**UNITED STATES COURT OF APPEALS**

**FOR THE NINTH CIRCUIT**

**Form 8. Certificate of Compliance for Briefs**

**9th Cir. Case Number(s)** 25-6970, 25-6980

I am the attorney or self-represented party.

**This brief contains 14,620 words**, including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief:

[  ] complies with the word limit of Cir. R. 32-1.

[  ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[  ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[  ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ X ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [X] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[  ] complies with the length limit designated by court order dated

79

_____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** */s/ Rachel H. Berg*     **Date** March 13, 2026

80

## CERTIFICATE OF SERVICE

I hereby certify that on March 13, 2026, an electronic copy of the foregoing brief was filed with the Clerk of Court for the United States Court of Appeals for the Ninth Circuit using the Court's CM-ECF system and was served electronically by the Notice of Docket Activity upon registered CM-ECF participants.

**Signature** */s/ Rachel H. Berg*          **Date** March 13, 2026