Nos. 25-6970, 25-6980

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

_____

HELEN ROE, *et al.*,
PLAINTIFFS-APPELLEES,

V.

DEBORAH JOHNSTON,
DEFENDANT-APPELLANT.

_____

HELEN ROE, *et al.*,
PLAINTIFFS-APPELLEES,

V.

DEBORAH JOHNSTON,
DEFENDANT-APPELLANT,

V.

WARREN PETERSON AND STEVE MONTENEGRO,
INTERVENOR-DEFENDANTS-APPELLANTS.

_____

**On Appeal from the United States District Court
for the District of Arizona
No. 4:20-cv-00484-JAS**

_____

**AMICUS CURIAE BRIEF OF THE STATES OF CALIFORNIA,
WASHINGTON, COLORADO, DISTRICT OF COLUMBIA, ILLINOIS,
MAINE, MASSACHUSETTS, MINNESOTA, NEVADA, NEW YORK,
AND OREGON IN SUPPORT OF PLAINTIFFS-APPELLEES**

*(Counsel Listed on Inside Cover)*

ROB BONTA
  *Attorney General of California*
MICHAEL L. NEWMAN
  *Senior Assistant Attorney General*
VIRGINIA CORRIGAN
  *Supervising Deputy Attorney*
  *General*
ELIA HERRERA
LAUREN GREENAWALT
  *Deputy Attorneys General*
STATE OF CALIFORNIA
DEPARTMENT OF JUSTICE
300 South Spring Street, Suite 1702
Los Angeles, CA 90013-1230
Telephone: (213) 269-6530
elia.herrera@doj.ca.gov
*Attorneys for State of California*

NICHOLAS W. BROWN
  *Attorney General of Washington*
EMILY NELSON
  *Assistant Attorney General*
  *Civil Rights Division*
MOLLY POWELL
JULIE MORONEY
  *Assistant Attorneys General*
  *Complex Litigation Division*
STATE OF WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
Telephone: (206) 464-7744
emily.nelson@atg.wa.gov
molly.powell@atg.wa.gov
julie.moroney@atg.wa.gov
  *Counsel for the State of Washington*
  *(additional counsel listed on*
  *signature page)*

March 20, 2026

## TABLE OF CONTENTS

**Page**

Interest of Amici Curiae..............................................................1

Argument...............................................................................2

    I.     Requiring Transgender Applicants to Undergo A "Sex Change Operation" Undermines Important State Interests .......2

          A.    Amici States' Birth Certificate Amendment Laws .........3

          B.    Subsection (A)(3)'s "Sex Change Operation" Requirement Undermines the Accuracy of Birth Certificates....................................................................7

          C.    Inaccurate Birth Certificates Undermine Resident Wellbeing ................................................................12

    II.    Intervenors' Justifications for Subsection (A)(3) Are Not Persuasive ...............................................................16

          A.    Subsection (A)(3) Does Not Advance State Interests in Identity Verification and Fraud Prevention ..............16

          B.    Intervenors' Arguments Regarding "Stability" and "Minimizing Administrative Costs" are Pretextual ......22

    III.    Conclusion........................................................................25

i

# TABLE OF AUTHORITIES

Page

**CASES**

*Ray v. McCloud*
507 F. Supp. 3d 925 (S.D. Ohio 2020) ....................................................... 17

**STATUTES**

10-146-016 Me. Code R. § 2 (2020) .................................................... 6

410 Ill. Comp. Stat. 535 / 17 (2023) ................................................... 6

Ariz. Admin. Code
§ R6-13-112 ............................................................................ 19
§ R9-19-208 ............................................................................ 7
§ R9-19-208(O) ........................................................................ 1

Ariz. Rev. Stat.
§ 15-828(A) ............................................................................ 4
§ 32-3230(A) .......................................................................... 10
§ 36-337(A) ............................................................................ 7
§ 36-337(A)(1) ........................................................................ 22
§ 36-337(A)(2) ........................................................................ 22
§ 36-337(A)(3) ................................................................... *passim*
§ 36-337(G) ....................................................................... 20, 21

Cal. Health & Safety Code
§§ 102625-102710 .................................................................... 23
§§ 102750-102765 .................................................................... 23
§§ 103400-103410 .................................................................... 23
§§ 103425-103455 .................................................................... 23
§ 103426 ........................................................................... 6, 18
§ 103440 .............................................................................. 21

Colo. Code Regs.
§ 1006-1-5.5 (2024) .................................................................. 6

ii

**TABLE OF AUTHORITIES**
**(continued)**

Page

D.C. Code
§ 7-231.22 (2018) ................................................................. 6

Mass. Gen. Laws
Chapter 46, § 13 (2025) ........................................................ 7

N.Y. Pub. Health Law
§ 4138 (2021)........................................................................ 7

Nev. Admin. Code
§ 440.030 (2020)................................................................... 7

Or. Rev. Stat.
§ 432.235 (2025)................................................................... 7

Wash. Admin. Code
§ 246-490-075...................................................... 4, 6, 18
§ 246-490-305................................................................... 23

Wash. Rev. Code
§ 70.58A.400 ..................................................................... 23
§ 70.58A.500 ....................................................................... 4
§ 70.58A.500(2), (4) .......................................................... 23

**COURT RULES**

Federal Rules of Appellate Procedure
Rule 29(a)(2) ........................................................................ 1

**OTHER AUTHORITIES**

A.B. 1121, 2013-2014 Assemb. (Cal. 2013) ............................. 6, 18

Am. Medical Ass'n, *Policy H-65.967: Conforming Sex and
Gender Designation on Government IDs and Other
Documents* (2021).......................................................................... 5

iii

## TABLE OF AUTHORITIES
### (continued)

**Page**

Ankit Rastogi et al., *Health and Wellbeing: A report of the 2022 U.S. Transgender Survey* (2025) ............................................................... 8, 9

Ariz. Dep't of Pub. Safety, *Employment Background Checks for Authorized Agency* ................................................................................. 19

Assemb. Comm. on Appropriations, Rep. on A.B. 1121, 2013-2014 Assemb. (Cal. 2013) .................................................................... 23

Assemb. Comm. on Judiciary, Rep. on A.B. 1121, 2013-2014 Assemb. (Cal. 2013) ................................................................................. 4

Ayden I. Scheim, et al., *Gender-Concordant Identity Documents and Mental Health Among Transgender Adults in the USA: A Cross-Sectional Study*, 5 Lancet Pub. Health e196 (2020) ............ 12, 13, 15

*Birth Certificates*, Am. Bar Ass'n. ...................................................................... 3

Cal. Dep't of Motor Vehicles, *Real ID Checklist* .......................................... 19

E. Coleman et al., *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, 23 Int'l J. of Transgender Health (2022) .................................... 7, 9, 10, 12

H.J. Tobin, et al., *Securing Equal Access to Sex-Segregated Facilities for Transgender Students*, 28 Wis. J. of L., Gender, and Soc'y 301 (2013) ......................................................................... 14

J.A. Puckett, et al., *Barriers to Gender-Affirming Care for Transgender and Gender Non-Conforming Individuals,* 7 Sexuality Rsch. & Soc. Pol'y (Aug. 4, 2017) ............................................. 9

Jessica A. Clarke, *Sex Assigned at Birth*, 122 Colum. L. Rev. 1821 (2022) ...................................................................................... 19

iv

## TABLE OF AUTHORITIES
### (continued)

Page

Joshua D. Safer et al., *Barriers to Health Care for Transgender Individuals*, 23(2) Current Op. Endocrinology, Diabetes, & Obesity 168 (2016) ........................................................... 10

Julie A. Greenberg & Marybeth Herald, *You Can't Take It with You: Constitutional Consequences of Interstate Gender-Identity Rulings*, 80 Wash. L. Rev. 819 (2005) ........................................ 22

Julie Sharp, *Children's Hospital Los Angeles to Close Trans Youth Center*, CBS News (June 13, 2025).................................... 10

K. C. Velte, *Mitigating the "LGBT Disconnect": Title IX's Protection of Transgender Students, Birth Certificate Correction Statutes, and the Transformative Potential of Connecting the Two*, 27 Am. U. J. Gender Soc. Pol'y & L. 193 (2019) ............................................................................. 3, 14

KFF, *Policy Tracker: Youth Access to Gender Affirming Care and State Policy Restrictions* (Nov. 24, 2025)........................... 10

Lydia R. Harris, *Identity Documents for Transgender Texans: A Proposal for a Uniform System for Correcting Gender Markers in Texas*, 24 Scholar: St. Mary's L. Rev. on Race & Soc. Just. 59 (2022).................................................................. 21

Minn. Dep't of Health, *Change a Birth Record*................................. 5

Movement Advancement Project, *The ID Divide: How Barriers to ID Impact Different Communities and Affect Us All* 13 (2022) ............................................................................... 15

Sandy E. James et al., *Early Insights: A Report of the 2022 U.S Transgender Survey* (2024).................................................... 14

SB 179 Leg. Findings, Sec. 2(b), 2017-2018 S. (Cal. 2017)............. 4

v

**TABLE OF AUTHORITIES**
**(continued)**

Page

Soc. Security Admin., *What to Know about Proving Your Identity*
(Apr. 28, 2025) ................................................................................ 20

Susan J. Pearson, *The Birth Certificate: An American History* 8
(2011) ............................................................................................... 3

Tiffany Glynn et. al, *The Role of Gender Affirmation in the*
*Psychological Well-being Among Transgender Women*, 3
Psych. of Sexual Orientation & Gender Diversity 336 ............................ 13

Transp. Security Admin., TSA Precheck Frequently Asked
Questions ......................................................................................... 20

U.S. Census Bureau, *State-to-State Migration Flows*, Table 2024
(Jan. 20, 2026) .................................................................................. 2

Vivek Divan et. al, *Transgender Social Inclusion and Equality: a*
*pivotal path to development*, 19 J. of the Int'l AIDS Soc'y 2
(July 17, 2016) ............................................................................. 13, 15

Wash. Dep't of Health, *Significant Rule Analysis WAC 246-490-*
*075, Changing sex designation on a birth certificate*
(December 13, 2017) .................................................................... 4, 5, 24

Wash S.B. 5332 Multiple Agency Fiscal Note Summary January
29, 2019 ........................................................................................... 24

**INTEREST OF AMICI CURIAE**

Amici States California, Washington, Colorado, District of Columbia, Illinois, Maine, Massachusetts, Minnesota, Nevada, New York, and Oregon ("Amici States") submit this brief, pursuant to Rule 29(a)(2) of the Federal Rules of Appellate Procedure, in support of Plaintiffs-Appellees' challenge to Arizona Revised Statutes Section 36-337(A)(3) (Subsection (A)(3)) and Arizona Administrative Code Section R9-19-208(O).

Amici States have an interest in protecting all people from discrimination— including transgender people who continue to face high levels of persecution and discrimination. Each Amici State permits people to amend the sex marker[1] on their birth certificate through a private administrative process without requiring that they first undergo a "sex change operation." A.R.S. § 36-337(A)(3). These laws and policies advance important state interests in providing accurate identification information, while promoting resident wellbeing and safety.

Amici States also have an interest in ensuring that their own residents, including those who were born in Arizona, have accurate birth certificates for school enrollment, obtaining drivers' licenses, employment, travel, and other

---

[1] This brief uses the term "sex marker" to align with the language used in Plaintiffs-Appellees' answering brief. *See* Answering Br. for Pls.-Appellees 2, Dkt. No. 38.1. All citations to the record are to Case Number 25-6970.

1

aspects of daily life.[2] A law that erects barriers for Arizona-born transgender people to correct their birth certificates will leave those residents with birth certificates that are incongruent with their gender identity. These inaccurate birth certificates can make it difficult for Arizona-born, transgender residents of Amici States to participate fully in society and can expose them to violence and discrimination, which implicates Amici States' law enforcement and civil rights agencies.

## ARGUMENT

**I.     REQUIRING TRANSGENDER APPLICANTS TO UNDERGO A "SEX CHANGE OPERATION" UNDERMINES IMPORTANT STATE INTERESTS**

Amici States have an interest in ensuring their residents have accurate birth certificates that facilitate their full participation in society. Amici States also share an interest in advancing the wellbeing and dignity of their residents. Amici States' birth certificate amendment processes—which allow transgender individuals to update their birth certificate sex markers through a purely administrative process without undergoing a "sex change operation"—advance these interests. Barriers that make it unnecessarily difficult for transgender people to amend their birth

---

[2] Approximately 72,956 people relocate from Arizona to Amici States each year, including approximately 28,174 to California. U.S. Census Bureau, *State-to-State Migration Flows*, Table 2024 (Jan. 20, 2026), https://tinyurl.com/bdyctsns (reflecting data from 2024).

certificates to comport with their gender identity, by contrast, result in inaccurate birth certificates that harm transgender people in myriad ways.

### A.   Amici States' Birth Certificate Amendment Laws

Birth certificates are foundational identity documents that state residents use to secure additional identity documents, gain employment, and access government benefits. *See* Susan J. Pearson, *The Birth Certificate: An American History* 8 (2011) (noting birth certificates serve essential functions in education, employment, and provision of social services). Birth certificates serve several important purposes, including providing "proof of an individual's age, citizenship status, and identity." *Birth Certificates*, Am. Bar Ass'n, https://tinyurl.com/mwy6zk55 (last visited Feb. 11, 2026). In the United States, a birth certificate is "necessary to obtain a social security number, apply for a passport, enroll in schools, get a driver's license, gain employment, or apply for other benefits."[3] *Id.* Birth certificates are "particularly important" to people under the age of 18, who often lack other identification documents and must produce their birth certificate to secure other identification and enroll in school. K. C. Velte,

---

[3] *See also* Def.'s Controverting Statement of Facts ¶ 17, *Roe ex rel. Roe v. Cunico*, No. 4:20-cv-484 (D. Ariz. Jan. 15, 2025), Dkt. No. 244 (reflecting no objection to Plaintiffs' statement that "Birth certificates are government-issued documents that people use to prove their identities for a wide variety of situations, including to school registration and employment and to obtain other identity documents such as driver's licenses, social security cards, and passports.").

*Mitigating the "LGBT Disconnect": Title IX's Protection of Transgender Students, Birth Certificate Correction Statutes, and the Transformative Potential of Connecting the Two*, 27 Am. U. J. Gender Soc. Pol'y & L. 193, 215 (2019); Ariz. Rev. Stat. § 15-828(A) (requiring most people enrolling a pupil for the first time in a school district to provide a certified copy of the pupil's birth certificate). States therefore have an interest in ensuring their residents have accurate birth certificates that facilitate their full participation in society.

Amici States recognize that an accurate birth certificate is one that matches a person's gender identity. *See*, *e.g.*, SB 179 Leg. Findings, Sec. 2(b), 2017-2018 S. (Cal. 2017) ("Gender identification is fundamentally personal, and the state should endeavor to provide options on state-issued identification documents that recognize a person's accurate gender identification."); Assemb. Comm. on Judiciary, Comm. Rep. on A.B. 1121, 2013-2014 Assemb. (Cal. 2013) at 3 (reflecting that an accurate birth certificate is one that reflects an individual's gender identity in analysis of bill creating private administrative process for amending birth certificate sex marker); Wash. Rev. Code § 70.58A.500; Wash. Admin. Code § 246-490-075 (2018); Wash. Dep't of Health, *Significant Rule Analysis WAC 246-490-075, Changing sex designation on a birth certificate* ("Rule Analysis WAC"), 3-4 (December 13, 2017) ("Birth certificates are recorded at birth, but are used as a foundational identity document for the rest of a person's life. However, identity

4

goes beyond physical sex at birth and includes the person's gender identity as it develops over time."); *see also* Rule Analysis WAC at 4 (stating that "having accurate identification documents is an issue of access and health equity," and noting that individuals with inaccurate birth certificates are "subjected to abuse, harassment, or lack of privacy").[4] To advance their interest in ensuring residents have accurate birth certificates, Amici States have adopted a range of policies that create pathways for transgender people to amend their birth certificates to comport with their gender identity without requiring a "sex change operation" or a court order.[5]

In Minnesota, for example, transgender people can amend the sex marker on their birth certificate by providing a letter signed by a licensed physician certifying that the individual is receiving treatment for gender transition. Minn. Dep't of Health, *Change a Birth Record*, https://tinyurl.com/37st3evv (last updated Feb. 19, 2026). Other Amici States currently administer, or have administered, similar

---

[4] The Significant Rule Analysis is not publicly available, and a copy has been submitted as Exhibit A with Amici States' brief for the Court's convenience.

[5] Amici States are not alone in the understanding that an accurate birth certificate is one that reflects an individual's gender identity. The American Medical Association, for example, supports every individual's right to determine their sex designation on their government identification and supports policies that allow for a change in sex designation as reported by the individual without need for verification by a medical professional. Am. Medical Ass'n, *Policy H-65.967: Conforming Sex and Gender Designation on Government IDs and Other Documents* (2021), https://tinyurl.com/jdhbfkrc.

processes. In Washington a minor may change the sex marker on their birth certificate without a court order by submitting both a form signed by a parent or guardian and a form signed by a licensed health care provider whose scope of practice allows them to determine that the requested change is consistent with the minor's identity. Wash. Admin. Code § 246-490-075 (2018); *see also* D.C. Code § 7-231.22 (2018) (allowing individuals to request a new gender designation on their birth certificate by submitting, *inter alia*, a statement signed by a licensed health care provider that the individual has undergone appropriate treatment for gender transition); A.B. 1121, 2013-2014 Assemb. (Cal. 2013) codified as Cal. Health & Safety Code § 103426 (2014) (amended 2018, repealed and replaced 2023).

Other Amici States have created additional pathways for transgender people to amend the sex marker on their birth certificates without any medical documentation or court order. For example, since 2018, transgender individuals in California have been able to amend the sex marker on their birth certificate by submitting an attestation to the state registrar, under threat of perjury, that the request is to conform the person's legal gender to their gender identity. Cal. Health & Safety Code § 103426; *see also* Wash. Admin. Code § 246-490-075 (2018) (allowing transgender adults in Washington to do the same); Colo. Code Regs. § 1006-1-5.5 (2024); 410 Ill. Comp. Stat. 535 / 17 (2023); 10-146-016 Me. Code

R. § 2 (2020); Mass. Gen. Laws ch. 46, § 13 (2025); Nev. Admin. Code § 440.030 (2020); N.Y. Pub. Health Law § 4138 (2021); Or. Rev. Stat. § 432.235 (2025).

**B.    Subsection (A)(3)'s "Sex Change Operation" Requirement Undermines the Accuracy of Birth Certificates**

Arizona Revised Statutes Section 36-337(A), and its accompanying regulation, Arizona Administrative Code Section R9-19-208, set forth Arizona's procedures for amending a birth certificate. As relevant here, subsection (A)(3) of Arizona Revised Statutes Section 36-337 (Subsection (A)(3)) allows people born in Arizona to amend the sex marker of their birth certificate by submitting to the State Registrar a doctor's note verifying either a "sex change operation"[6] or a "chromosomal count that establishes the sex of the person as different than in the registered birth certificate." A.R.S. § 36-337(A)(3) (2021). Upon receipt of such documentation, the State Registrar must amend the birth certificate. *Id.* Because transgender people typically do not have a chromosomal count different than the sex on their original birth certificate, most transgender people seeking to amend

---

[6] Amici States do not adopt any specific definition of "sex change operation," a term that is not defined by either statute or regulation. Further, "sex change operation" is an outdated term; current treatment standards refer instead to "gender-affirmation surgeries" or specific types of surgical treatment such as phalloplasty, metoidioplasty, and vaginoplasty. E. Coleman et al., *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8* ("WPATH Standards v.8"), 23 Int'l J. of Transgender Health at S86-87 (2022), https://tinyurl.com/v2w7h868 (describing genital and other forms of gender affirming surgeries). Amici States use the term "sex change operation" to reflect the language in Subsection (A)(3).

7

their birth certificate under Subsection (A)(3), or its implementing regulation, would need to demonstrate proof of a "sex change operation."

As detailed above, Amici States, by contrast, allow transgender people to amend the sex marker on their birth certificates through an administrative process without proof of a "sex change operation" and without a court order. In Amici States' experience, a "sex change operation" requirement is an unnecessary barrier to amending birth certificate sex markers that undermines the accuracy of birth certificates. Many transgender people transition without undergoing any type of surgical procedure. Ankit Rastogi et al., *Health and Wellbeing: A report of the 2022 U.S. Transgender Survey* at 46-48 (2025), https://tinyurl.com/56254dhm (2022 nationwide survey of transgender people reflecting that only 2% of transgender people assigned female at birth report undergoing a genital surgery as part of their transition and only 9% of transgender people assigned male at birth report undergoing vaginoplasty or labiaplasty as part of their transition). If a "sex change operation" is required to change identity markers on birth certificates, many transgender people will have certificates that are incongruous with the way they live their lives.

The reasons why transgender people do not undergo a "sex change operation" vary. In many cases, surgical procedures are not needed for transition. *See id.* at 46-48 (reflecting that 57% of transgender people assigned female at birth reported

no interest in phalloplasty; 45% of transgender people assigned female at birth reported no interest in metoidioplasty; and 21% of transgender people assigned male at birth reported no interest in vaginoplasty or labiaplasty); *see also* WPATH Standards v.8 at S7 ("It should be emphasized there is no 'one-size-fits-all' approach and [transgender and gender diverse] people may need to undergo all, some, or none of these interventions to support their gender affirmation.").[7]

In other cases, transgender people might face barriers to accessing needed surgical care. *See* Rastogi et al., *supra*, at 47, 49 (reflecting that higher percentages of transgender people desire surgical procedures than receive them). In an online survey of transgender people, "[t]he most commonly reported barrier to gender-affirming care was financial issues." J.A. Puckett, et al., *Barriers to Gender-Affirming Care for Transgender and Gender Non-Conforming Individuals* 7 Sexuality Rsch. & Soc. Pol'y (Aug. 4, 2017), https://tinyurl.com/aaef8fd5; s*ee also* Rastogi et al., *supra*, at 8 (2022 survey results reflecting 20% of transgender people seeking transition-related surgeries were denied coverage by health insurance). Even when transgender people can afford care, a dearth of local service

---

[7] *See also* Def.'s Controverting Statement of Facts ¶¶ 13-15, *Roe ex rel. Roe*, No. 4:20-cv-484 (reflecting that Defendant had no objection to facts establishing that transition is highly individualized and can include "one or more" of the following: social transition, medical transition including medication and "typically only for adults," "surgeries to alter the appearance and functioning of primary- and secondary-sex characteristics.").

providers can preclude access to care. Some transgender patients "report that lack of providers with expertise in transgender medicine represents the single largest component inhibiting access" to health care. *See* Joshua D. Safer et al., *Barriers to Health Care for Transgender Individuals*, 23(2) Current Op. Endocrinology, Diabetes, & Obesity 168, 169 (2016); *see also* Julie Sharp, *Children's Hospital Los Angeles to Close Trans Youth Center*, CBS News (June 13, 2025), https://tinyurl.com/3pzvsx7r (reporting the closing of a gender affirming healthcare center due to "significant operational, legal, and financial risks stemming from the shifting policy landscape at both the state and federal levels").

Additionally, transgender children and adolescents are often precluded from "sex change operation[s]" by law and/or treatment standards. *See* KFF, *Policy Tracker: Youth Access to Gender Affirming Care and State Policy Restrictions* (Nov. 24, 2025), https://tinyurl.com/muszj32x (summarizing state law on gender affirming care for youth); WPATH Standards v.8 at S66 (recommending against phalloplasty before the age of 18). Indeed, in Arizona, transgender adolescents such as Plaintiffs-Appellees are barred from obtaining gender reassignment surgery by law. *See* Ariz. Rev. Stat. § 32-3230(A).

Intervenor-Defendants-Appellants ("Intervenors") recognize that Arizona law makes it exceedingly difficult for transgender people to amend the sex marker on their birth certificates. Indeed, Intervenors' brief confirms that under Arizona's

10

birth certificate amendment law, very few transgender people are able to amend their birth certificates. *See* Intervenor-Defs.-Appellants' Opening Br. ("Intervenors' Opening Brief") 23, Docket No. 27.1 ("Under Arizona law, a birth certificate reflects an individual's sex as observed at birth, with only limited bases for amending that original designation. Under this regime it is very unlikely that there will be any need to amend the sex field on a birth certificate at all."). Subsection (A)(3)'s unnecessary barrier to birth certificate amendments leaves many transgender people with discordant birth certificates—that is, documents that do not match their gender identity and impede their ability to fully participate in society.

Because most transgender people never undergo a "sex change operation," and because children and adolescents in Arizona are barred from undergoing such operations, requiring transgender people to provide a doctor's note verifying that they have undergone a "sex change operation" means that many transgender people will not be able to avail themselves of the private administrative process described in Subsection (A)(3) and its implementing regulations. This makes it more difficult, or even impossible, for many transgender people in Arizona (and particularly adolescents) to update their birth certificate sex marker to comport with their gender identity. That, in turn, undermines the goal of ensuring accurate birth certificates.

11

### C. Inaccurate Birth Certificates Undermine Resident Wellbeing

Amici States have an interest in promoting the wellbeing of their residents, which includes improving mental wellbeing, reducing discrimination and violence, and facilitating free and full participation in society. Amici States' birth certificate amendment laws promote these interests. Amending identification documents, including birth certificates, is an important part of transition for many transgender people and can yield psychological benefits. WPATH Standards of Care v.8 at S15 ("[Transgender and gender diverse] people who have changed gender markers on key documents enjoy better mental health."). Laws that make it unnecessarily difficult for transgender people to update their birth certificates, by contrast, lead to discordant birth certificates which undermine States' interests in the wellbeing of their residents. Transgender people with discordant identity documents, like birth certificates, can face significant hardships both from possessing an identity document that does not reflect their gender identity and from presenting it to others.

Research shows that transgender people with discordant identity documents, such as birth certificates, experience higher levels of psychological distress, suicidal ideation, and suicidal plannings than do transgender people with identity documents that conform to their gender identity. Ayden I. Scheim, et al., *Gender-Concordant Identity Documents and Mental Health Among Transgender Adults in*

12

*the USA: A Cross-Sectional Study*, 5 Lancet Pub. Health e196, e200-01(2020), https://tinyurl.com/bde86x69. Some of these psychological harms stem from the fact that an incongruence between a person's identity and their identity documents disaffirms their identity and erodes their dignity. *See id.* at e202 ("[P]ossessing gender-concordant IDs might promote positive mental health by affirming one's gender identity and increasing access to interpersonal gender affirmation in social interactions."); Tiffany Glynn et. al, *The Role of Gender Affirmation in the Psychological Well-being Among Transgender Women*, 3 Psych. of Sexual Orientation & Gender Diversity 336, 336-344 (concluding that medical, psychological, and social processes that acknowledge transgender identities promote the psychological well-being of transgender women); *see also* Vivek Divan et. al, *Transgender Social Inclusion and Equality: a pivotal path to development*, 19 J. of the Int'l AIDS Soc'y 2 (July 17, 2016), https://tinyurl.com/mjzd5ay3 ("For trans people, their very recognition as human beings requires a guarantee of a composite of entitlements that others take for granted–core rights that recognize their legal personhood. . . A basic part of their identity–gender–is unrecognized. This recognition of their gender is core to having their inherent dignity respected …").

Further, transgender people who are forced to present discordant identity documents, including birth certificates, face the risk of discrimination, denial of

13

services, and violence. *See* Sandy E. James et al., *Early Insights: A Report of the 2022 U.S Transgender Survey* at 22 (2024), https://tinyurl.com/fpw8fump ("Twenty-two percent (22%) of all respondents reported being verbally harassed, assaulted, asked to leave a location, or denied services when they have shown someone an ID with a name or gender that did not match their presentation."). For some transgender people, presenting an identity document that is discordant with their gender identity and presentation essentially outs them as transgender. Velte, *supra,* at 211. For example, "[o]ne way a student is outed as transgender, before they even enter a classroom, is by the presentation of a birth certificate, which is required to register a child in public school." *Id.* at 207; *see also* H.J. Tobin, et al., *Securing Equal Access to Sex-Segregated Facilities for Transgender Students*, 28 Wis. J. of L., Gender, and Soc'y 301, 305-06 (2013) (recounting experience of transgender boy who had transitioned but whose challenges "began when [he] was ready to matriculate at the local elementary school" because "[r]egistration at the school required [his] parents to provide his birth record, which would disclose his assigned birth sex and make his transgender status public.").

The threat and fear of violence and discrimination can lead transgender people to exclude themselves from daily life. Transgender people may avoid social participation in areas such as education, recreation, and employment because they anticipate they will be mistreated upon presenting a birth certificate that is

14

discordant with their gender identity. *See* Scheim, et al., *supra*, at e202 (discussing birth certificates and other forms of identification); *see also* Movement Advancement Project, *The ID Divide: How Barriers to ID Impact Different Communities and Affect Us All* 13 (2022), https://tinyurl.com/msjvpy9 ("[A] transgender person whose ID does not reflect their gender identity might avoid medical care to avoid having to present an incorrect ID and face potential harassment or denial of care.").[8] A recognition of one's gender in official government-issued documents, by contrast, "results in fuller civic participation of and by trans people." Divan et al., *supra*, at 3.

In sum, when transgender people, like Plaintiffs-Appellees, have birth certificates incongruent with their gender identity, they often face an impossible choice: (1) use the discordant birth certificate and risk revealing personal

---

[8] That some transgender people with inaccurate birth certificates avoid participating in daily life is also supported by the District Court record. *See* Expert Report of Dr. Randi C. Ettner ¶ 47, *Roe ex rel. Roe*, No. 4:20-cv-484, Dkt. No. 233-2 ("Inaccurate documents can cause an individual to isolate to avoid situations that might evoke discrimination, ridicule, accusations of fraud, harassment, or even violence—experiences that are all too common among transgender people."); Def.'s Controverting Statement of Facts ¶ 58, *Roe ex rel. Roe*, No. 4:20-cv-484 ("Defendant does not dispute: (1) that the sex field on Plaintiffs' birth certificates is incongruent with their gender identifiers; (2) if they show their birth certificate to another person, they believe they risk disclosing private medical information and intensely personal aspects of their identities; and (3) because of their concerns, they believe they have only two choices: disclose that private medical information and potentially reveal their transgender status to participate in the activity that requires a birth certificate to participate or forgo participation in the activity.").

information and potentially exposing themselves to violence or discrimination; or (2) exclude themselves from core activities of daily life, such as education, recreation, and employment. Either option threatens their wellbeing. Beyond this double-bind, the very possession of a discordant birth certificate can create dignitary and psychological harms. As such, Subsection (A)(3) undermines the wellbeing of transgender people born in Arizona.

## II. INTERVENORS' JUSTIFICATIONS FOR SUBSECTION (A)(3) ARE NOT PERSUASIVE

Intervenors argue that Subsection (A)(3) advances two important state interests: (1) verifying a person's identity and preventing fraud, particularly in government programs and (2) increasing stability in state records, thereby reducing administrative costs. Neither argument is persuasive.

### A. Subsection (A)(3) Does Not Advance State Interests in Identity Verification and Fraud Prevention

Intervenors argue that Subsection (A)(3) is both substantially and rationally related to Arizona's interest in reliably verifying an individual's identity and preventing fraud, particularly in the context of Arizona benefits, background checks for regulated professions, and voter registration. Intervenors' Opening Br. at 18, 25. While Amici States agree that verifying identity and preventing fraud in government programs are important state interests, Subsection (A)(3) undermines those interests because a "sex change operation" requirement precludes many

16

transgender people from conforming their birth certificate to their gender presentation. Further, Intervenors fail to otherwise relate a "sex change operation" requirement to identity verification or the reduction of fraud. Intervenors' proposed link—that a "sex change operation" can be independently verified through a physical examination—is counter to common sense, decency, and Amici States' experience.

First, Subsection (A)(3)'s "sex change operation" requirement *reduces* the accuracy of birth certificates and could undermine identity verification. Transgender people can present and be perceived as a different gender than the sex assigned at birth on their birth certificate. *See* Section I(c), *supra* (describing how some transgender people are essentially "outed" by discordant birth certificates). When a transgender person is perceived as a different gender than their sex assigned at birth but is unable to amend their birth certificate because of Subsection (A)(3)'s "sex change operation" requirement, their gender presentation will not comport with their birth certificate, which means the birth certificate will be *less* useful for identity verification.

Further, Intervenors fail to rationally relate Subsection (A)(3) to identity verification and fraud prevention.[9] Intervenors do not explain if or how the sex

---

[9] Other litigants have also tried and failed to make this argument. In *Ray v. McCloud*, Ohio identified fraud prevention as a justification for its policy of

(continued…)

17

marker on a birth certificate is used by Arizona to verify identity nor how a birth certificate sex marker that reflects a person's gender identity, rather than genitals, erodes identity verification or leads to fraud, particularly in government programs. Intervenors simply posit that "if a dispute about identification were to arise," Subsection (A)(3) provides a "method for objectively correlating an individual to the sex listed on the birth certificate[:]" a "physical examination" to confirm that a "sex change operation" has occurred. Intervenors' Opening Br. at 19. This argument is not merely unsupported by evidence—it belies common sense, logic, and Amici States' experience. Amici States' experience reflects that there are a range of ways to "correlate an individual to the sex listed on their birth certificate," without a physical examination or "sex change operation," including self-attestation, Cal. Health & Safety Code § 103426, or a physicians' verification of appropriate transition-related treatment, A.B. 1121, 2013-2014 Assemb. (Cal. 2013); *see also* Wash. Admin. Code 246-490-075 (2018) (requiring adults to amend sex designation under threat of perjury and requiring minors to submit statement from provider attesting that the amendment aligns with the minor's identity).

---

prohibiting transgender applicants to amend the sex designation on their birth certificates. The court rejected this as the state failed to prove the connection between fraud and amendment of sex designation on identification documents. 507 F. Supp. 3d 925, 939 (S.D. Ohio 2020).

More importantly, Intervenors' suggestion that disputes about identity should be resolved through a physical examination of genitals runs counter to common sense and decency. *See* Jessica A. Clarke, *Sex Assigned at Birth*, 122 Colum. L. Rev. 1821, 1865 (2022) ("Genitalia are regarded as so quintessentially private that the metaphor of 'stripping someone bare' is used to describe other privacy violations."). Arizona and other state governments do not verify identity through physical exams of a person's genitals. *See* Ariz. Admin. Code R6-13-112 (specifying that driver-license or documents such as birth certificates and voter registration cards "reasonably establish" the identity of an applicant for the tuberculosis control program payment); Cal. Dep't of Motor Vehicles, *Real ID Checklist*, https://tinyurl.com/57x5zrvf (last visited March 3, 2026) (listing documents that appropriately prove identity); *see also* Ariz. Dep't of Pub. Safety, *Employment Background Checks for Authorized Agency*, https://tinyurl.com/e639cfb6 (last visited Feb. 26, 2026) (reflecting that Arizona agencies should use designated background check program "which conducts *fingerprint-based* state and federal criminal history background checks for authorized agencies.") (emphasis added).

Subjecting people to a physical exam to verify their identity would be not only highly invasive, but unfruitful given that sex organs bear little relevance to a person's identification. When a government needs to verify identification, it relies

19

on fingerprints and other biometrics, photo identification, and employment or residential history. For example, the Social Security Administration's website reflects that under a strengthened identity verification program, "the easiest and most secure way" for a person to prove their identity to access benefits is through an online form. *See* Soc. Security Admin., *What to Know about Proving Your Identity* (Apr. 28, 2025), https://tinyurl.com/48wbe6jy (last visited March 11, 2026); *see also* Transp. Security Admin., TSA Precheck Frequently Asked Questions, https://tinyurl.com/44fec8x8 (last visited Feb. 25, 2026) (reflecting that identity is confirmed for TSA Precheck through online application, scan of identity documents, photocapture, and fingerprinting). Should there ever be a need to refer to *sex assigned at birth* as part of identity verification, Arizona already has a system in place to maintain sealed copies of all original birth certificates and the "evidentiary documents provided to amend the birth certificate." *See* A.R.S. § 36-337(G); *see also* Excerpts of Record 3-DirectorER-197, Dkt. No 30.4 (confirming that original birth certificate and any evidentiary document are permanently retained). If an Arizona court determined that these documents were needed to help verify a person's identity, the State Registrar would be required to produce the documents. *Id.*[10]

---

[10] The District Court did not, as Intervenors contend, require Arizona to maintain two different birth certificates. Intervenors' Opening Br. at 21. Instead,

(continued…)

Finally, Amici States' experience demonstrates that requiring transgender people to undergo a "sex change operation" to amend their birth certificates is not reflective of a unified history or consensus. *Contra* Intervenors' Opening Br. at 26 (arguing that consensus, history, and common-sense support Intervenors' argument that Subsection (A)(3) improves identity verification and prevents fraud). Transgender people in Amici States have been able to amend their birth certificates without a "sex change operation" or court order for over a decade. *See* Section I(A), *supra* (describing laws). And, despite birth certificate amendment laws that allow transgender people to amend their sex markers without a "sex change operation" or court order (and in some cases, without a doctor's verification), Amici States have not experienced significant incidence of identity theft or other fraud. *See* Lydia R. Harris, *Identity Documents for Transgender Texans: A Proposal for a Uniform System for Correcting Gender Markers in Texas*, 24 Scholar: St. Mary's L. Rev. on Race & Soc. Just. 59, 80 (2022) ("There is no evidence to support the argument that legal gender corrections lead to an increase in fraud" and "any legal change to identifying documents can always be traced back to the original identity, thus eliminating the risk of fraud.") (citing *License to*

---

Arizona law already requires that the Registrar maintain all registered birth certificates under seal. *See* A.R.S. § 36-337(G). Amici States have similar requirements, s*ee, e.g.*, Cal. Health & Safety Code § 103440 (dictating that sealed original birth record remains part of state registrar's records), and have faced neither administrative burden nor confusion from these systems.

*be Yourself: Responding to National Security and Identity Fraud Arguments*, Open Soc'y Found. (Apr. 2017)); *see also* Julie A. Greenberg & Marybeth Herald, *You Can't Take It with You: Constitutional Consequences of Interstate Gender-Identity Rulings*, 80 Wash. L. Rev. 819, 865-66, 867-68 (2005) (reflecting that between 1966 and 2005 no court held that concerns of fraud justified refusing to acknowledge a person's self-identified sex).[11]

### B. Intervenors' Arguments Regarding "Stability" and "Minimizing Administrative Costs" are Pretextual

Intervenors further argue that the State's interest in the "stability of its vital records," and related interest in "minimizing administrative cost and burden" justify Subsection (A)(3)'s barriers to amending birth certificates. Intervenors Opening Br. at 23-24. But Amici States' experience demonstrates that laws that require neither a "sex change operation" or court order do not erode stability nor increase state costs. Intervenors' focus on the stability of vital records instead suggests a desire to erect unnecessary barriers for transgender people to amend their birth certificates.

Intervenors' argument that subsection (A)(3) is necessary to ensure Arizona's vital records remain "stable" is inconsistent with other Arizona provisions that permit amendments, without limitation. *See* A.R.S. §§ 36-337(A)(1) (adoption), (2)

---

[11] Intervenors' government speech doctrine argument is a red herring given that Plaintiffs-Appellees do not raise a First Amendment claim.

22

(voluntary acknowledgement of paternity). Arizona's own pathways to birth certificate amendments recognize that records must accurately reflect the reality of their residents—whether it be an adoption, a gender transition, a name change, or acknowledgement of paternity—rather than prioritizing "stability" at all costs.[12] Intervenors have provided no reason to prioritize "stability" over accuracy only as to sex marker changes.

Amici States' experience further shows that Intervenors' concerns about "confusion, cost, and administrative burdens" are unfounded. Intervenors' Opening Br. at 23. Amici States have not experienced undue instability or administrative burdens while administering programs that allow amendments to birth certificate sex markers without requiring a "sex change operation" or court order. In fact, Amici States have consistently found that creating new pathways for transgender people to amend their birth certificates imposes little to no costs on the State. *See* Wash S.B. 5332 Multiple Agency Fiscal Note Summary January 29, 2019 (finding Washington's legislation rewriting vital statistics, including allowing amendment of birth certificate sex designations, had no financial impact); Assemb. Comm. on

---

[12] Amici States also have laws that allow birth certificate amendments to reflect the reality of their residents. *See, e.g.*, Wash. Rev. Code § 70.58A.400; Cal. Health & Safety Code §§ 102625-102710 (allowing amendments in case of adoption); Wash. Admin. Code § 246-490-305 (2019); Cal. Health & Safety Code §§102750-102765 (same as to acknowledgment of parentage); Wash. Rev. Code § 70.58A.500(2), (4); Cal. Health & Safety Code §§103400-103410; §§103425-103455 (name change and gender change).

Appropriations, Rep. on A.B. 1121, 2013-2014 Assemb., at 1 (Cal. 2013) (concluding that law creating private administrative process for transgender people to amend their birth certificate sex marker imposed only minor costs to California's registrar and that those costs would be covered by an existing fee for issuance of a new birth certificate).[13] Even states with laws requiring no medical documentation to amend birth certificate sex markers have not experienced the burdens that Intervenors argue will occur.

Intervenors' focus on "stability" instead reflects a desire to prevent transgender people from amending their birth certificates. Indeed, Intervenors emphasize that under Arizona's birth certificate laws "it is very unlikely that there will be *any* need to amend the sex field on a birth certificate at all." Intervenors' Opening Br. at 23 (emphasis added). At bottom, Subsection (A)(3) makes it almost impossible for transgender people to amend the sex marker on their birth certificates. As explained throughout the brief, Subsection (A)(3)'s "sex change operation" requirement undermines important state interests without advancing the interests identified by Intervenors.

_____

[13] While laws that provide new pathways for transgender people to update their gender markers lead to minimal administrative burden and costs to the States, laws that impose unnecessary barriers impose tremendous costs and burden upon transgender people. *See* Rule Analysis WAC at 9-10 (Department of Health concluding that an attestation from a medical professional is not necessary "to confirm what an adult is capable of determining on their own" and that requiring a medical attestation is "unnecessarily burdensome both in time and cost.").

## III. CONCLUSION

For the foregoing reasons, the Ninth Circuit should affirm the District Court's order.

Dated: March 20, 2026

Respectfully submitted,

*/s/ Elia Herrera*

Rob Bonta
  *Attorney General of California*
Michael L. Newman
  *Senior Assistant Attorney General*
Virginia Corrigan
  *Supervising Deputy Attorney General*
Elia Herrera
Lauren Greenawalt
  *Deputy Attorneys General*

Nicholas W. Brown
  *Attorney General of Washington*
Emily Nelson
  *Assistant Attorney General*
*Civil Rights Division*
Molly Powell
Julie Moroney
  *Assistant Attorneys General*
*Complex Litigation Division*

25

PHILIP J. WEISER
 *Attorney General, State of Colorado*
Office of the Attorney General
Colorado Department of Law
1300 Broadway, 10th Floor
Denver, CO 80203

KWAME RAOUL
 *Attorney General*
State of Illinois
115 S. LaSalle St.
Chicago, IL 60603

ANDREA JOY CAMPBELL
 *Attorney General*
Commonwealth of Massachusetts
One Ashburton Place
Boston, MA 02108

AARON D. FORD
 *Attorney General of Nevada*
100 North Carson Street
Carson City, NV 89701

DAN RAYFIELD
 *Attorney General of Oregon*
1162 Court Street NE
Salem, OR 97301

BRIAN L. SCHWALB
 *Attorney General for the District of Columbia*
400 6th Street, NW, Suite 8100
Washington, D.C. 20001

AARON M. FREY
 *Attorney General of Maine*
6 State House Station
Augusta, ME 04333-0006

KEITH ELLISON
 *Attorney General*
State of Minnesota
102 State Capitol
75 Rev. Dr. Martin Luther King Jr. Blvd.
St. Paul, MN 55155

LETITIA JAMES
 *Attorney General*
State of New York
28 Liberty Street
New York, NY 10005

26

# CERTIFICATE OF COMPLIANCE

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 25-6970; 25-6980

I am the attorney or self-represented party.

**This brief contains 5,571 words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[x] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** _/s/ Elia Herrera_____ **Date** _March 20, 2026___
*(use "s/[typed name]" to sign electronically-filed documents)*

# Exhibit A

# Significant Rule Analysis

# WAC 246-490-075
# Changing sex designation on a birth certificate

# December 13, 2017

Template Updated November 2015

# Contents

Section 1:     Describe the rule, including a brief history of the issue, and explain why the rule is needed.

Section 2:     Is a Significant Analysis required for this rule?

Section 3:     Clearly state in detail the general goals and specific objectives of the statute that the rule implements.

Section 4:     Explain how the department determined that the rule is needed to achieve these general goals and specific objectives. Analyze alternatives to rulemaking and the consequences of not adopting the rule.

Section 5:     Explain how the department determined that the probable benefits of the rule are greater than the probable costs, taking into account both the qualitative and quantitative benefits and costs and the specific directives of the statute being implemented.

Section 6:     Identify alternative versions of the rule that were considered, and explain how the department determined that the rule being adopted is the least burdensome alternative for those required to comply with it that will achieve the general goals and specific objectives stated previously.

Section 7:     Determine that the rule does not require those to whom it applies to take an action that violates requirements of another federal or state law.

Section 8:     Determine that the rule does not impose more stringent performance requirements on private entities than on public entities unless required to do so by federal or state law.

Section 9:     Determine if the rule differs from any federal regulation or statute applicable to the same activity or subject matter and, if so, determine that the difference is justified by an explicit state statute or by substantial evidence that the difference is necessary.

Section 10:    Demonstrate that the rule has been coordinated to the maximum extent practicable with other federal, state, and local laws applicable to the same activity or subject matter.

Appendix A:  Department of Health procedure "Gender Change on a Birth Certificate".

2

# SECTON 1:

## Describe the rule, including a brief history of the issue, and explain why the rule is needed.

The Department of Health (department) adopted a new section to the Washington Administrative Code, WAC 246-490-075. The chapter establishes vital statistics requirements for amending data on birth certificates in addition to requirements related to releasing vital records data and registering delayed births. The new rule adopts the department procedure to request a change to the sex designation on birth certificates established in 2008[1]. See Appendix A. The procedure was adopted in response to requests to change birth certificates based on an individual's clinically assessed sex or gender identity or both. The procedure allowed individuals to change the sex designation on their birth certificate from male to female, or female to male. To change their birth certificate, the person had to provide a letter with sufficient information to identify the record, contact information, and the change requested, along with a letter from a licensed medical doctor or osteopathic physician stating that the applicant had the appropriate clinical treatment. The procedure was developed in collaboration with affected individuals, the Human Rights Commission, the Governor's office, and other stakeholders.

Since the department established the procedure, requests for sex designation changes on birth certificates have steadily increased. As of December 1, 2017, the department has processed 276 requests compared to 56 requests in 2013. Additionally, the department has received requests to change the sex designation to something other than male or female. This rule making is intended to meet the needs of those who identify as male or female, non-gendered, and non-binary including those born intersex.

The rule adopts the current department procedure to request a change to the sex designation on a birth certificate with the following changes:
- Expands the current procedure to allow sex designation as male, female, or X on birth certificates;
- Modifies the current procedure to require the sex designation change application of an adult to be notarized and signed under penalty of perjury rather than requiring attestation by a medical doctor or an osteopathic physician;
- Allows minors to change the sex designation on their birth certificate with written consent of a parent or legal guardian, and a signed attestation by a licensed health care provider whose scope of practice allows for the attestation; and
- Increases the types of licensed health care providers who can provide the attestation to those whose scope of practice allows them to make the determination that the sex designation change is consistent with the requestor's identity.

Under chapter 246-491 WAC, Vital Statistics - Certificates, sex is recorded at birth by the attending health care provider based on physical attributes as male, female, or undetermined for babies born intersex. This requirement is consistent with national standards for recording live births. This chapter was not amended as part of the rule making process. Birth certificates are recorded at birth, but are used as a foundational identity document for the rest of a person's life.

---

[1] Gender Change on a Birth Certificate

3

However, identity goes beyond physical sex at birth and includes the person's gender identity as it develops over time. In fact, under the Washington Law Against Discrimination (chapter 49.60 RCW), the terms `sex' and `gender' are synonymous. See RCW 49.60.040(25).

For people whose gender identity does not match their sex designation as recorded on their birth certificates or other identity documents, having accurate identification documents is an issue of access and health equity. They are often faced with proving the validity of their identity documents. Some health care providers refuse service to transgender patients, including a Washington state hospital that is currently involved in a discrimination lawsuit with the American Civil Liberties Union[2]. It is also common for these people to be subjected to abuse, harassment, or lack of privacy.

The national conversation on sex and gender is changing to be more inclusive of people who are transgendered and those who identify as neither male nor female. Federal agencies as well as many states and cities currently allow people to change their sex designation from male to female, or female to male on identity documents such as passports and driver licenses, and for receiving benefits. Legislation passed in Oregon[3] and California[4] this year allows individuals to change the sex designation on their birth certificate from male to female, female to male, or to something other than male or female. Internationally, laws related to sex and gender are becoming more inclusive, including Canada's 2017 law that protects gender identity and gender expression as a human right.[5]

As noted above, it is critical for the health and safety of transgender and gender non-conforming people to have identity documents, including birth certificates, match their lived identity. Through this rule making, the department will improve the public health and safety by recognizing the lived identity of those people who were born intersex and those whose physical sex, gender, or both have changed since their physical sex was recorded at birth.

## SECTION 2:

### Is a Significant Analysis required for this rule?

Yes, as defined in RCW 34.05.328, the rule requires significant analysis because the rule makes significant amendments to a policy of the department by allowing changes to the sex designation on birth certificates, and establishes requirements for amending birth certificates. The rule also includes procedural application requirements that are not considered significant requirements under RCW 34.05.328 and are not analyzed in this document.

---

[2] https://www.seattletimes.com/seattle-news/health/washington-state-family-sues-medical-center-for-refusing-services-to-transgender-son/
[3] https://olis.leg.state.or.us/liz/2017R1/Downloads/MeasureDocument/HB2673/Enrolled
[4] https://leginfo.legislature.ca.gov/faces/billNavClient.xhtml?bill_id=201720180SB179
[5] http://www.parl.ca/LegisInfo/BillDetails.aspx?billId=8269852&Language=E&Mode=1

4

## SECTION 3:

**Clearly state in detail the general goals and specific objectives of the statute that the rule implements.**

The department has broad authority over Washington's system of vital records. RCW 43.70.150 requires the Secretary of the department to "prepare the necessary rules, forms, and blanks for obtaining records, and insure the faithful registration [of vital records]". Further, RCW 43.70.160 charges the state registrar to "prepare and issue such detailed instructions as may be required to secure the uniform observance of [chapter 70.58 RCW] and the maintenance of a perfect system of registration." The general goals and specific objectives of RCW 43.70.150 are for the department to create and maintain an accurate system of vital records, which includes adopting rules related to recording, amending, and issuing birth certificates. The statute specifically directs the Secretary of Health to have charge of the state's system of vital records and ensure records, including records of birth, are faithfully registered.

## SECTION 4:

**Explain how the department determined that the rule is needed to achieve these general goals and specific objectives. Analyze alternatives to rulemaking and the consequences of not adopting the rule.**

The department has determined the rule is necessary to implement the general goals and specific objectives of RCW 43.70.150 and RCW 43.70.160 mandating the department create a perfect system of registration and ensure the faithful registration of vital records, because the rule establishes generally applicable requirements for requesting amendment of birth records to reflect accurate sex designation. If the department fails to adopt a rule relating to amendment of birth records to allow an additional non-binary sex destination, the statutory direction to adopt rules for insuring the faithful and perfect registration of birth records would not be sufficiently met because the sex designation field would inaccurately reflect the current identity of the individual named in the record. The rule is necessary in order to make sure the department faithfully maintains the system of registration, and to provide the public with a process to amend birth records. The department has therefore determined there is no feasible alternative to rule making.

## SECTION 5:

**Explain how the department determined that the probable benefits of the rule are greater than the probable costs, taking into account both the qualitative and quantitative benefits and costs and the specific directives of the statute being implemented.**

The adopted rule establishes application requirements for adults and minors to request an amendment to the sex designation on their birth certificate from male to female, from female to male, or from female or male to X. The rule defines X as:

5

a gender that is not exclusively male or female, including, but not limited to, intersex, agender, amalgagender, androgynous, bigender, demigender, female-to-male, genderfluid, genderqueer, male-to-female, neutrois, non-binary, pangender, third sex, transgender, transsexual, Two Spirit, and unspecified.

As identified in Sections 1 and 2 of this document, the rule adopts significant amendments to a policy of the department by allowing changes to the sex designation on birth certificates, and establishes requirements for amending birth certificates.

The requirements analyzed in this section include submitting the following as part of the application for changing the sex designation on a birth certificate:
1. For adults, the application must be notarized and signed under penalty of perjury pursuant to chapter 9A.72 RCW.
2. For minors, the parent or legal guardian must give consent and the application must be signed by a health care provider attesting that the minor identified on the application is under the provider's care and the request to change sex designation on the birth certificate is consistent with the minor's gender identity. The attestation must be provided by a licensed health care provider whose scope of practice allows them to make the determination that the sex designation change is consistent with the minor's gender identity.

**Allowing Sex Designation Changes to Birth Certificates:** The rule incorporates the recommendations of the National Center for Transgender Equality[6]. The department expects the rule will address many obstacles of daily living and potentially reduce the risk of harm that gender diverse people face every day. Further, because printed birth certificates only reflect the effect of the requested change and no notation that a change was made, an individual will not be able to know what if any change was made to a birth certificate.

Having a birth certificate that accurately reflects the sex and gender of a person's lived experience benefits those whose identity has changed since their sex was recorded at birth. Every time a person must show their birth certificate and the sex does not reflect how they present themselves in public, they can experience a range of negative outcomes. These negative outcomes range from denial of employment, education, housing, health care, and public benefits, to verbal harassment and even physical violence.[7] Both the 2015 U.S. Transgender Survey Report[8] and Understanding Issues Facing Transgender Americans 2016[9] document these effects.

**Benefits:** The primary benefit of this rule is a reduction in the negative outcomes gender diverse people experience in their daily lives. The department assumes the benefits of allowing a sex designation change on the birth certificate range from peace of mind when producing a birth certificate with a sex identity that matches their presentation, to the avoided cost of worse health outcomes, lower education achievement, lack of employment and housing, and physical and emotional injury through acts of violence.

_____

[6] *Updating Birth Certificate Gender Change Policies*, National Center for Transgender Equality
[7] *Updating Birth Certificate Gender Change Policies*, National Center for Transgender Equality
[8] http://www.ustranssurvey.org/reports
[9] http://www.lgbtmap.org/file/understanding-issues-facing-transgender-americans.pdf

6

**Costs:** All amendments made to birth certificates are done free of charge. Therefore, the department assumes there are no probable costs associated with allowing sex designation changes to birth certificates.

Qualitative costs of changing a birth certificate are primarily related to using a Washington state birth certificate to obtain other identity documents and benefits. Those who choose X as their sex designation may be faced with other state and federal agencies not recognizing X as a valid sex identifier. For example, the U.S. Department of State currently allows only sex designation of male and female. This could also impact a person's ability to receive public benefits.

**Requiring Notarized Applications for Adults:** The current department procedure requires an attestation from a medical doctor or osteopathic physician stating that the applicant had the appropriate clinical treatment in order for the sex designation of a birth certificate to be changed from male to female, or from female to male. The department determined the decision to request a sex designation change on a birth certificate to match one's own sex or gender identity is the prerogative of an adult. However, to protect the subject of the record, the rule requires a notarized signature on the application for birth certificate sex designation change to ensure the applicant is the subject of the record.

**Benefits:** Requiring an application be notarized and signed under penalty of perjury pursuant to chapter 9A.72 RCW protects the subject of the record by ensuring the identity of the applicant has been verified by an independent third party licensed under Washington State law. This protects the subject of the record from the potential malicious acts of others and provides a level of protection from error.

In addition, by not adopting the current procedure of an attestation from a medical doctor or osteopathic physician, the rule reduces the current barrier for adults to change the sex designation on their birth certificates.

**Costs:** A notary is not required to charge a fee, and if a fee is charged, it may not be more than $10 as established under WAC 308.30.020. The department offers notary services free of charge as do many banks, credit unions, and service organizations across the state. Therefore, the range for the cost of notarizing an adult application ranges from $0 to $10.

**Requiring Parental or Legal Guardian Consent and Licensed Health Care Provider Attestation for Minors:** The rule is consistent with the legal actions a minor can take without parental or legal guardian consent. The birth certificate is a legal document and serves as prima facie evidence of a person's identity. Therefore, a minor, as defined in the rule, may not change the birth certificate without parental or legal guardian consent.

The rule also requires attestation of a licensed health care provider in order for a minor to request a change to the sex designation on their birth certificate. The provider must sign the application attesting that the minor identified on the application is under the provider's care, and that the request to change sex designation on the birth certificate is consistent with the minor's gender identity. The attestation must be provided by a licensed health care provider whose scope of

7

practice allows them to make the determination that the sex designation change is consistent with the minor's gender identity.

Currently, the following licensed health care providers have been identified by the Division of Health Systems Quality Assurance as providers whose scope of practice allows them to make the determination that the sex designation change is consistent with a minor's gender identity:

- Psychiatrists
- Psychologists
- Advanced social workers
- Independent clinical social workers
- Marriage and family therapists
- Mental health counselor
- Medical, osteopathic, and naturopathic physicians
- Physician assistants
- Advanced registered nurse practitioner

**Benefits:** Changing sex on a birth certificate carries with it potential consequences that a minor may not fully comprehend or be able to manage. These include negative reactions to an X designation such as the potential denial of a driver license, passport, or public benefits. These risks are mitigated by requiring parental or legal guardian consent to ensure the minor understands and has the capacity to manage challenges posed by changing the sex designation on their birth certificate. Health care provider attestation is required to help ensure the sex designation on the minor's application is consistent with the minor's gender identity, and not the result of a transitory state of development, or the desire of a parent or legal guardian.

**Costs:** The department assumes the costs of this requirement are primarily related to obtaining licensed health care services. The department further assumes these costs could range from a single visit to complete the attestation by a provider who has an existing relationship with a client, to multiple visits for a client with a new provider relationship. These costs may also include indeterminate travel expenses depending on the person's residence and availability of providers in their area.

The department requested information from health care providers who indicated they provide services related to gender identity to minors. The results are summarized by generally describing the process and the estimated costs of services with and without insurance.

Step 1: Process to attest that the minor identified on the application is under care:
- Release of Information signed by the client and their guardian (if under 13) as part of one session.

Step 2: Process to attest that the provider has determined the request to change sex designation on the birth certificate is consistent with the minor's gender identity:
- Intake and 2 to 6 sessions depending on the client's situation, age, and understanding of the request to change sex designation. If the client is under 13, include the client's parent or guardian to attend sessions to learn about their experience and views regarding the request.

8

Costs per session:
- The co-pay for clients with insurance coverage is estimated to be between $0 and $30 per session. The estimated charge for private pay sessions is $130 per session.

The department assumes the costs of obtaining an attestation from a licensed health care provider range from $0 for those with an existing provider and insurance, to $910 (for 6 + 1 sessions at $130 per session) for clients with no insurance.

**Summary of Benefits and Costs:**

The probable benefits described in this analysis for those who seek to amend their birth certificates to reflect their lived experience of sex and gender are qualitatively and quantitatively substantial and important public health goals for health equity. Allowing a sex designation change on the birth certificate provides at a minimum peace of mind that a person is less likely to be challenged when they provide their birth certificate as proof of identity. More substantially, the rule may contribute to preventing negative health outcomes, lower education achievement, lack of employment and housing, and physical and emotional injury through acts of violence against those who are gender diverse.

The probable costs for changing the sex designation on a birth certificate range from $0 for an adult to obtain notary services, to $910 (for 6 + 1 sessions at $130 per session) for a minor to obtain a health care provider attestation. While the department recognizes requiring parent or legal guardian consent and provider attestation may pose a barrier to accessing a sex designation change on the birth certificate, the department determined the need for more certainty in the decision making of a minor given the potential consequences of changing a birth certificate outweighs the potential cost of the rule.

In conclusion, the department determined the probable benefits of the rule outweigh the probable costs.

# SECTION 6:

**Identify alternative versions of the rule that were considered, and explain how the department determined that the rule being adopted is the least burdensome alternative for those required to comply with it that will achieve the general goals and specific objectives state previously.**

*The department considered the following alternatives to the proposed rule and determined the proposed rule is the least burdensome alternative for those required to comply with it that will achieve the general goals and specific objectives of RCW 43.70.150 and RCW 43.70.160.*

**Require medical attestation for an adult to amend the sex designation of a birth certificate.** Sex or gender identity is a deeply personal experience that an adult is capable of determining for

9

themselves. Though the department currently requires an attestation from a licensed medical doctor or osteopathic physician for an adult, the department concluded that requiring such an attestation to confirm what an adult is capable of determining on their own is unnecessarily burdensome both in time and cost.

**Allow self-attestation with no third party verification of an adult submitting the sex designation application.** While the department determined the decision to request a sex designation change on a birth certificate to match one's own sex or gender identity is the prerogative of an adult, the adopted rule requires a notarized signature on the birth certificate sex designation change application. The department determined that requiring a notarized signature is the least burdensome method of protecting the subject of the record from the potential malicious acts of others as well as providing a level of protection from error.

**Include the list of licensed health care providers whose scope of practice allows them to make a determination that the sex designation change is consistent with a minor's gender identity.** The department did not include the list of licensed health care providers because the department does not have the authority to set scope of practice under RCW 43.70.150. This authority resides with the legislature. However, to assist applicants in knowing which type of health care provider can sign the attestation, the application form and department birth certificate web page will include the current list of health care providers allowed to attest as provided by the licensing entities of each health care profession.

*Additional recommendations provided by stakeholders through the informal comment process that would have had the greatest impact on the people requesting sex designation change.*

**Move the sex designation to the confidential section of the birth certificate.** The department did not move the sex designation to the confidential section of the birth certificate primarily because sex designation is required on all certificates issued by the state registrar under RCW 70.58.104. Additionally, sex designation is required for obtaining other identity documents and for receiving certain benefits. These documents include passports and driver licenses, and benefits include social security and insurance. If the sex designation were moved to the confidential section of the birth certificate, all children born in Washington State whose sex designation would not be included on the birth certificate after the rule change would be ineligible for these identity documents and benefits.

**Create a field for gender separate from the sex designation on the birth certificate.** Including both sex and gender on a birth certificate would not provide the same benefit as the adopted rule to those who request the birth certificate change. The person would not have the benefit of an identification document that unambiguously represents their lived identity and their sex or gender identity would remain in question to others.

**Allow more than one alternative to male and female or allow a blank to write in gender on the birth certificate.** The department carefully considered gender designation options beyond male and female. Ultimately the department chose a single mark (X) rather than a word or a blank write-in space to capture this information. The term "X" as defined in the new rule provides the most flexibility of the options available without the prohibitive added cost of updating the statewide data system to allow a write-in option. X is also becoming the national and international standard as described in Section 1 of this document.

10

**Allow minors to submit a request with either a provider attestation OR parental consent rather than both.** The department does not accept any birth certificate changes for any purpose from minors without parental or legal guardian consent. While this may be viewed as an unnecessary burden, it is the responsibility of the department to maintain the integrity of the vital records system. Under RCW 70.58.104, birth certificates are prima facie evidence of the facts contained in the certificate when certified by the state registrar. Because of this legal presumption, changes to the birth certificate must be made by persons deemed competent for such action under the law. The rule reflects that in Washington State, adults, legal guardians, and emancipated minors are deemed competent for this purpose.

Changing sex on a birth certificate carries with it potential consequences that a minor may not fully comprehend or be able to manage. These include negative reactions to an X designation such as the potential denial of a driver license, passport, or public benefits. Health care provider attestation is required to help ensure the sex designation on the minor's application is consistent with the minor's gender identity, and not the result of a transitory state of development, or the desire of a parent or legal guardian.

**Allow all licensed health care providers to provide attestation for minors.** As with adopting the list of licensed health care providers in rule, the department rule making authority related to the vital records system does not govern the scope of practice of licensed health care providers. The department cannot adopt in this rule what services a specific licensed health care provider may or may not provide under their license's scope of practice. This authority resides with the legislature.

# SECTION 7:

**Determine that the rule does not require those to whom it applies to take an action that violates requirements of another federal or state law.**

The rule does not require those to whom it applies to take an action that violates requirements of another federal or state law.

# SECTION 8:

**Determine that the rule does not impose more stringent performance requirements on private entities than on public entities unless required to do so by federal or state law.**

The rule does not impose more stringent performance requirements on private entities than on public entities.

# SECTION 9:

**Determine if the rule differs from any federal regulation or statute applicable to the same activity or subject matter and, if so, determine that the difference is**

11

**justified by an explicit state statute or by substantial evidence that the difference is necessary.**

The rule does not differ from any applicable federal regulation or statute.

---

# SECTION 10:

**Demonstrate that the rule has been coordinated, to the maximum extent practicable, with other federal, state, and local laws applicable to the same activity or subject matter.**

The department is the sole agency responsible for amending Washington State birth records.

To understand any impacts to other government agencies or the people they serve, and for the purpose of coordination with agencies who receive Washington State birth certificates in the exercise of their duties, the department notified the following agencies of this rule making: federal agencies including Selective Service, the Department of State, and the Department of Health and Human Services; Washington State agencies including the Department of Licensing, Department of Social and Human Services, Department of Corrections, and the Health Care Authority; Washington State local registrars; and state registrars in other jurisdictions.

12

# Appendix A: Gender Change on a Birth Certificate

**People who want to change their gender on their birth certificate must send:**

**A letter that includes:**

- Name on record (first, middle, last)
- Date of birth (month, day, year)
- Place of birth (city or county)
- Mother/Parent full name listed on certificate (first, middle, last)
- Father/Parent full name listed on certificate (first, middle, last)
- Contact information (return mailing address and phone number)
- The change being requested and  new information such as name and gender

**And one of the following:**

A letter, on applicable letterhead, from your medical (MD) or osteopathic physician (DO) stating that you have had the appropriate clinical treatment. The letter should include personal identifiers such as:

- Your name on your birth certificate
- Your date of birth
- Your new gender.

To ensure confidentiality, the letter should not include details of your treatment.
We will not return the documentation.

**OR**

A CERTIFIED copy of a court order that states your name, date of birth, gender currently listed on birth record and new gender. Certified copies of court orders have an original signature or raised seal from the court clerk. Photo copies will not be accepted. The court order will be returned to you.

Available at:
https://www.doh.wa.gov/LicensesPermitsandCertificates/BirthDeathMarriageandDivorce/GenderChange

13