**Nos. 25-6970, 25-6980**

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

HELEN ROE, a minor, by and through parent and next friend Megan Roe, et al.,
*Plaintiffs-Appellees*,

v.

DEBORAH JOHNSTON, in her official capacity as State Registrar of Vital Records and Interim Director of the Arizona Department of Health Services,
*Defendant-Appellant*,

and

WARREN PETERSEN, Senator, President of the Arizona State Senate;
BEN TOMA, Representative, Speaker of the Arizona House of Representatives,
*Intervenors-Defendants-Appellants.*

On Appeal from the United States District Court for the District of Arizona
No. 4:20-cv-00484, Hon. James A. Soto

**BRIEF OF GLBTQ LEGAL ADVOCATES & DEFENDERS AND LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC. AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS-APPELLEES**

Angela Y. Wu
Patience Crozier
GLBTQ Legal Advocates
& Defenders
18 Tremont Street, Suite 950
Boston, MA 02108
(617) 426-1350
awu@gladlaw.org
pcrozier@gladlaw.org

*Counsel for Amici Curiae*

Kell L. Olson
Lambda Legal Defense and
Education Fund, Inc.
3849 E Broadway Boulevard #136
Tucson, AZ 85716
(213) 382-7600
kolson@lambdalegal.org

Charlie Ferguson
Lambda Legal Defense and
Education Fund, Inc.
120 Wall Street, 19th Floor
New York, NY 10005
(323) 507-3740
cferguson@lambdalegal.org

**TABLE OF CONTENTS**

IDENTITY AND INTEREST OF *AMICUS CURIAE* .............................................1

SUMMARY OF THE ARGUMENT ........................................................................1

ARGUMENT ..........................................................................................................2

    I.    Arizona's surgical requirement to update birth certificates impedes transgender people's ability to freely participate in society. ........................2

    II.   Updated identity documents improve transgender people's health and well-being; Arizona's surgical requirement impedes these outcomes. ......11

    III.  The surgical requirement is not justified by Arizona's purported state interests. .............................................................................................14

CONCLUSION .....................................................................................................17

i

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Bostock v. Clayton Cnty.*, 590 U.S. 644 (2020) ........................................................8

*Pavan v. Smith*, 582 U.S. 563 (2017) ..................................................................16

*Romer v. Evans*, 517 U.S. 620 (1996) ...................................................................2

## CONSTITUTIONAL PROVISIONS

U.S. Const. Article 1, § 3, cl. 3 ............................................................................3

## STATUTES AND REGULATIONS

20 C.F.R. § 422.103 .............................................................................................3

42 C.F.R. § 435.407 .............................................................................................3

Ariz. Admin. Code § R4-10-402 ..........................................................................4

Ariz. Admin. Code § R4-26-203 ..........................................................................4

Ariz. Admin. Code § R9-19-208 .....................................................................15, 16

Ariz. Admin. Code § R21-6-403 ..........................................................................4

Ariz. Rev. Stat. § 1-501 .......................................................................................3

Ariz. Rev. Stat. § 1-502 ....................................................................................3, 7

Ariz. Rev. Stat. § 15-828 .....................................................................................4

Ariz. Rev. Stat. § 16-166 .....................................................................................3

Ariz. Rev. Stat. § 32-3230 ................................................................................5, 13

Ariz. Rev. Stat. § 36-337 .............................................................................5, 13, 15

Ariz. Rev. Stat. § 41-1080 ...................................................................................3

**OTHER AUTHORITIES**

Adelante Healthcare, *Prepare for Your Visit*,
    https://adelantehealthcare.com/patients/prepare-for-your-visit (last visited Mar.
    20, 2026) ....................................................................................................................7

Advocs. for Transgender Equal. et al., *Civic Engagement in the 2022 U.S.
    Transgender Survey* (Aug. 2024), https://transequality.org/sites/default/files/
    2024 08/USTS_2022CivicEngagementReport_Final.pdf .............................10, 11

Am. Bar Ass'n, *Birth Certificates* (Nov. 20, 2018),
    https://www.americanbar.org/groups/public_education/publications/teaching-
    legal-docs/birth-certificates ...................................................................................3

Am. Med. Ass'n, *Conforming Sex and Gender Designation on Government IDs
    and Other Documents H-65.967* (2021), https://policysearch.ama-
    assn.org/policyfinder/detail/gender?uri=%2FAMADoc%2FHOD.xml-0-
    5096.xml .................................................................................................................13

Ankit Rastogi et al., Advocs. for Trans Equal., *Health and Wellbeing: A Report of
    the 2022 U.S. Transgender Survey* (June 2025),
    https://transequality.org/sites/default/files/2025-
    06/USTS_2022Health%26WellbeingReport_WEB.pdf ......................................6

Annette R. Appell, *Certifying Identity*, 42 CAP. U. L. REV. 361 (2014).....................4

Ariz. Dep't of Econ. Security, *How to Apply for Medical Assistance*,
    https://des.az.gov/services/basic-needs/medical-assistance/how-to-apply (last
    visited Mar. 20, 2026)..............................................................................................7

Ariz. Dep't of Transp., *Arizona Travel ID*, https://azdot.gov/mvd/services/driver-
    services/arizona-travel-id (last visited Mar. 20, 2026).........................................3

Ayden I. Scheim et al., *Gender-Concordant Identity Documents and Mental Health
    Among Transgender Adults in the USA: A Cross-Sectional Study*, 5 LANCET
    PUB. HEALTH e196 (2020) .....................................................................................12

Ayden I. Scheim et al., *Legal Gender Recognition and the Health of Transgender
    and Gender Diverse People: A Systematic Review and Meta-Analysis*, 378 SOC.
    SCI. & MED. 118147 (2025)................................................................................9, 13

iii

Bita Tristani-Firouzi et al., *Preferences for and Barriers to Gender Affirming Surgeries in Transgender and Non-Binary Individuals*, 23 INT'L J. TRANSGENDER HEALTH 458 (2022) ...................................................................14

Brad Sears et al., UCLA Sch. of L. Wiliams Inst., *Workplace Experiences of Transgender Employees* (Nov. 2024), https://williamsinstitute.law.ucla.edu/wp-content/uploads/Trans-Workplace-Discrimination-Nov-2024.pdf ......................8

Dignity Health Med. Grp. Ariz., *Welcome, New Patients!*, https://www.dignityhealth.org/arizona/medical-group/patient-resources/new-patients (last visited Mar. 20, 2026) ...................................................................7

Greta R. Bauer et al., *Intervenable Factors Associated with Suicide Risk in Transgender Persons: A Respondent Driven Sampling Study in Ontario, Canada*, 15 BMC PUB. HEALTH 6 (2015) .........................................................12

Jamie Langowski et al., *Transcending Prejudice: Gender Identity and Expression-Based Discrimination in the Metro Boston Rental Housing Market*, 29 YALE J.L. & FEMINISM 321 (2018) .................................................................9

Jonah P. DeChants et al., *Association of Updating Identification Documents with Suicidal Ideation and Attempts among Transgender and Nonbinary Youth*, 19 INT'L J. ENV'T. RSCH. & PUB. HEALTH (2022)...................................................12

Kristen Jaramillo et al., *Policy and Prejudice: The Impact of Trump-era Executive Orders on Transgender Employees*, 18 INDUS. & ORGANIZATIONAL PSYCH. 355 (2025)......................................................................................................8

Movement Advancement Project, *Identity Document Laws and Policies: Birth Certificates*, *and Policies: Birth Certificates*, https://www.lgbtmap.org/img/maps/citations-id-birth-certificate.pdf (last visited Mar. 20, 2026)..........................................................................................14

Nat'l Acads., Sci., Eng'g, & Med., *Understanding the Well-Being of LGBTQI+ Populations* (2020) ...................................................................................3, 9

Nat'l Ctr. for Transgender Equal., *2015 U.S. Transgender Survey: Arizona State Report*, https://transequality.org/sites/default/files/docs/usts/USTSAZStateReport(1017).pdf .........................................................................9

Oralia Loza et al., *Impact of Name Change and Gender Marker Correction on Identity Documents to Structural Factors and Harassment among Transgender and Gender Diverse People in Texas*, 4 SEXUALITY, GENDER & POL'Y 76 (2021) ........................................................................................10

Press Release, U.S. Equal Emp. Opportunity Comm'n, EEOC Commission Votes to Rescind 2024 Harassment Guidance (Jan. 23, 2026), https://www.eeoc.gov/newsroom/eeoc-commission-votes-rescind-2024-harassment-guidance........................................................................................8

Richard A. Crosby et al., *Gender Affirmation and Resiliency Among Black Transgender Women With and Without HIV Infection*, 1 TRANSGENDER HEALTH 86 (2016) ................................................................................................12

Sandy E. James et al., Nat'l Ctr. for Transgender Equal., *Early Insights: A Report of the 2022 U.S. Transgender Survey* (Feb. 2024), https://transequality.org/sites/default/files/2024-02/2022%20USTS%20Early%20Insights%20Report_FINAL.pdf..........7, 10, 11

Shoreh Davoodi, *More Than a Piece of Paper: Same-Sex Parents and Their Adopted Children are Entitled to Equal Protection in the Realm of Birth Certificates*, 90 CHI.-KENT L. REV. 703 (2015).......................................................4

U.S. Bureau of Labor Statistics, *The Employment Situation — December 2022* (Jan. 6, 2023), https://www.bls.gov/news.release/archives/empsit_01062023.pdf......................8

U.S. Census Bureau, *Poverty in the United States* (Sept. 12, 2023), https://www.census.gov/library/publications/2023/demo/p60-280.html .............8

U.S. Citizenship & Immigr. Servs., *Form I-9 Acceptable Documents* (updated Nov. 19, 2025), https://www.uscis.gov/i-9-central/form-i-9-acceptable-documents..............................................................................3, 7

Wylie C. Hembree et al., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline*, 102 J. CLINICAL ENDOCRINOLOGY & METABOLISM 3869 (2017) ......................13

v

## IDENTITY AND INTEREST OF *AMICUS CURIAE*

*Amici curiae* GLBTQ Legal Advocates & Defenders (GLAD Law) and Lambda Legal Defense and Education Fund, Inc. (Lambda Legal) are LGBTQ legal advocacy organizations dedicated to securing legal equality for transgender people, LGBQ people, and people living with HIV on the bedrock promise that we all come before our government as equals. *Amici* have decades of experience working in the courts, in legislative and agency policy arenas, and in our communities to empower transgender people and to support their ability to equally participate in all areas of life and society with safety and security.

Pursuant to Federal Rule of Appellate Procedure 29(a)(2), *amici curiae* submit this brief without an accompanying motion for leave to file because all parties have consented to its filing. In addition, pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), *amici* represent that no party's counsel authored this brief in whole or in part, no party or party's counsel contributed money that was intended to fund preparing or submitting this brief, and no one other than *amici*, their members, or their counsel contributed money intended to fund preparing or submitting this brief.

## SUMMARY OF THE ARGUMENT

*Amici curiae* respectfully submit this brief in support of Plaintiffs-Appellees to present the following to this Court:

1

(i) Birth certificates are important legal identification documents that Arizona residents use in myriad ways. The current surgical requirement renders birth certificates for many transgender Arizonans inaccurate, undermining their ability to engage in a wide range of everyday activities.

(ii) Extensive evidence shows that forcing transgender people to use inaccurate identification inflicts profound harms on their health and well-being.

(iii) Arizona's purported state interests do not justify the surgical requirement.

The foregoing underscores that Arizona's surgical requirement inflicts deep and lasting harm upon transgender people in violation of their constitutional rights to equal protection and to due process. *See* Pls.-Appellees' Br. at 27–63.

**ARGUMENT**

**I. Arizona's surgical requirement to update birth certificates impedes transgender people's ability to freely participate in society.**

Arizona's surgical requirement harms transgender people in "an almost limitless number of transactions and endeavors that constitute ordinary civil life in a free society." *Romer v. Evans*, 517 U.S. 620, 631 (1996). People rely on birth certificates in a plethora of life-sustaining ways to function in society, and they are foundational for accessing a wide range of federal rights and benefits. *See* Nat'l

2

Acads., Sci., Eng'g, & Med., *Understanding the Well-Being of LGBTQI+ Populations*, 108–09 (2020); *see also* Am. Bar Ass'n, *Birth Certificates*, (Nov. 20, 2018), https://www.americanbar.org/groups/public_education/publications/teaching-legal-docs/birth-certificates. A birth certificate provides proof of citizenship, and citizenship is necessary to vote and run for certain elected offices. *See, e.g.*, U.S. Const. art. 1, § 3, cl. 3; Ariz. Rev. Stat. § 16-166(F)(2). A birth certificate is necessary to obtain a Social Security number. 20 C.F.R. § 422.103. It may also be used to apply for key federal government health benefits such as Medicaid and Medicare,[1] to establish employment authorization,[2] and to obtain an Arizona Travel ID.[3]

As with federal rights and benefits, birth certificates are vital for accessing state services in Arizona. The State of Arizona uses birth certificates to verify individuals' citizenship when administering federal, state, and local public benefits, Ariz. Rev. Stat. §§ 1-501(A)(2), 1-502(A)(2), and when issuing licenses for a wide range of purposes, *id.* § 41-1080(A)(3), including medical professional licensure,

---

[1] 42 C.F.R. § 435.407.

[2] *See* U.S. Citizenship & Immigr. Servs., *Form I-9 Acceptable Documents* (updated Nov. 19, 2025), https://www.uscis.gov/i-9-central/form-i-9-acceptable-documents.

[3] *See* Ariz. Dep't of Transp., *Arizona Travel ID*, https://azdot.gov/mvd/services/driver-services/arizona-travel-id (last visited Mar. 20, 2026). An Arizona Travel ID can be used as a driver's license and as a REAL ID for domestic air travel. *Id.*

*see, e.g.*, Ariz. Admin. Code § R4-26-203(B)(4), licensure for hairstyling and cosmetology establishments, *id.* § R4-10-402(1)(f), and licensure for foster parenting, *id.* § R21-6-403(B)(10).

In addition to providing proof of citizenship, birth certificates also establish parentage, thus making them crucial identity documents for children and their families. Birth certificates may be required to confirm the parent-child relationship so the child can receive various benefits, including health insurance, surviving child Social Security benefits, entitlement to a parent's retirement benefits, and inheritance.[4] Additionally, parents may need to present a birth certificate to make important decisions on behalf of their child, like setting up a bank account or making emergency medical decisions.[5]

Birth certificates are especially important documents for children and families seeking access to education. In Arizona, enrolling a student in a public or private K-12 school requires a certified copy of their birth certificate or other documentation proving the student's identity and age. Ariz. Rev. Stat. § 15-828(A). Birth certificates or other proof of identity and age must also be provided to the county school superintendent for children who are homeschooled. *Id.* § 15-828(B). And

---

[4] Shoreh Davoodi, *More Than a Piece of Paper: Same-Sex Parents and Their Adopted Children are Entitled to Equal Protection in the Realm of Birth Certificates*, 90 CHI.-KENT L. REV. 703, 708 (2015); *see generally* Annette R. Appell, *Certifying Identity*, 42 CAP. U. L. REV. 361 (2014).

[5] Davoodi, *supra* note 4, at 708–10.

birth certificates are often needed to enroll children in extracurricular activities and after-school programs.

The experience of James Poe, one of the Named Plaintiffs in this case, illustrates how inaccurate birth certificates can limit access to education. James is a transgender boy; although his sex was recorded as female on his birth certificate, from a young age, he expressed through his words and actions that he is a boy. 4-DirectorER-664, ¶¶ 95–96. After counseling from medical professionals, James began the process of social transition, which included using male pronouns and a male name. *Id.* at -664, -665, ¶¶ 98. But when James's parents sought a court order to correct the sex listed on James's birth certificate, the judge provided them with a printed copy of Arizona's law requiring a "sex change operation" to amend the sex marker on an Arizona birth certificate. *Id.* at -666, ¶ 102 (citing Ariz. Rev. Stat. § 36-337). Due to James's age, he is not permitted under Arizona law to undergo gender transition-related surgery, Ariz. Rev. Stat. § 32-3230(A), and he, like other transgender people, may never need to undergo surgery. As a result, James's parents continue to worry that disclosure of James's transgender status to others would result in mistreatment—and indeed, James has already been mistreated by some of his peers. 4-DirectorER-665, ¶¶ 99–100. James's parents made the difficult choice of not enrolling their son in public school due to the requirement that a birth certificate be provided. *Id.* ¶¶ 100–01.

James's story is not an outlier. Holding a birth certificate that does not match one's physical appearance forces transgender people to make the impossible choice between disclosure of their transgender status every time they present that document—violating their privacy and jeopardizing their safety—or forgoing participation in certain activities altogether. Beyond the school context, it is well-documented that transgender people's inability to obtain accurate identity documents can lead to questioning, suspicion, and ultimately denial of service and other barriers in many spheres of life, such as:

**Health Care.** Transgender people encounter significant discrimination in health care settings, and the experience and fear of denial and discrimination dissuades transgender people from seeking basic health care. The 2022 U.S. Transgender Survey ("U.S. Transgender Survey"), which involved over 90,000 transgender respondents, found that nearly a quarter (24%) of those surveyed had not visited a health care provider in the past year due to fear of discrimination.[6] Among respondents who had visited a health care provider in the past year, almost half (47%) had at least one negative experience when accessing health care.[7]

---

[6] Ankit Rastogi et al., Advocs. for Trans Equal., *Health and Wellbeing: A Report of the 2022 U.S. Transgender Survey*, 29–31 (June 2025), https://transequality.org/sites/default/files/2025-06/USTS_2022Health%26WellbeingReport_WEB.pdf.

[7] *Id.*

6

Medical providers may require proof of identity to see a doctor,[8] and identity documents are required by the Arizona Health Care Cost Containment System (the state's Medicaid agency).[9] The need to identify oneself as transgender at the front desk of a doctor's office (because it will be apparent as soon as identification is handed over) is a barrier to the health and well-being of the transgender community.

**Employment and Economic Security.** Accurate identification—often multiple forms[10]—is vital to accessing employment and, in turn, promoting economic stability for transgender individuals and their families. Transgender people have higher unemployment and poverty rates than the U.S. population as a whole.[11] Although employment discrimination based on transgender status is

---

[8] *See, e.g.*, Adelante Healthcare, *Prepare for Your Visit*, https://adelantehealthcare.com/patients/prepare-for-your-visit (last visited Mar. 20, 2026) (stating that new patients should bring two forms of identification with them to their appointments); Dignity Health Med. Grp. Ariz., *Welcome, New Patients!*, https://www.dignityhealth.org/arizona/medical-group/patient-resources/new-patients (last visited Mar. 20, 2026) (telling new patients to bring a photo ID to their appointments).

[9] *See* Ariz. Dep't of Econ. Security, *How to Apply for Medical Assistance*, https://des.az.gov/services/basic-needs/medical-assistance/how-to-apply (last visited Mar. 20, 2026) (stating that "[b]irth certificates for everyone who is applying for benefits" may be required to complete an application for state medical assistance benefits); Ariz. Rev. Stat. § 1-502(A)(2) (requiring proof of citizenship, such as a birth certificate, to access Arizona state and local public benefits).

[10] *See* U.S. Citizenship & Immigr. Servs., *supra* note 2.

[11] *Compare* Sandy E. James et al., Nat'l Ctr. for Transgender Equal., *Early Insights: A Report of the 2022 U.S. Transgender Survey* 21 (Feb. 2024), https://transequality.org/sites/default/files/2024-02/2022%20USTS%20Early%20Insights%20Report_FINAL.pdf [hereinafter "2022 USTS Early Insights Report"] (2022 U.S. Transgender Survey finding a 34%

prohibited by Title VII of the Civil Rights Act of 1964, *see Bostock v. Clayton Cnty.*, 590 U.S. 644 (2020), transgender people continue to experience pervasive discrimination in the workplace.  A survey conducted in 2023 found that 47% of transgender adults had experienced workplace discrimination or harassment in the past year, including being fired, not hired, not promoted, or verbally, sexually, or physically harassed, compared to only 15% of non-transgender LGBQ respondents reporting similar discrimination or harassment.[12]

Unfortunately, as some scholars have warned, "discrimination targeting transgender employees may become more prevalent and/or more severe" due to recent federal policies,[13] such as the Equal Employment Opportunity Commission's rescission of guidance that protected employees from discrimination on the basis of transgender status.[14]  But accurate identity documents may offset some of these

---

poverty rate and 18% unemployment rate among respondents), *with* U.S. Census Bureau, *Poverty in the United States*: 2022 (Sept. 12, 2023), https://www.census.gov/library/publications/2023/demo/p60-280.html (overall poverty rate of 11.5% in 2022), *and* U.S. Bureau of Labor Statistics, *The Employment Situation — December 2022* (Jan. 6, 2023), https://www.bls.gov/news.release/archives/empsit_01062023.pdf (overall unemployment rate of 3.5% in December 2022).

[12] Brad Sears et al., UCLA Sch. of L. Wiliams Inst., *Workplace Experiences of Transgender Employees* 4 (Nov. 2024), https://williamsinstitute.law.ucla.edu/wp-content/uploads/Trans-Workplace-Discrimination-Nov-2024.pdf.

[13] Kristen Jaramillo et al., *Policy and Prejudice: The Impact of Trump-era Executive Orders on Transgender Employees*, 18 INDUS. & ORGANIZATIONAL PSYCH. 355, 358 (2025).

[14] Press Release, U.S. Equal Emp. Opportunity Comm'n, EEOC Commission Votes to Rescind 2024 Harassment Guidance (Jan. 23, 2026),

consequences: As noted in a recent meta-analysis examining the impacts of legal gender recognition, studies have shown that having accurate identity documents was positively associated with income and employment for some groups of transgender people.[15]

**Housing**.  Housing is another arena that routinely requires multiple forms of identification, and one in which discrimination (and indeed, homelessness) is an acute problem for the transgender community.  *See* Nat'l Acads., Sci., Eng'g, & Med., *supra*, at 271–75.  Data collected in Arizona revealed that 27% of respondents had faced housing discrimination in the past year due to their transgender status, while 32% had experienced homelessness at some point in their lives.[16]  Rates of discriminatory treatment may be even higher in certain areas.  A study of one American metropolitan area found that 61% of transgender people experienced discriminatory treatment when searching for housing.[17]

However, having accurate identity documents can reduce the risk of housing-

---

https://www.eeoc.gov/newsroom/eeoc-commission-votes-rescind-2024-harassment-guidance.

[15] Ayden I. Scheim et al., *Legal Gender Recognition and the Health of Transgender and Gender Diverse People: A Systematic Review and Meta-Analysis*, 378 Soc. Sci. & Med. 118147, at 12 (2025) [hereinafter "2025 Meta-Analysis"].

[16] Nat'l Ctr. for Transgender Equal., *2015 U.S. Transgender Survey: Arizona State Report* 2 (Oct. 2017), https://transequality.org/sites/default/files/docs/usts/USTSAZStateReport(1017).pdf.

[17] Jamie Langowski et al., *Transcending Prejudice: Gender Identity and Expression-Based Discrimination in the Metro Boston Rental Housing Market*, 29 YALE J.L. & FEMINISM 321, 322 (2018).

related discrimination. One recent study of transgender respondents in Texas found that having an accurate name and sex marker on identity documents was associated with decreased odds of being evicted and experiencing homelessness in the past year.[18]

**Daily life and civic engagement**. Daily life requires many interactions to verify identity. Denying transgender people accurate identification to use in these daily interactions is not merely an inconvenience; it subjects them to discrimination, harassment, and worse, allegations of criminal activity such as fraud. The U.S. Transgender Survey found that 22% of respondents had been "verbally harassed, assaulted, asked to leave a location, or denied services" due to showing someone an identity document with a name or gender that did not match their presentation.[19]

Having inaccurate identity documents may even impede transgender people's ability to vote. The U.S. Transgender Survey revealed that in the 2020 presidential election, many voting-eligible transgender people did not register to vote or did not vote because they did not possess accurate identity documents, and they feared harassment by election officials.[20] Among respondents who voted in person,

---

[18] Oralia Loza et al., *Impact of Name Change and Gender Marker Correction on Identity Documents to Structural Factors and Harassment among Transgender and Gender Diverse People in Texas*, 4 SEXUALITY, GENDER & POL'Y 76, 92 (2021).

[19] 2022 USTS Early Insights Report, *supra* note 11, at 22.

[20] Advocs. for Transgender Equal. et al., *Civic Engagement in the 2022 U.S. Transgender Survey* 4–6 (Aug. 2024), https://transequality.org/sites/default/files/2024-08/USTS_2022CivicEngagementReport_Final.pdf.

hundreds encountered problems with voting related to their transgender status, including having a problem with the sex marker on their identity document.[21]

The cumulative impact of everyday discrimination and unequal treatment may be so immense that transgender people make the difficult decision to leave their home state altogether. Moving out-of-state can be challenging for numerous reasons, including the costs of relocation, difficulty securing employment in a new state, and concerns about moving away from family members and friends. Yet despite these barriers to moving, the U.S. Transgender Survey found that Arizona was among the top ten states from which respondents moved away due to state laws targeting transgender people for unequal treatment.[22] Among the state laws impacting these respondents' choice may have been the surgical requirement, which exacerbates the harms suffered by transgender people in Arizona by restricting their ability to update their birth certificates.

## II. Updated identity documents improve transgender people's health and well-being; Arizona's surgical requirement impedes these outcomes.

The steps a person takes to live in a sex different from their birth sex, including medical treatment, are generally referred to as "gender transition." A key component of this process is a legal transition, which ensures that a person's identity documents accurately reflect their name and sex. *See* Ayden I. Scheim et al., *Gender-*

---

[21] *Id.* at 7 & n.14.
[22] 2022 USTS Early Insights Report, *supra* note 11, at 23.

11

*Concordant Identity Documents and Mental Health Among Transgender Adults in the USA: A Cross-Sectional Study*, 5 LANCET PUB. HEALTH e196, e197 (2020) ("Changing one's name and gender marker on IDs such as birth certificates, passports, and driver's licenses can be a crucial step in legal and social gender affirmation."); Richard A. Crosby et al., *Gender Affirmation and Resiliency Among Black Transgender Women With and Without HIV Infection*, 1 TRANSGENDER HEALTH 86, 87 (2016) ("[C]oncordant identification documents are a critical step in gaining social inclusion and legal legitimacy, which may have downstream effects on transgender health—particularly among those for whom access to medical transition might be limited due to resources (e.g., low-income transwomen).").

For transgender people, having legal identification consistent with the sex they live in provides enormous positive health benefits that have been extensively documented and recognized by medical experts. Multiple studies have found that updating identity documents is associated with a significant reduction in suicidal ideation and suicide attempts for transgender youths and adults.[23] In addition to

---

[23] *See, e.g.*, Scheim et al., *supra*, at e201; Greta R. Bauer et al., *Intervenable Factors Associated with Suicide Risk in Transgender Persons: A Respondent Driven Sampling Study in Ontario, Canada*, 15 BMC PUB. HEALTH 6 (2015) ("[H]aving one or more identity documents concordant with lived gender . . . [had] the potential to prevent 90 cases of [suicide] ideation per 1,000 trans persons . . . and 230 [suicide] attempts per 1,000 with ideation."); Jonah P. DeChants et al., *Association of Updating Identification Documents with Suicidal Ideation and Attempts among Transgender and Nonbinary Youth*, 19 INT'L J. ENV'T. RSCH. & PUB. HEALTH 6–7 (2022) (finding that transgender youth who had changed their official documents

12

reduced suicide risk, updated identity documents are also associated with less psychological distress, reduced self-injury, reductions in depressive and anxiety symptoms, and less tobacco use.[24]  Recognizing the importance of updated identity documents, the American Medical Association supports policies that allow people to amend the sex marker on all government IDs.[25]

Arizona law contradicts this medical evidence by requiring a medical professional to verify that a person underwent a "sex change operation" before the sex marker on a birth certificate can be updated.  Ariz. Rev. Stat. § 36-337(A)(3).  But surgery is not an option for many transgender people who would otherwise want to update their birth certificates.  As noted previously, pursuant to state law, children in Arizona cannot undergo gender transition-related surgery.  Ariz. Rev. Stat. § 32-3230(A).  And among adults, many transgender people do not want to or cannot undergo transgender-related surgery, including because surgery is too expensive or is not medically indicated.[26]  The surgical requirement deprives these Arizonans of

---

reported lower rates of attempting suicide (11%), compared to transgender youth who were not able to change their documents (24.5%) and transgender youth who are able but had not yet done so (33.4%)).

[24] 2025 Meta-Analysis, *supra* note 15, at 10 (reviewing twenty-four studies related to updated identity documents and health outcomes).

[25] Am. Med. Ass'n, *Conforming Sex and Gender Designation on Government IDs and Other Documents H-65.967* (2021), https://policysearch.ama-assn.org/policyfinder/detail/gender?uri=%2FAMADoc%2FHOD.xml-0-5096.xml.

[26] *See, e.g.*, Wylie C. Hembree et al., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline*, 102 J. CLINICAL ENDOCRINOLOGY & METABOLISM 3869, 3872 (2017)

the ability to acquire accurate identity documents, jeopardizing their health and well-being.

**III. The surgical requirement is not justified by Arizona's purported state interests.**

Given the critical need for accurate identification, it is no wonder that most states, as well as the District of Columbia, allow individuals to amend the sex marker on a birth certificate without proof of surgery.[27] That these amendments are permitted in most other states significantly undermines the scant, purported crime-related "state interests" asserted by the Appellant and Intervenors. *See* Def.-Appellant's Br. at 39; Intervenor-Defs.-Appellants' Br. at 18. In all these other states, reducing barriers to accurate identification does not seem to impede law enforcement functions. Appellant and Intervenors have proffered no evidence showing that Arizona faces some unique risk of identity theft or fraud that other jurisdictions do not.

---

(Endocrine Society guidelines stating that a patient should pursue genital surgery only if the mental health provider and clinician "both agree that surgery is medically necessary and would benefit the patient's overall health and/or wellbeing"); Bita Tristani-Firouzi et al., *Preferences for and Barriers to Gender Affirming Surgeries in Transgender and Non-Binary Individuals*, 23 INT'L J. TRANSGENDER HEALTH 458, 462 (2022) (analyzing respondents' disinterest in various transgender-related surgeries and barriers to surgery, including cost and lack of health care resources).

[27] *See* Movement Advancement Project, *Identity Document Laws and Policies: Birth Certificates*, https://www.lgbtmap.org/img/maps/citations-id-birth-certificate.pdf (last visited Mar. 20, 2026) (listing thirty-one states and D.C. that do not require proof of surgery to update sex markers on birth certificates).

Moreover, as Appellant admits, Arizona permits amendment—not merely correction—of birth certificates in *numerous* circumstances to reflect information that was not available at the time of a person's birth, or information that has changed since birth. *See* Def.-Appellant's Br. at 12 (citing 4-DirectorER-507–08 § 36-326). Take, for instance, adoption: Adoptive parents in Arizona can request an amended birth certificate that accurately records the adoptive parents as the child's legal parents. Ariz. Admin. Code § R9-19-208(M)(2)(e); *see also* Ariz. Rev. Stat. § 36-337(A) (requiring the state registrar to amend the birth certificate after receipt of an adoption certificate or court order). Arizona also allows amendment of the father's name on a birth certificate upon execution of a voluntary acknowledgment of parentage or upon receipt of an administrative order or court order establishing parentage. Ariz. Rev. Stat. § 36-337(B); *see also* Ariz. Admin. Code § R9-19-208(K), (L) (implementing regulations). Beyond parentage determinations, the state registrar accepts requests to change an individual's name, or the individual's parents' last names, listed on a birth certificate in a multitude of scenarios. Ariz. Admin. Code § R9-19-208(E) (setting forth the requirements to add an individual's first name, middle name, or suffix to the birth certificate within ninety days of the individual's birth); *id.* at (F) (adding a first name, middle name, or suffix between ninety days and seven years after birth); *id.* at (G) (amendment of an individual's name within ninety days of birth); *id.* at (H) (amendment of an individual's name

15

between ninety days and one year after birth); *id.* at (J) (changing either parent's last name on birth certificate).

That Arizona permits numerous types of birth certificate amendments undermines any purported governmental interest in having birth certificates be fixed, unchangeable documents. Birth certificates in Arizona are not unalterable. Rather, Arizona's birth certificate amendment system reflects that the state uses birth certificates to provide "a form of legal recognition" that includes updated information. *See Pavan v. Smith*, 582 U.S. 563, 567 (2017). The state is well-equipped to update information on birth certificates as part of its normal operations. Allowing people to amend the sex markers on their birth certificates without a burdensome surgical requirement, as they would to amend their names or parentage information, is compatible with the state's asserted interest in the "integrity and accuracy of birth records." Def.-Appellant's Br. at 39.

As described above, *see supra* Sections I and II, extensive medical research and surveys of transgender people's experiences confirm the immense health and safety benefits of having the sex one lives in be reflected in identity documents. By imposing an unreasonable burden on access to accurate identity documents, the surgical requirement subjects transgender Arizonans to a litany of harms in violation of their constitutional rights. *See* Pls.-Appellees' Br. at 27–63.

16

## CONCLUSION

For these reasons and those presented by Plaintiffs-Appellees, *amici curiae* respectfully submit that the judgment of the district court should be affirmed.

Date: March 20, 2026

Respectfully submitted,

*/s/ Angela Y. Wu*
Angela Y. Wu
Patience Crozier
GLBTQ Legal Advocates & Defenders
18 Tremont Street, Suite 950
Boston, MA 02108
(617) 426-1350
awu@gladlaw.org
pcrozier@gladlaw.org

Kell L. Olson
Lambda Legal Defense and
Education Fund, Inc.
3849 E Broadway Boulevard #136
Tucson, AZ 85716
(213) 382-7600
kolson@lambdalegal.org

Charlie Ferguson
Lambda Legal Defense and
Education Fund, Inc.
120 Wall Street, 19th Floor
New York, NY 10005
(323) 507-3740
cferguson@lambdalegal.org

*Counsel for Amici Curiae*