**Case Nos. 25-6970, 25-6980**

## THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

HELEN ROE, a minor, by and through her parent and next friend Megan Roe; et al.,

*Plaintiffs-Appellees.*

*v.*

DEBORAH JOHNSTON, in her official capacity as State Registrar of Vital Records and Interim Director of the Arizona Department of Health Services,

*Defendant-Appellant,*

*v.*

WARREN PETERSEN, President of the Arizona State Senate; STEVE MONTENEGRO, Speaker of the Arizona House of Representatives,

*Intervenor-Defendant-Appellant,*

On Appeal from the United States District Court
for the District of Arizona

No. 4:20-cv-00484

## REPLY BRIEF OF DEFENDANT-APPELLANT

Nathan Arrowsmith (AZ Bar No. 031165)
Lauren Watford (AZ Bar No. 037346)
Timothy Horley (AZ Bar No. 038021)
OFFICE OF THE ARIZONA
   ATTORNEY GENERAL
2005 N. Central Ave. Phoenix, AZ 85004
(602) 542-3333
Nathan.Arrowsmith@azag.gov
Lauren.Watford@azag.gov
Timothy.Horley@azag.gov
ACL@azag.gov

*Counsel for Defendant-Appellant*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES.................................................................................iii

INTRODUCTION .............................................................................................1

ARGUMENT....................................................................................................2

I.   Arizona does not have a surgical requirement. .....................................2

   A.   Section 36-337(A) requires the Director to act when she
        receives certain evidentiary documents.........................................2

   B.   Comparison to other states' laws shows that (A)(3) is
        not a "surgical requirement." ........................................................4

II.  Plaintiffs bring a facial challenge to (A)(3), and don't meet
     their burden on such a claim................................................................5

   A.   Section (A)(3) has constitutional applications.............................5

   B.   The named Plaintiffs' individual experiences are
        insufficient to prevail on a facial challenge. ...............................8

III. Plaintiffs' Equal Protection challenge fails. ..........................................9

   A.   Section (A)(3) does not treat transgender people
        differently than non-transgender people.....................................10

   B.   Section (A)(3) does not classify based on sex or
        transgender status. .......................................................................13

IV.  Plaintiffs' Due Process challenge fails. ...............................................17

   A.   Section (A)(3) is not a surgical requirement, and
        Plaintiffs' problems with the court order process do not
        render (A)(3) facially unconstitutional.........................................18

   B.   Section (A)(3) does not burden any fundamental rights...........22

i

V.    The challenged provisions are subject to at most rational basis review, and satisfy both rational basis review and heightened scrutiny. ..................................................................24

    A.    The challenged provisions are subject to rational basis review at most. ...........................................................25

    B.    The challenged provisions survive rational basis review because they advance Arizona's legitimate interest in fraud prevention and accurate record-keeping. ...........................26

    C.    Even if heightened scrutiny applies, (A)(3) survives. .................28

VI.    The permanent injunction is deeply flawed. ...........................................29

    A.    The permanent injunction improperly rewrites state law. ...................................................................................30

    B.    The permanent injunction subjects the Director to the threat of contempt proceedings for failing to honor amendment requests supported by indeterminate criteria. ...............................................................................31

VII.    The district court should have abstained from hearing this state-law case so that it could be resolved by state courts. ...................33

CONCLUSION .................................................................................................35

CERTIFICATE OF COMPLIANCE ....................................................................37

CERTIFICATE OF SERVICE ..............................................................................38

ii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ayotte v. Planned Parenthood,*
    546 U.S. 320 (2006) ...................................................................30

*Baker v. Rolnick,*
    110 P.3d 1284 (Ariz. Ct. App. 2005)........................................34

*Beatie v. Beatie,*
    333 P.3d 754 (Ariz. Ct. App. 2014)................................. 6, 14, 35

*Brnovich v. Democratic Nat'l Comm.,*
    594 U.S. 647 (2021) ...................................................................26

*California v. Trump,*
    963 F.3d 926 (9th Cir. 2020)................................................ 13, 14

*Calvary Chapel Bible Fellowship v. County of Riverside,*
    948 F.3d 1172 (9th Cir. 2020).................................................9, 12

*Coleman v. City of Mesa,*
    284 P.3d 863 (Ariz. 2012).........................................................34

*Crawford v. Marion Cnty. Election Bd.,*
    553 U.S. 181 (2008) ...................................................................26

*Doe v. Horne,*
    115 F.4th 1083 (9th Cir. 2024) ........................................... 24, 29

*F.C.C. v. Beach Commc'ns, Inc.,*
    508 U.S. 307 (1993) ............................................................ 24, 26

*Fry v. Melaragno,*
    939 F.2d 832 (9th Cir. 1991)......................................................13

*Fulton v. City of Philadelphia,*
    593 U.S. 522 (2021) ...................................................................25

iii

*Gore v. Lee*,
    107 F.4th 548 (6th Cir. 2024) ....................................................................27

*In re Kirkland*,
    915 F.2d 1236 (9th Cir. 1990)......................................................................7

*In re McLaughlin v. Swanson*,
    476 P.3d 336 (Ariz. Ct. App. 2020)........................................... 3, 7, 20, 34

*Lanier v. City of Woodburn*,
    518 F.3d 1147 (9th Cir. 2008)......................................................................8

*Off. of Senator Mark Dayton v. Hanson*,
    550 U.S. 511 (2007) .....................................................................................7

*Pac. Shores Props., LLC v. City of Newport Beach*,
    730 F.3d 1142 (9th Cir. 2013)....................................................................16

*Pers. Adm'r of Mass. v. Feeney*,
    442 U.S. 256 (1979) ...................................................................................17

*Potrero Hills Landfill, Inc. v. County of Solano*,
    657 F.3d 876 (9th Cir. 2011)................................................................ 33, 34

*Protectmarriage.com-Yes on 8 v. Bowen*,
    752 F.3d 827 (9th Cir. 2014).....................................................................27

*Roe v. Critchfield*,
    137 F.4th 912 (9th Cir. 2025) ......................................................................8

*R.R. Comm'n of Tex. v. Pullman Co.*,
    312 U.S. 496 (1941) ...................................................................................33

*Smelt v. County of Orange*,
    447 F.3d 673 (9th Cir. 2006)................................................................. 34, 35

*Stormans, Inc. v. Wiesman*,
    794 F.3d 1064 (9th Cir. 2015).....................................................................25

*Tingley v. Ferguson*,
    47 F.4th 1055 (9th Cir. 2022) ....................................................................25

iv

*United States v. Holtzman,*
762 F.2d 720 (9th Cir. 1985).................................................................32

*United States v. Navarro,*
800 F.3d 1104 (9th Cir. 2015)..............................................................28

*United States v. Rahimi,*
602 U.S. 680 (2024) ...........................................................................5, 6

*United States v. Skrmetti,*
605 U.S. 495 (2025) ....................................................................... 16, 17

*Vivid Ent., LLC v. Fielding,*
774 F.3d 566 (9th Cir. 2014).............................................................30

*Ward v. Rock Against Racism,*
491 U.S. 781 (1989) ...........................................................................21

**Statutes and Rules**

Ala. Code § 22-9A-19 ................................................................................4

Ark. Code § 20-18-307..............................................................................4

A.R.S. § 25-325 .......................................................................................19

A.R.S. § 25-806 .......................................................................................19

A.R.S. § 36-301(2).................................................................................10

A.R.S. § 36-301(6).................................................................................10

A.R.S. § 36-337(A)......................................................... 2, 3, 4, 16, 19, 20

A.R.S. § 36-337(A)(3) ......................................................................passim

A.R.S. § 36-337(A)(4) ......................................................................passim

Fed. R. Civ. P. 65................................................................................ 30, 31

Ga. Code § 31-10-23..................................................................................4

Ky. Rev. Stat. § 213.121 ............................................................................4

La. Stat. § 40:62 .......................................................................................4

Mo. Ann. Stat. § 193.215 ........................................................................4

Neb. Rev. Stat. § 71-604.01 .....................................................................4

Wis. Stat. § 69.15 .....................................................................................5

**Regulations and Other Authorities**

A.A.C. R9-19-103 ....................................................................................22

A.A.C. R9-19-201(A)(3)(a) ......................................................................15

A.A.C. R9-19-207 ....................................................................................10

A.A.C. R9-19-208 ....................................................................... 10, 12, 22

A.A.C. R9-19-208(O) ............................................... 1, 5, 9, 17, 18, 22, 24

New Oxford American Dictionary (3rd ed. 2010) ..........................................14

**INTRODUCTION**

The Answering Brief demonstrates that Plaintiffs would like to amend the sex marker on their Arizona birth certificates without having to obtain a court order. This case is not the right vehicle to accomplish that goal.

Plaintiffs pursued only a narrow facial challenge to A.R.S. § 36-337(A)(3) ("(A)(3)") and its implementing regulation ("208(O)"). That choice has consequences. The bar for a facial challenge is quite high, and Plaintiffs failed to meet it because they conceded that (A)(3) has at least two constitutional applications.

Plaintiffs may raise legitimate concerns about the challenges faced by transgender people without congruent identity documents and the logistical requirements of Arizona's process. But Plaintiffs did not challenge A.R.S. § 36-337(A)(4) ("(A)(4)"), which requires the Director to amend a birth certificate upon receipt of a court order to do so. Nearly all of Plaintiffs' concerns are traceable to that unchallenged process or to the actions of persons incorrectly applying (A)(4). Problems with the text or application of (A)(4) cannot help Plaintiffs meet their burden on a facial challenge to (A)(3), which neither prevents any transgender person from obtaining a birth

1

certificate with an amended sex marker nor requires undergoing a surgical procedure to do so.

The district court conflated the narrow facial challenge Plaintiffs did file with a challenge that Plaintiffs perhaps wish they had filed (an as-applied challenge to Arizona's broader statutory scheme). That was error. The district court should have held Plaintiffs to their heavy burden and granted summary judgment in favor of the Director. This Court should reverse.

## ARGUMENT

### I. Arizona does not have a surgical requirement.

Plaintiffs' case below relied on the fallacy that transgender Arizonans must either "undergo a sex change operation" or live with birth certificates incongruent with their gender identity. Plaintiffs double down on this position throughout their Answering Brief, so a refresher on the actual textual requirements is warranted.

### A. Section 36-337(A) requires the Director to act when she receives certain evidentiary documents.

The Director clearly explained Arizona's vital records laws in her Opening Brief (Dir. OB) (at 5–10). Notably, Plaintiffs don't meaningfully engage with the Director's explanation of the statutory scheme. They just

2

repackage and repeat their "surgical requirement" myth. But repeating something doesn't make it so.

On its face, § 36-337(A) lists four different types of evidentiary documents that trigger the Director's duty to amend a birth certificate. *See* A.R.S. § 36-337(A) (stating the Director "shall amend the birth certificate for a person born in this state when [she] receives any of the following"); Dir. OB at 7. In other words, § 36-337(A) imposes an affirmative duty on the Director; it does not impose any duties or limitations on anyone else.

Contrary to Plaintiffs' framing, § 36-337(A) authorizes two different types of evidentiary documents to support a request to amend a birth certificate's sex marker: (A)(3) authorizes persons who have "undergone a sex change operation" to submit a written physician's verification of said operation, and (A)(4) authorizes all Arizonans to submit a court order. A.R.S. § 36-337(A)(3)–(4). Nothing in the text of § 36-337(A) suggests that (A)(3) is a prerequisite for obtaining a court order under (A)(4). *Id.* And nothing in the text limits the superior court's authority to order amendments under (A)(4)—a superior court judge can order ADHS to amend any field or any field identifier using language appropriate for the circumstances. *See In re McLaughlin v. Swanson*, 476 P.3d 336, 339 ¶ 13 (Ariz. Ct. App. 2020).

3

Put simply, (A)(3) is not a "surgical requirement." Rather, as the plain text and context of (A)(3) make clear, it simply sets out one type of evidentiary document that, when submitted, requires the Director to amend a birth certificate. Dir. OB at 7, 10.

**B.    Comparison to other states' laws shows that (A)(3) is not a "surgical requirement."**

To understand how § 36-337(A) works, it is also important to consider what § 36-337(A) does *not* say. In contrast to many (much more restrictive) state statutes, § 36-337(A) does *not* say that the sex marker on an Arizona birth certificate may be amended only following a surgical procedure or that a surgical procedure is a prerequisite for obtaining a court order. *Compare* A.R.S. § 36-337(A)(3), *with* Ala. Code § 22-9A-19(a), (d) (amendment to a birth certificate's sex field requires court order "indicating that the sex of an individual born in this state has been changed by surgical procedure"), Ark. Code § 20-18-307(a), (d) (same), Ga. Code § 31-10-23(a), (e) (similar), Ky. Rev. Stat. § 213.121(1), (5) (requiring court order and "sworn statement by a licensed physician"), La. Stat. § 40:62 (requiring court order and proof of surgical procedure), Mo. Ann. Stat. § 193.215(9) (similar), Neb. Rev. Stat. § 71-604.01 (requiring "notarized affidavit from the physician that

4

performed sex reassignment surgery" and court order), *and* Wis. Stat. § 69.15(4)(b) (similar).

Plaintiffs and amici frame their arguments as a challenge to that kind of restrictive statute. The district court erred by uncritically accepting that framing because Arizona's statute is simply different. That error infects the district court's whole analysis.

## II. Plaintiffs bring a facial challenge to (A)(3), and don't meet their burden on such a claim.

### A. Section (A)(3) has constitutional applications.

For Plaintiffs to prevail on their facial challenge—the "most difficult challenge to mount successfully"—they are required to "establish that no set of circumstances exist[] under which [(A)(3) and 208(O)] would be valid." *United States v. Rahimi*, 602 U.S. 680, 693 (2024) (quotation omitted). Yet nowhere in their brief do Plaintiffs even identify the requisite burden.

Perhaps that is because (A)(3) has numerous constitutional applications. For example, applicants who *have* received a sex change operation can present the evidentiary documents authorized by (A)(3) to amend their birth certificates. Undisputed record facts show that the Director takes a flexible approach to what constitutes a sex change operation

5

(including, for example, chest masculinization surgery). *See* 3-DirectorER-305:12–306:1, -325:18–326:13; *see also Beatie v. Beatie*, 333 P.3d 754, 759–60 ¶ 25 (Ariz. Ct. App. 2014) ("Arizona's statute does not require specific surgical procedures be undertaken . . . .").

(A)(3) is also constitutional as an optional alternative to, rather than a prerequisite for, obtaining a court order to amend the sex field on one's birth certificate under (A)(4). Undisputed evidence confirms that transgender Arizonans have obtained court orders under (A)(4) regardless of any medical procedure. 2-DirectorER-087–88 ¶¶ 2, 7–8; 3-DirectorER-351:10–16, -351:21–352:7, -358:2–20; 4-DirectorER-713 ¶ 7.

Plaintiffs hinge their entire challenge on an outdated misreading of (A)(3) and (A)(4) and their misapplication in some of the individual plaintiffs' cases. But Plaintiffs cannot succeed on a facial challenge by twisting the words of a statute to their most constitutionally suspect interpretation, especially when that interpretation fails as a matter of basic statutory interpretation. *See, e.g., Rahimi*, 602 U.S. at 701 (courts must consider circumstances in which challenged laws are most likely to be constitutional, not slay "a straw man" by imagining the most unconstitutional scenarios).

6

Further, it is "established practice" that statutes should be interpreted to avoid constitutional difficulties. *Off. of Senator Mark Dayton v. Hanson*, 550 U.S. 511, 514 (2007). The district court did not do so: In addition to adopting Plaintiffs' exceedingly restrictive interpretation of (A)(3), it overlooked the record and Arizona case law, both of which demonstrate that (A)(4) operates to grant the relief Plaintiffs seek. *See* 2-DirectorER-088 ¶ 7; 4-DirectorER-713 ¶ 7; *McLaughlin*, 476 P.3d at 339 ¶ 13. That approach flouted this Court's precedent, which required the district court to "follow the decisions of the state's intermediate courts" absent "convincing evidence that the highest court of the state would decide differently." *In re Kirkland*, 915 F.2d 1236, 1239 (9th Cir. 1990) (citation omitted). No convincing evidence exists that the Arizona Supreme Court would adopt the understanding of (A)(3) advanced by Plaintiffs and the district court.

Plaintiffs also cannot ignore undisputed record evidence that undermines their facial challenges. The record shows that constitutional applications of (A)(3) are not only possible, but commonplace.

For nearly a decade, the Director has accepted court orders under (A)(4) to amend the sex field without any doctor's attestation of a sex change operation. *See* 2-DirectorER-088 ¶ 7; 3-DirectorER-315:12–16, -351:21–352:7;

7

3-DirectorER-421–31; 4-DirectorER-713 ¶ 7.  Meanwhile, under (A)(3), the Director has accepted doctors' attestations of significantly less invasive surgical procedures than those Plaintiffs allege (A)(3) requires — without the need for a court order.  *See* 3-DirectorER-305:12–306:1, -325:18–326:13. Additionally, amendments to "nonbinary" have been processed via (A)(4). 2-DirectorER-087–88 ¶ 2; 3-DirectorER-358:2–20.  These undisputed facts fatally undermine Plaintiffs' theory that (A)(3) imposes a rigid surgical requirement for changing the sex field on one's birth certificate.  And as constitutional applications of (A)(3), they sink Plaintiffs' facial challenge. *See Roe v. Critchfield*, 137 F.4th 912, 924–25 (9th Cir. 2025).

### B.    The named Plaintiffs' individual experiences are insufficient to prevail on a facial challenge.

Instead of attempting to meet their burden under the required facial challenge standards, Plaintiffs cite individual experiences of named Plaintiffs.  That does not suffice for a facial challenge.  *See Lanier v. City of Woodburn*, 518 F.3d 1147, 1150 (9th Cir. 2008) (identifying plaintiff's burden on facial challenge to show law is invalid in all circumstances).

This is a substantive point, not a mere technicality.  Because Plaintiffs abandoned their as-applied challenge, the district court necessarily did not

consider whether one or more of the named Plaintiffs' rights were violated by how Arizona law was applied to them. *See* 4-DirectorER-605 & n.4. The individualized facts Plaintiffs cite, *see generally* Answering Br. ("AB") at 17–18, 67–68, lack the completeness that would come from a full adversarial contestation of those facts, or a fact-finding effort by the district court to weigh them.

If this were an as-applied challenge, this Court would have to consider Plaintiffs' individual experiences and the fact-bound questions they raise. But it's a facial challenge, so this Court can set aside Plaintiffs' individual experiences as the red herring they are. *Cf. Calvary Chapel Bible Fellowship v. County of Riverside*, 948 F.3d 1172, 1176 (9th Cir. 2020) ("As this is a facial challenge, we consider only the text of the zoning ordinance, not its application.").

## III. Plaintiffs' Equal Protection challenge fails.

The district court should have granted summary judgment for the Director on Plaintiffs' Equal Protection claim because (A)(3) and 208(O) do not discriminate against the Plaintiff class or draw any suspect classifications on their face, and the evidentiary documents authorized by (A)(3) are

rationally related to the State's legitimate interest in preventing fraud and ensuring the accuracy of birth certificates. *See* Section V.A, below.

## A. Section (A)(3) does not treat transgender people differently than non-transgender people.

Plaintiffs allege that "[w]hen it comes to changing the sex listed on an individual's birth certificate, Arizona law treats transgender and non-transgender people differently." AB at 27. No, it doesn't.

In an effort to create an equal protection problem, Plaintiffs compare the correction process found in A.A.C. R9-19-207 with the amendment process found in A.A.C. R9-19-208. *See* AB at 10–12, 27, 34–35, 65–66. But corrections and amendments are *different things*. *Compare* A.R.S. § 36-301(2) ("'Amend' means to make a change, other than a correction, to a registered birth certificate by *adding, deleting or substituting* information . . . .") (emphasis added), *with* § 36-301(6) ("'Correction' means a change made to a registered certificate because of a *typographical error . . . .*") (emphasis added).

The correction process applies equally to every Arizonan. Any Arizonan, whether cisgender, transgender, intersex, or nonbinary, can use the correction process in A.A.C. R9-19-207 to correct a typo on their birth certificate. And no Arizonan, whether cisgender, transgender, intersex, or

10

nonbinary, can use the correction process for any other purpose. The correction process does not treat anyone unequally.

In any event, this case is about amendments, not corrections. Plaintiffs do not contend that the sex marker on their birth certificates is incorrect because of a typo. To the contrary, Plaintiffs acknowledge that the sex field on an Arizona birth certificate documents a medical professional's assessment of the person's external genitalia at the time of birth. 2-DirectorER-127 at ¶ 1. Plaintiffs also acknowledge that a person's gender identity is "internal" and therefore cannot be known or observed at birth. *Id.* ¶ 3; 2-DirectorER-089 ¶ 9 ("[W]hen the sex field is completed on a birth certificate, the baby's gender identity is not yet known.").

Rather, Plaintiffs want to change the sex marker on their birth certificates because their gender identity is incongruent with their sex assigned at birth. That's an amendment: Plaintiffs want to delete the sex marker associated with their sex assigned at birth and substitute a sex marker that reflects their lived gender identity. *See* 2-DirectorER-127 ¶ 7.

The appropriate question, then, is whether the *amendment* process treats transgender people differently than non-transgender people. It does not.

11

Plaintiffs claim that transgender people must "submit a physician's written statement that they have 'undergone a sex change operation'" in order to change the sex listed on their birth certificate. AB at 27 (citation omitted). That's just not true. Transgender people may change the sex marker on their birth certificate via court order, without any such statement. *See* 2-DirectorER-088 ¶ 7.

The court order process, which Plaintiffs did not challenge, is available to every Arizonan—there are no restrictions or limitations. *See* A.R.S. § 36-337(A)(4); A.A.C. R9-19-208(B). And, as explained above, there is no basis in the plain text of (A)(3) to conclude that (A)(3) is a prerequisite for (A)(4). Rather, the text makes clear that the evidentiary documents outlined in (A)(3) are an *alternative* to a court order under (A)(4).

Plaintiffs take issue with the (A)(4) court order process. But they didn't challenge it. Nor can they use problems with the application of (A)(4) as a basis to invalidate (A)(3) on its face. For example, the fact that some Arizona trial courts have incorrectly read (A)(3) as applying to the court order process is irrelevant because a trial court's failure to properly apply a law does not render that law facially unconstitutional. *See Calvary Chapel*, 948 F.3d at 1177.

12

### B. Section (A)(3) does not classify based on sex or transgender status.

In direct contravention of the record, Plaintiffs now claim that *only* transgender individuals are affected by the statute.[1]  *See* AB at 27, 30. Plaintiffs did not dispute below that intersex individuals are capable of obtaining a sex change operation and accordingly waived such claim.  *See* 2-DirectorER-090 ¶ 14.  Plaintiffs' arguments to the contrary—made for the first time on appeal—should thus be disregarded.  *See Fry v. Melaragno*, 939 F.2d 832, 835 (9th Cir. 1991).

But even analyzing Plaintiffs' claim, it proves incorrect.

Plaintiffs say that "the statutory phrase 'sex change operation' is fundamentally inapt" for intersex people.  AB at 30.  Arizona law does not define the term "sex change operation."  When a statutory term is undefined, courts look to dictionaries to determine its ordinary meaning. *E.g.*, *California*

---

[1] Plaintiffs argue that because no expert testimony was presented on the subject, the question of whether intersex individuals can obtain a sex change operation should—for inexplicable reasons—be resolved in their favor.  AB at 31.  Whether intersex individuals can receive a sex change operation was not at issue below *because Plaintiffs did not dispute it*.  2-DirectorER-090 ¶ 14.  Plaintiffs cannot concede a basic factual point central to their claims and then, on appeal, highlight any alleged failure by the Director to provide additional support for that undisputed fact as operating in their favor.

*v. Trump*, 963 F.3d 926, 944 (9th Cir. 2020). The district court undertook no statutory interpretation below; it simply adopted Plaintiffs' (mis)reading of the statute.

The ordinary meaning of "a person who has undergone a sex change operation" is someone who has experienced an act of surgery to change their physical sexual characteristics. *See* Sex change, New Oxford American Dictionary (3rd ed. 2010) (defining "[s]ex change" as "a change in a person's physical sexual characteristics, typically by surgery and hormone treatment"); Operation, *id.* (defining "[o]peration" as "an act of surgery performed on a patient"). Plaintiffs argue that although "intersex people may undergo procedures to address ambiguous or atypical sex characteristics, these procedures are not 'sex change operations.'" AB at 30. Respectfully, that doesn't make sense. Any surgical procedure that changes a person's physical sexual characteristics is a "sex change operation" under the ordinary meaning of that phrase. Arizona courts have confirmed that (A)(3) "does not require specific surgical procedures be undertaken or obligate the applicant to forgo procreation." *Beatie*, 333 P.3d at 759 ¶ 25.

Consider a hypothetical person—Jordan Doe. Jordan is born with congenital adrenal hyperplasia, elements of both male and female external

genitalia. Doc. 231-2 ¶ 41 (Expert Report of Dr. Daniel Shumer, MD, MPH). The sex field on Jordan's birth certificate says "not yet determined." *See* A.A.C. R9-19-201(A)(3)(a). Jordan does not have any surgical procedures on their external genitalia until age 21, when they undergo surgery to remove elements of male external genitalia. Jordan then wants to change the sex marker on her birth certificate from "not yet determined" to "female." Under the plain language of (A)(3), Jordan would have "undergone a sex change operation" and could submit a written amendment request and written physician's verification of the operation to the Director. The Director would then be required to amend Jordan's birth certificate under (A)(3). Plaintiffs have never contended that such an application of (A)(3) is unconstitutional.

Plaintiffs also say that "a law draws a facial classification when it 'discriminates against individuals on the basis of criteria that are *almost exclusively* indicators of membership in the disfavored group.'" AB at 29 (quotation modified). Not quite. Their cherry-picked quote is from a discussion about whether "plaintiffs who allege disparate treatment under statutory anti-discrimination laws" are required to "demonstrate the existence of a similarly situated entity who or which was treated better than

the plaintiffs in order to prevail." *Pac. Shores Props., LLC v. City of Newport Beach*, 730 F.3d 1142, 1158 (9th Cir. 2013). This case isn't about how Plaintiffs were treated in comparison to another group. It's about the text of (A)(3) and whether that text, on its face, draws an unconstitutional classification. Of course, Plaintiffs don't really explain how *the text* of (A)(3) discriminates against transgender people; they just rely on the fallacy that it imposes a "surgical requirement" to amend the sex marker on an Arizona birth certificate.

Plaintiffs' premise is flawed—Section (A)(3) requires the Director to accept an alternative evidentiary document "for a person who has undergone a sex change operation or has a chromosomal count that establishes the sex of the person as different than in the registered birth certificate." This alternative path does not discriminate against transgender people. It does not say that transgender people may only amend their birth certificates by undergoing surgery. *See* A.R.S. § 36-337(A).

Neither is (A)(3) an attempt to "circumvent the Equal Protection Clause by writing in abstract terms," as Plaintiffs suggest. AB at 28 (quoting *United States v. Skrmetti*, 605 U.S. 495, 514 (2025)). Any classification in (A)(3) can be "plausibly explained on a neutral ground"—it applies to people who

have undergone certain medical procedures that establish their sex as different from the sex listed on their birth certificate. *See Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 275 (1979). Section (A)(3) "does not mask sex-based classifications" because it "does not prohibit conduct for one sex that it permits for the other." *Skrmetti*, 605 U.S. at 514–15. Neither does (A)(3) classify on the basis of gender identity. Indeed, persons of "*any* sex" or gender identity may "undergo[] a sex change operation." *Id.* at 515; A.R.S. § 36-337(A)(3).

Trying to distinguish *Skrmetti*, Plaintiffs say that "the group of people [who] would seek a 'sex change operation' under Section (A)(3) includes *only* transgender people." AB at 33. No, it doesn't—that claim is belied by Plaintiffs' own concession below that intersex people may also seek out a "sex change operation." 2-DirectorER-090 ¶ 14. That concession clearly establishes that any classification in (A)(3) is one based on medical use, not one based on sex or transgender status.

## IV.   Plaintiffs' Due Process challenge fails.

The district court erred when it concluded that (A)(3), on its face, violates Plaintiffs' due process rights. Plaintiffs claim that (A)(3) and 208(O) burden their right to informational privacy; their right to individual liberty

17

and autonomy; and their right to choose whether to undergo a particular medical treatment. Even assuming those rights exist and apply here, (A)(3) does not burden them. On their face, (A)(3) and 208(O) do not force Plaintiffs to disclose anything, undergo any medical procedure, or define or express their identity other than how they wish—they require the *Director* to amend a birth certificate under specified circumstances.

### A. Section (A)(3) is not a surgical requirement, and Plaintiffs' problems with the court order process do not render (A)(3) facially unconstitutional.

According to Plaintiffs, (A)(3) and 208(O) "put Plaintiffs to an impossible choice . . . between undergoing medically inappropriate, unnecessary, unaffordable, or even illegal surgery, or subjecting themselves to the constant risk of dangerous exposure from having identity documents that disclose their transgender status." AB at 58–59. For any of Plaintiffs' arguments to make sense, the Court would have to pretend that (A)(3) is the only way to amend the sex marker on an Arizona birth certificate. That is just not the case—as already discussed *supra* Section I.A, the (A)(4) court order process exists and is available to everyone. Any member of the Plaintiff class can obtain a birth certificate that is consistent with their gender

18

identity by presenting the Director with a court order ordering her to amend the birth certificate, without proof of any surgical procedure.

Plaintiffs also catalog a litany of alleged problems with the (A)(4) court order process. *See* AB at 14 (identifying "prepar[ing] a court petition, pay[ing] a fee, [and] fil[ing] it with the court" as unduly burdensome). Again, though, they did not challenge that process, facially or as-applied to them, so any problems with the (A)(4) process are simply not relevant to the questions before the Court.

Even so, these arguments are meritless. These anodyne requirements apply to essentially all instances in which individuals seek to amend vital records. *See, e.g.*, A.R.S. § 25-325 (restoring one's maiden name after divorce); *id.* § 25-806 (settling paternity). Further, as Plaintiffs admit, all of this can be accomplished through a confidential process.[2] *See* AB at 14.

Plaintiffs seem to argue that (A)(4) does not authorize sex marker changes because (A)(3) is the only part of § 36-337(A) that mentions the "sex

---

[2] Insofar as a court denies an individual's request to seal records, that decision can be challenged on an individual basis. Nor do Plaintiffs challenge the specific parameters of obtaining an amendment pursuant to (A)(4).

19

of the person." AB at 64–65. Arizona law disagrees: considering whether the superior court could order ADHS to amend the field identifiers on a birth certificate in *McLaughlin*, the court said that if the Legislature had "intended to limit the amendments referenced in [§ 36-337(A)] to name changes, it could have done so." 476 P.3d at 338 ¶ 9.

The same is true here. If the Legislature had intended to limit amendments to the sex field, it could have done so, but it did not. Rather, as the *McLaughlin* court recognized, "the plain language of the statutory scheme establishes that a trial court may order ADHS," in amending birth certificates, "to use whatever terms the court deems appropriate in the circumstances." *Id.* "In sum, our legislature has given trial courts general authority to order ADHS to amend birth certificates," and "[n]othing in the statutory scheme preclude[s]" the trial court from ordering ADHS to amend the sex marker on Arizona birth certificates. *Id.* at 339 ¶ 13. It doesn't matter that some trial courts have misunderstood (A)(3) as a prerequisite for an order under (A)(4). As explained ad nauseum, there is no basis in the plain text of (A)(3) and (A)(4) for that interpretation. The proper remedy for these alleged misapplications is an appeal in the specific case at hand, not the facial challenge to (A)(3) Plaintiffs bring here.

20

Plaintiffs repeatedly highlight that "despite its contrary statements in this appeal, ADHS has previously taken the public position that Arizona courts lack the authority under Section (A)(4) to issue orders amending the sex listed on an Arizona birth certificate unless the individual has undergone surgery." AB at 15; *see also id*. at 25, 65. But Plaintiffs argue with ghosts. It is undisputed that under the current state of affairs, individuals may obtain a change to the gender on their birth certificate through obtaining a court order pursuant to (A)(4). The Director has identified this position as "legally correct" since 2017. 3-DirectorER-428–30. Plaintiffs' insistence that outdated facts control here should not be given credence by this Court.

Plaintiffs cite *Ward v. Rock Against Racism*, 491 U.S. 781, 795–96 (1989), for the proposition that courts should consider "administrative interpretation and implementation of a statute or regulation" in the context of a facial challenge. AB at 68 n.18. This argument cuts *against* Plaintiffs: There is undisputed evidence in the record that the Director has processed amendments to the sex field pursuant to a court order without proof of any surgical procedure. 2-DirectorER-087–88 ¶¶ 2, 7–8; 3-DirectorER-351:10–16, -351:21–352:7, -358:2–20; 4-DirectorER-713 ¶ 7. The contrary evidence Plaintiffs cite predates the 2017 Administrative Law Decision concluding

21

that ADHS was required to amend birth certificates pursuant to a court order under (A)(4) without the documentation listed under (A)(3). *Compare* 3-SER-712–19 (filed February 15, 2017), *with* 3-DirectorER-422–429 (affirming ALJ order on July 24, 2017). Plaintiffs offer no subsequent evidence of the Director or ADHS adopting a contrary position. The Director's "interpretation and implementation" of (A)(4) for the last nine years thus demonstrate that (A)(3) is not a prerequisite to the (A)(4) process. If Arizona trial courts have taken a different position, their error is not traceable to the Director or to the text of (A)(3).

**B.** **Section (A)(3) does not burden any fundamental rights.**

Plaintiffs claim that (A)(3) "foreclose[es] access to ADHS's private administrative process to change the sex marker on their birth certificates," and that it therefore "forces transgender people to disclose their transgender status when they present an inaccurate identity document." AB at 52. It doesn't. As explained, (A)(3) does not create any "private administrative process"—the administrative process for all amendment requests is the same. *See* A.A.C. R9-19-103; *compare id.* R9-19-208(B), *with* -208(O). If a class member has an inaccurate birth certificate, that is not caused by the text of (A)(3); it is caused by their choice not to pursue an amended birth certificate

22

under (A)(4) or by an Arizona court's erroneous (and appealable) decision to deny an amendment request based on (A)(3).

Section (A)(3) does not force the disclosure of Plaintiffs' identity nor does it force any person to undergo any surgical procedure. Any Arizonan may obtain an amended birth certificate without any "surgical requirement" by presenting the Director with a court order ordering her to amend the sex marker on their birth certificate. It is undisputed that the Director has processed many such amendment requests. 2-DirectorER-088 ¶ 7. If Plaintiffs don't want to use that process, their choice does not create a constitutional problem with (A)(3). And for those members of the Plaintiff class whose petitions to amend their birth certificates were denied by superior court judges, their inaccurate identity documents are traceable to the erroneous (and appealable) decisions of those superior court judges.

Again, if the Legislature wanted to say that only persons who have undergone surgical procedures may change the sex marker on their Arizona birth certificate, it could have said so. But it did not. Instead, it created a broad path for amendments to all fields by requiring the Director to amend birth certificates upon receipt of a court order. And it required the Director

23

to accept alternative documentation from persons who have undergone a sex change operation.

## V. The challenged provisions are subject to at most rational basis review, and satisfy both rational basis review and heightened scrutiny.

For the reasons above, (A)(3) and 208(O) are facially neutral provisions with constitutional applications. Plaintiffs' facial challenge thus fails at the doorstep. But even if the Court were to find that (A)(3) and 208(O) are subject to any form of constitutional scrutiny, rational basis review applies, because the challenged provisions are neutral and generally applicable.

Laws satisfy rational basis review if there is "any reasonably conceivable state of facts that could provide a rational basis for the classification." *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993). And although not the appropriate standard of review, heightened scrutiny considers whether a challenged provision "serve[s] important governmental objectives" and is "substantially related to achievement of those objectives." *Doe v. Horne*, 115 F.4th 1083, 1106 (9th Cir. 2024) (citation omitted).

The state has legitimate and important interests in preventing fraud and ensuring the accuracy of vital records—interests which are directly

24

furthered by the challenged provisions. The challenged provisions thus satisfy not only rational basis review but also heightened scrutiny.

### A. The challenged provisions are subject to rational basis review at most.

Neutral and generally applicable laws are subject to rational basis review. *See Stormans, Inc. v. Wiesman*, 794 F.3d 1064, 1084 (9th Cir. 2015). The challenged provisions are both neutral and generally applicable.

The test for neutrality looks first to whether the law was passed with a discriminatory purpose, and second to whether the text of the law is neutral on its face. *See Tingley v. Ferguson*, 47 F.4th 1055, 1085 (9th Cir. 2022). As the district court found (and Plaintiffs do not contest), (A)(3) was not passed with a discriminatory purpose. *See* 1-DirectorER-9 ("[T]he legislature clearly intended to provide a carved-out exception for transgender Arizonans to amend their birth certificates."). And for the reasons explained in Section III.B, the text of the law is neutral on its face.

The challenged provisions are also generally applicable. Laws are generally applicable unless they "invite[] the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions." *Fulton v. City of Philadelphia*, 593 U.S. 522, 533

25

(2021) (quotations omitted) (cleaned up). The challenged provisions contain no such exemption, and apply to all individuals seeking to amend—rather than correct—the sex field on their birth certificates.

**B.** **The challenged provisions survive rational basis review because they advance Arizona's legitimate interest in fraud prevention and accurate record-keeping.**

A "statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *F.C.C.*, 508 U.S. at 313. Arizona has a rational basis for the extant regime on two fronts: preventing fraud and maintaining the integrity and accuracy of birth records.

Arizona has a legitimate interest in fraud prevention. *See, e.g., Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 194–96 (2008). Plaintiffs' assertions about a lack of fraud, AB at 40, are of no moment because Arizona can enact laws to prevent fraud "without waiting for it to occur." *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 686 (2021).

Contrary to Plaintiffs' representations, AB at 40, the Director has also repeatedly emphasized the State's interest in preserving the accuracy of vital

26

records over the course of this litigation. *See, e.g.*, Doc. 256 at 14; Doc. 243 at 16; Doc. 230 at 21–23. Courts have established the legitimacy of these interests. *See Gore v. Lee*, 107 F.4th 548, 560–61 (6th Cir. 2024) (protecting the integrity and accuracy of vital records is "a legitimate State interest."); *see also Protectmarriage.com-Yes on 8 v. Bowen*, 752 F.3d 827, 833 (9th Cir. 2014) (identifying the state's interest in "accurate record-keeping").

Plaintiffs argue that "ADHS's appeal to an interest in maintaining accurate records is self-contradictory and provides no basis to justify Section (A)(3)." AB at 37. As Plaintiffs (and various state amici[3]) understand it, accuracy is furthered when records correctly identify the gender marker on an individual's birth certificate.

But Plaintiffs misconstrue the Director's position. It is not the Director's position that the sex marker on a birth record should conflict with a transgender person's gender identity. Rather, it is the Director's position that birth certificate amendment requests should be supported by an

---

[3] *See* Dkt. 49, Amicus Brief of California, et al. in Support of Plaintiffs-Appellees at 7–15.

appropriate evidentiary document.  Section (A)(3) outlines one such evidentiary document but does not close the door to others.

Under rational basis review, "all that is needed is some 'rational connection' between the rule and the governmental interest, regardless of whether that rule is an 'exact fit' for the interest at issue."  *United States v. Navarro*, 800 F.3d 1104, 1114 (9th Cir. 2015) (quotations omitted).

The challenged provisions more than clear this bar.  For the reasons above, Arizona has a legitimate interest in preventing fraud and ensuring the accuracy of vital records.  And the challenged provisions *are* an exact fit for Arizona's interest in maintaining accurate vital records.  The challenged provisions merely ensure that individuals seeking to obtain an amendment submit an evidentiary document, which, as described above, does not infringe upon their fundamental rights.

Accordingly, if the Court elects to undertake judicial review of the constitutionality of the challenged provisions, the Court should find that they satisfy rational basis review.

## C.  Even if heightened scrutiny applies, (A)(3) survives.

Although heightened scrutiny is not the appropriate standard of review, the challenged provisions satisfy that standard as well.  "To

28

withstand heightened scrutiny, a classification 'must serve important governmental objectives and must be substantially related to achievement of those objectives.'" *Horne*, 115 F.4th at 1106 (citation omitted).

Arizona's interest in maintaining accurate vital records is an important one, as identified above. And the challenged provisions directly serve that objective. This is demonstrated by the fact that the challenged provisions reflect—and are even more liberal than—the language provided in the National Center for Health Statistics' Model State Vital Statistics Act. *See* 3-DirectorER-399 § 21(d). That Act was explicitly promulgated to facilitate the uniform gathering of vital statistical data across states. Laws reflecting the Model Act are thus self-evidently connected to the purpose of maintaining uniform vital records: indeed, enacting legislation in keeping with the Model Act is likely the *best* way for states to meet the objective of accurately maintaining vital records.

The challenged provisions thus satisfy not only rational basis review, but also the more demanding standard of heightened scrutiny.

## VI. The permanent injunction is deeply flawed.

The district court erred on two fronts in issuing the permanent injunction. First, the injunction rewrites Arizona law. Second, the injunction

fails to provide the Director with guidance on how to adhere to its terms, violating Federal Rule of Civil Procedure 65.

### A.     The permanent injunction improperly rewrites state law.

It is a foundational principle of jurisprudence that a court cannot rewrite a statute. *See Ayotte v. Planned Parenthood*, 546 U.S. 320, 329 (2006). The injunction does exactly that. Contrary to Plaintiffs' assertions that enjoining enforcement of the word "operation" constitutes properly severing an offending provision, AB at 72–73, the district court's injunction rewrites state law to provide a form of relief never contemplated by the legislature.

Section (A)(3), as laid out above, does not serve as a bar to the relief that Plaintiffs seek. But it does, in its unaltered form, provide *one* avenue for Plaintiffs to obtain a change to their birth certificates. In mandating that the Director now grant amendments to individuals who have obtained an undefined "sex change," the permanent injunction creates a novel affirmative benefit. But this Court has long held that "only legislatures ought to make positive law." *Vivid Ent., LLC v. Fielding*, 774 F.3d 566, 573 (9th Cir. 2014). If the court itself did not define what constitutes a "sex

30

change," it follows that no Arizona legislator could have enacted a provision granting relief on that amorphous basis.

### B. The permanent injunction subjects the Director to the threat of contempt proceedings for failing to honor amendment requests supported by indeterminate criteria.

Although Arizona law does not define a "sex change operation," (A)(3) nevertheless provides workable standards by which physicians and patients can provide supporting documentation in order to obtain the amendments they seek. Under the extant regime, amendments have been processed for requests accompanied by documentation demonstrating that an individual has undergone an "operation or a surgery that changed the sex of the individual from what it was at the time of birth to what it is now." 3-DirectorER-305:22–306:01.

But the permanent injunction effectuates an unworkable regime that, by its own terms, leaves the Director with no guidance as to what constitutes a "sex change." *See* 1-DirectorER-010 (identifying the decision of what constitutes a sex change as determinable exclusively by "patients and . . . physicians"). This alleged solution falls far short of "specifically" describing the "acts restrained or required" in "reasonable detail," as required by Federal Rule of Civil Procedure 65. Fed. R. Civ. P. 65(d).

31

The injunction places the Director at risk of contempt if the district court determines that she has failed to comply with an order that deliberately leaves key terms undefined. *See* 1-DirectorER-10. For example, does a letter attesting that a patient has begun hormone blocking therapy meet the criteria? How about a letter from a physician expressing that the applicant has the desire to change their gender expression, without any medical intervention? If so, why are physicians being charged with determining the scope of state law? The vagueness of the injunction places the Director in an impossible position, threatened with contempt proceedings for denying amendment requests that, under the express terms of the injunction, do not contain any meaningful criteria for determining their validity.

Because the injunction is "so vague that [it has] no reasonably specific meaning," the Court should vacate it. *United States v. Holtzman*, 762 F.2d 720, 726 (9th Cir. 1985). At the very least, the Court should remand and direct the district court to provide more specificity in regards to what documentation the Director must accept.

32

**VII. The district court should have abstained from hearing this state-law case so that it could be resolved by state courts.**

As an alternative to overruling the district court's decision on the merits or its unlawful permanent injunction, this Court should vacate the judgment based on *Pullman* abstention. *See R.R. Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496, 501 (1941). The three conditions of *Pullman* are satisfied here: (1) Plaintiffs' complaint requires resolution of sensitive questions of constitutional law; (2) the constitutional question could be mooted or narrowed by a definitive ruling on the appropriate meaning and application of § 36-337(A); and (3) the possibly determinative issue of state law is unclear. *See Potrero Hills Landfill, Inc. v. County of Solano*, 657 F.3d 876, 888 (9th Cir. 2011).

Plaintiffs do not contest the first condition, but contend the second two conditions are not satisfied because "any state court case regarding the statutory interpretation of Section (A)(4) could not resolve the constitutional issues before this Court" and "Section (A)(3) is not ambiguous." AB at 76. Neither contention holds water, in part because neither contention accurately frames the relevant *Pullman* question.

33

The question under prong two is not whether the constitutional issues Plaintiffs raise could be decided in state court, but whether those issues "could be mooted or narrowed by a definitive ruling on the state law issues." *See Potrero Hills*, 657 F.3d at 888; *Smelt v. County of Orange*, 447 F.3d 673, 679, 681 (9th Cir. 2006). Here, the Arizona appellate courts could rule, for example, that Plaintiffs are not required to present a physician's attestation of a sex change operation to receive a court order ordering a sex field amendment under (A)(4). Indeed, given Arizona case law, the Court of Appeals likely *would* do so. *See McLaughlin*, 476 P.3d at 338 ¶ 9. Further, Plaintiffs are wrong to suggest that Arizona courts cannot decide constitutional issues—they can and routinely do. *See Baker v. Rolnick*, 110 P.3d 1284, 1288 ¶ 18 (Ariz. Ct. App. 2005) (observing that "states have concurrent jurisdiction with the federal courts to enforce rights created by federal law"); *Coleman v. City of Mesa*, 284 P.3d 863, 866 ¶¶ 1–2 (Ariz. 2012) (holding that tattooing is protected speech under the First Amendment and the Arizona Constitution).

As for prong three, the question is not whether the text of (A)(3) is ambiguous, but whether this Court can "predict with any confidence" how the Arizona Court of Appeals or Supreme Court would decide the state law

34

issues. *Smelt*, 447 F.3d at 681 (quotation omitted). The Director maintains that § 36-337(A) already provides Plaintiffs the relief they seek, but Arizona's higher courts have not addressed the questions in this case, so the issue remains uncertain. As with (A)(4), however, Arizona precedent favors Plaintiffs. *See Beatie*, 333 P.3d at 759–60 ¶ 25.

A key point raised in the Director's Opening Brief was that instead of appealing their adverse results to the Arizona Court of Appeals, Plaintiffs chose to bring a class-action facial challenge in federal district court. Dir. OB at 19, 28, 56–60. Plaintiffs gave no answer to this in their Answering Brief, and have failed to explain why they did not first seek that state court relief. This Court should hold that abstention is appropriate under these circumstances.

## CONCLUSION

This Court should vacate the district court's judgment.

35

Respectfully submitted this 27th day of March, 2026.

KRISTIN K. MAYES
 ARIZONA ATTORNEY GENERAL

By */s/   Nathan Arrowsmith*
Nathan Arrowsmith
Lauren Watford
Timothy Horley

OFFICE OF THE ARIZONA
 ATTORNEY GENERAL
2005 N. Central Ave.
Phoenix, AZ 85004
(602) 542-3333
Nathan.Arrowsmith@azag.gov
Lauren.Watford@azag.gov
Timothy.Horley@azag.gov
ACL@azag.gov

*Counsel for Defendant-Appellant
Deborah Johnston*

36

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Circuit Rule 32-1(b) because it contains 6,948 words according to the word-processing system used to prepare the brief.

2. This brief complies with the typeface and typestyle requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in fourteen-point Book Antiqua type style.

Dated this 27th day of March, 2026.


By */s/ Nathan Arrowsmith*

37

## CERTIFICATE OF SERVICE

I certify that I presented the above and foregoing for filing and uploading to the ACMS system which will send electronic notification of such filing to all counsel of record.

Dated this 27th day of March, 2026.

*/s/ Nathan Arrowsmith*